**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

|  |  |
|---|---|
| In re:<br><br><br>THE SISTERS OF ST. ANN<br>d/b/a ANNA MARIA COLLEGE,<br><br><br>Debtor.[1] | Chapter 11<br><br>Case No. 26-40758 |

**DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING SALE
PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTOR'S ASSETS IN ONE OR MORE TRANSACTIONS, (B) SCHEDULING
AN AUCTION AND HEARING TO APPROVE THE SALE(S) AND THE FORM AND
MANNER OF NOTICE THEREOF, (C) ESTABLISHING PROCEDURES RELATING
TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, (D) AUTHORIZING DE MINIMIS SALES OF ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS, AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER
(A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S
ASSETS, IN ONE OR MORE TRANSACTIONS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**

The Sisters of St. Ann d/b/a Anna Maria College, as debtor and debtor in possession in the

above-captioned chapter 11 case (the "College" or the "Debtor"), hereby moves (the "Motion")

pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101–

1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, and 6006-1 of the

Local Rules for the United States Bankruptcy Court for the District of Massachusetts (the "Local

Rules") for entry of: (I) an order, substantially in the form attached hereto as Exhibit A (the "Sale

---

[1] The last four digits of the Debtor's taxpayer identification number are 2060. The Debtor's address is 50 Sunset Lane,
Paxton, MA 01612.

Procedures Order"), (a) approving sale procedures (the "Sale Procedures") in connection with the proposed sale or sales (each a "Sale" and collectively the "Sales") of substantially all of the Debtor's Sale Assets (as defined below) in one or more transactions, (b) scheduling an auction (the "Auction") and a hearing to consider approval of the Sale(s) (the "Sale Hearing") and approving the form and manner of notice thereof, (c) establishing procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale(s), (d) authorizing the Debtor to sell, transfer, or otherwise dispose of Sale Assets with a fair market value of less than $10,000 per transaction (each, a "De Minimis Sale") free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, without further order of this Court, subject to the notice and objection procedures set forth herein, and (e) granting related relief; and (II) an order, substantially in the form attached hereto as Exhibit B (the "Sale Order"), (a) approving the Sale(s) of the Sale Assets (defined below) to the Successful Bidder(s) (as defined herein), free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidder(s), and (c) granting certain related relief. In support of the Motion, the Debtor relies upon and incorporates by reference the *Declaration of Dr. Sean J. Ryan in Support of Chapter 11 Petition and First Day Pleadings* (the "First-Day Declaration"), filed contemporaneously herewith, and respectfully states as follows:

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief

2

requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rules 2002-1, 6004-1, and 6006-1.

## BACKGROUND

2. On June 26, 2026 (the "Petition Date"), the Debtor commenced the above-captioned proceeding by filing a petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"). The Debtor continues to operate its business and manage its property as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. To date, no creditors' committee has been appointed by the Office of the United States Trustee (the "U.S. Trustee") and no trustee or examiner has been appointed in the Chapter 11 Case.

4. As more fully set forth below, the Debtor's primary financial focus in this Chapter 11 Case is to monetize its assets through a process that initially involves a broker-driven marketing effort regarding its real estate assets, culminating in a call for offers to establish the universe of interested purchasers, for all or certain portions of the Debtor's real estate. With those results in hand, the Debtor intends to conduct an auction before this Court for the purpose of determining the highest and best bid or combination of bids for all or any portion of the Debtor's real estate. Upon completion of that auction process, the Debtor will request that the Court enter one or more orders under Section 363 approving and authorizing the sale or sales to the highest bidder or bidders free and clear of all liens, claims, encumbrances and interests, in compliance with the Sale Procedures Order.

5. As that sale process proceeds with the Debtor's real estate and campus, so will efforts to monetize the Debtor's non-real estate assets. That process will be run simultaneously with, and follow largely the same path as, the real estate process but with three notable exceptions.

First, a broker will not be involved in the search for purchasers of the non-real estate assets. Rather, the Debtor will rely on its internal resources and engaged professionals to identify appropriate purchasers for the assets involved. Second, through this Motion, the Debtor has sought authority to consummate certain *de minimis* asset sales, those involving sales of Sale Assets with a value of less than $10,000, without seeking additional Court approval if, after notice to the DIP Lender, the Prepetition Secured Creditor (defined below), the United States Trustee and any statutory committee formed, no objections are received.

6.      Finally, the Debtor has executed a non-binding memorandum of understanding with a purchaser for its nursing program, exclusive of real estate. Once definitive documents are executed a separate motion regarding that transaction will be brought before this Court.

A.      **General Background**

7.      The Debtor is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts, formally known as The Sisters of Saint Ann d/b/a Anna Maria College, a private Catholic institution of higher education located in the Town of Paxton, Worcester County, Massachusetts. The College's campus is situated at 50 Sunset Lane, Paxton, Massachusetts 01612 (the "Campus") and consists of approximately 261.75 acres, including 17 buildings totaling approximately 300,622 square feet of gross building area, the value of which, according to a recent appraisal prepared by BBG, Inc. dated January 7, 2025, has substantial value above the secured debt. The property is zoned GRB (General Residence District B) under the Town of Paxton's zoning regulations and operates as an educational institution by special permit. A detailed description of the Debtor's Assets, including the individual parcels, is set forth below.

8.      The College was founded in 1946 by the Sisters of Saint Ann under a charter granted in 1887 by the Commonwealth of Massachusetts. Originally a women's college, the

4

College opened its doors in September 1946 to its first freshman class. The College moved to its current campus in Paxton, Massachusetts in 1951, and became accredited by the New England Association of Schools and Colleges (now known as the New England Commission of Higher Education, or "NECHE") in 1955. The College transitioned to coeducation in 1973 and opened its graduate division in 1974. In 1980, the Sisters of Saint Ann relinquished the College's existing charter and degree-granting authority to a newly formed, independent Board of Trustees (the "Board").

9.      The College has suffered from a convergence of factors negatively impacting higher education nationwide.  Scholarly studies, including perhaps most notably Carleton College economist Nathan Grawe's book, *Demographics and the Demand for Higher Education*, (Johns Hopkins University Press, 2018), tracks a "demographic cliff" in the numbers of college aged individuals resulting from declining birth rates during the 2007-2009 recession which will result in a 12% drop of 18-21 year olds entering college during 2025-2030. Applying more granular factors, including shifting preferences for urban centers, a higher level of interest in larger universities, increasing unwillingness to take on substantial student debt, as well as factors such as race, ethnicity, geography and family income of those populations that suffered a lesser degree of birthrate decline during the recession period, industry experts including Professor Grawe project that schools like Anna Maria College - a relatively small, regional, tuition dependent college located in New England - are likely to be the most dramatically impacted.

10.      Actual results appear to support the reliability of the industry experts' predictions. A November 5, 2025 report by the Federal Reserve Bank of Boston states as follows: "In the last decade, 32 colleges in New England that offered four-year degrees have closed or merged, including 12 since 2020. Massachusetts has seen 12 schools shut down or merge since 2015, the

most in New England. Vermont is next with 11." *See* https://www.bostonfed.org/news-and-events/news/2025/11/colleges-close-increasing-new-england-higher-education-demographic-trends-community-economic-impact.aspx.  The Massachusetts Department of Higher Education suggests that the data understates the impact of the demographic cliff in Massachusetts, stating: "Between 2014 and 2022, 24 colleges and universities in the Commonwealth have closed or merged with other institutions of higher education or began the process of winding down operations." https://www.mass.edu/strategic/farm.asp.

11.     Tracking industry projections, total enrollment at the College as of fiscal year end 2021 peaked at approximately 1,853; however, enrollment had declined to approximately 1,520 for FYE 2025 and 1,529 in FYE 2026. During that same time period, the College, like many similarly demographically challenged industry participants, attempted to boost enrollment through increasing its discount rate - the percentage difference between the published base tuition rate and the amount actually charged to students - from 54% to 60%. The reduced per-student revenues, however, only resulted in a modest enrollment boost in the 2025-2026 academic year of a mere nine students after a steady five year downward trend resulting in an approximately 18% decrease in enrollment.

12.     The consequences to a tuition-dependent college like Anna Maria resulting from steady enrollment decline were significant. As of June 30, 2025, the College's independent auditors expressed substantial doubt about the College's ability to continue as a going concern in their report dated April 13, 2026. Recently, the College experienced accelerating operating losses, suffering net *losses* from operations of -$7,525,969 in fiscal year 2025 and -$4,631,060 in fiscal year 2024, a more than 60% year-over-year negative change. The College's financial deterioration continued during fiscal year 2026. For the nine months ending March 31, 2026, the College

recorded operating revenue and other support of approximately $19,954,547, operating expenses of approximately $23,418,379, a loss from operating activities of approximately -$3,463,832, and a total decline in assets of approximately -$3,507,852. The College's core tuition revenue also declined materially in the years preceding the Petition Date: net tuition and fees fell from approximately $19.2 million for fiscal year 2021 to approximately $14.3 million for fiscal year 2025.

13.     Similarly, the College's cash position deteriorated to just $133,499 as of June 30, 2025, down from $227,273 in 2024 and $981,420 in 2023, a decline of approximately 86% over two years. As a result, the College was forced to use substantially all of its unrestricted investment portfolio to fund operations, with investments falling from $8,666,820 in 2024 to $1,613,352 in 2025 (with $0 in undesignated investments remaining). The amount available for general expenditures within one year collapsed from $9,442,220 in 2024 to just $1,597,754 in 2025 – a decline of 83%. Furthermore, the College was in violation of certain debt covenant requirements for the year ending June 30, 2025.

14.     In an effort to bridge the gaps in its liquidity to meet current obligations to students and faculty as well as to continue its already 80 year long educational mission, the College reached out to donors and other benefactors to obtain consent to alter or delete restrictions on endowment funds.  In doing so, the College was fortunate to receive certain anonymous donations, including a $5.3 million infusion for operating and other general expenses and a separate $1.5 million restricted endowment donation dedicated to funding accrued obligations to the College's employees for wages and accrued benefits. Together, these funds enabled the College to complete the 2025-2026 academic year, confer degrees on graduating seniors as an accredited institution,

and pursue its then-underway efforts to improve financial performance through a combination of increased enrollment and alignment of expenses with projected enrollment revenue.

15. The financial hygiene efforts, however, instead revealed that the College has substantial liabilities that may not have been reflected fully or accurately on the College's internal accounting records when under the control of the now-departed chief financial officer. More specifically, certain vendors critical to completing the academic year were threatening contract termination absent substantial payments and utility shutoff notices had been received for non-payment. Previously unknown encumbrances asserted on title to the College's real property were discovered. Perhaps most importantly, both the federal agency tasked with administering Title IV and the Massachusetts Department of Higher Education in its capacity as administrators of state financial aid programs were indicating that account reconciliation undertakings had revealed substantial amounts due from the College.

16. In light of the realization by the College's current management and professionals that the ability to maintain the College's operations for the 2026/2027 academic year and beyond turns not only on achieving historically realized levels of enrollment and rationalizing expenses to projected enrollment, but also immediate payment of substantial liabilities owed to critical vendors and state and federal regulators without sufficient liquidity, the College determined that it had no alternative but to cease academic operations following the conclusion of the spring 2026 semester.

17. The College has now completed its final semester of instruction, graduating the Class of 2026 while a NECHE (defined below) accredited institution and is in the process of assisting its former students in the transition to local universities with oversight of the Massachusetts Department of Higher Education and the Attorney General's Office for the Commonwealth of Massachusetts. It has received sufficient funding to meet its monetary

8

obligations to the employees that were terminated prior to the Petition Date, or will soon be terminated. It has, however, fallen considerably shy of meeting its financial obligations to its lender, certain former students, vendors, and regulators.

18.     Without ongoing operations and as it winds-down its non-profit entity, the Debtor has determined that the best means of maximizing value of its portfolio of real estate and Campus for the benefit of its estate and creditors is to pursue a Sale with Court supervision of substantially all of the Sale Assets in order to realize what current indications suggest is substantial equity in its real property and other Sale Assets through the process described herein for distribution to its creditor body following conclusion of the Sale process.

**B.     The Debtor's Real and Personal Property Assets – And Sale Assets.**

19.     The Debtor's Assets fall roughly into the following categories:[2]

a.      Real Property. The Campus at 50 Sunset Lane, Paxton, Worcester County, Massachusetts, consisting of three parcels of land totaling approximately 261.75 acres, with 17 buildings and all improvements thereon, appraised at a total as-is market value well in excess of the Prepetition Secured Creditor's debt as of January 7, 2025. The Debtor holds fee simple title to all Campus parcels, as confirmed by Commonwealth Land Title Insurance Company Loan Policy No. 1447-1-51652-2017.81307-212819014, issued November 30, 2017. The individual Campus parcels are as follows:

i.      Parcel One.[3] 180.28 acres of land acquired by deed dated June 29, 1951, recorded at the Worcester County Registry of Deeds in Book 3346, Page 545, and described as land situated on the westerly side of Grove Street in the Town of Paxton, Worcester County, Massachusetts, with frontage on Grove Street and Sunset Lane.

(a) The Town of Paxton Tax Assessor identifies approximately 123.08 acres of this land as the developed campus at 50 Sunset Lane (Assessor's Parcel 17-

---

[2] Additional detail regarding the Assets will be set forth in the Debtor's Schedules, to soon be filed.

[3] The parcel labels used herein are descriptive labels for purposes of this Motion and do not correspond one-for-one to the parcel labels on the 1979 Recorded Plan, which identifies only "Parcel One" and "Parcel Two." "Parcel One" herein refers to the original mortgaged property shown as Parcel Two on the 1979 Recorded Plan; "Parcel Two" herein refers to the 2002-acquired Parcel B; and "Parcel Three" herein refers to the 2022-gifted property identified as Assessor's Parcel 17-22A, corresponding to the remainder of Parcel One on the 1979 Recorded Plan after the stated exceptions.

22), improved with 17 buildings containing approximately 300,622 square feet of gross building area.

    (b) The Town of Paxton Tax Assessor identifies approximately 56.49 acres of this land as excess undeveloped land on Grove Street (Assessor's Parcel 17-22M).

ii.    Parcel Two. 10.0651 acres of land acquired by quitclaim deed dated April 3, 2002, recorded at the Worcester District Registry of Deeds in Book 26876, Page 275, and described as land situated on the westerly side of Sunset Lane with frontage on Grove Street in the Town of Paxton, Worcester County, Massachusetts (Assessor's Parcel 17-22C).

iii.    Parcel Three. Approximately 72.12 acres of land acquired by quitclaim deed dated April 14, 2022, recorded at the Worcester District Registry of Deeds in Book 68580, Page 352, and described as land situated off Grove Street at the intersection of Grove Street and Streeter Road in the Town of Paxton, Worcester County, Massachusetts, excepting therefrom (i) a parcel conveyed to David E. Roy and Elaina M. Roy by deed dated May 16, 1997, recorded in Book 18897, Page 58, and (ii) Parcel Two described above (Assessor's Parcel 17-22A).[4]

b.    Buildings and Improvements. All buildings, structures, and improvements now located on the real property described above, consisting of 17 buildings totaling approximately 300,622 square feet of gross building area, built between 1750 and 2012, in average to average/good overall condition.

c.    Personal Property. All furniture, fixtures, equipment, machinery, tools, furnishings, inventory, supplies, and other tangible personal property located on or used in connection with the Campus, including, without limitation, furniture and equipment with a gross cost basis of approximately $13,049,731, motor vehicles with a gross cost basis of approximately $542,559, and library books, periodicals, and audio-visual materials with a gross cost basis of approximately $2,020,877. Perhaps most importantly, and within the Personal Property Category, are religious artifacts and artwork obtained by the College, generally from donors, over the eighty years of pursuing its educational mission.

d.    Intangible Property. All intellectual property, goodwill, permits, licenses (other than those related to the Nursing Program), accounts receivable, contracts, leases, and all other intangible assets used in connection with the operation of the College or the Campus. The College's various specialty accredited programs fall roughly in this category.

---

[4] In 2023, the Debtor obtained approval to separate approximately 2.4161 acres at the intersection of Grove Street and Streeter Road, Paxton Massachusetts ("Lot 2"), for separate sale and development. This property, however, remains titled in the Debtor's name and the Debtor intends to market the area marked as Lot 2 for sale along with the Main Campus and adjacent land. Lot 2 is the subject of certain state court litigation as described below.

20.     Specifically *excluded* from the scope of this Motion, however are the following

Assets (collectively, the "Excluded Assets"):

(a) all assets, contracts, permits, licenses, accreditations, and other property related to the Debtor's nursing program (the "Nursing Program Assets"),[5] which the Debtor intends to monetize through a separate sale process for which the Debtor will seek Court approval by separate motion;

(b) cash existing as of the Petition Date that constitutes gifts, grants, bequests, donations or contributions that were designated or restricted at the time they were made by the donor or maker as being for certain specified purposes; and

(c) any litigation rights, including but not limited to, avoidance actions. The Debtor reserves the right to modify the scope of the Excluded Assets prior to the Bid Deadline with the approval of the Bankruptcy Court.

21.     For purposes of this Motion, "Sale Assets" shall mean the Debtor's Assets, other

than the Excluded Assets.

**B.      The Debtor's Prepetition Capital and Debt Structure**

22.     As is described in the contemporaneously filed *Motion For Entry of Interim and*

*Final Orders (I) Authorizing Debtor to Obtain Postpetition Financing, (II) Granting Consensual*

*Liens and Providing Superpriority Administrative Expense Status to DIP Lender, (III) Authorizing*

*Consensual Use of Cash Collateral, (IV) Granting Adequate Protection to Prepetition Secured*

*Creditor, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting*

*Related Relief* (the "DIP Motion"), prior to the Petition Date, the Debtor obtained funding on a

secured basis from Citizens Funding Corp., a New Hampshire corporation (the "Purchaser"), and

Citizens Bank, N.A., a national banking association, as disbursing agent (the "Disbursing Agent"

and, together with the Purchaser, the "Prepetition Secured Creditor"), pursuant to a *Loan and*

---

[5] The Debtor operates a nursing program as part of the College's academic offerings. The Debtor has executed an MOU providing for the sale of the nursing program to a regional higher education institution and has sought specialty accreditor approval of the contemplated transaction. Upon execution of an APA, the College will file a separate motion seeking Court approval of the sale. Nothing in this Motion or the Sale Procedures Order is intended to prejudice or affect the Debtor's rights with respect to the separate sale of the Nursing Program Assets.

11

*Security Agreement,* dated November 1, 2017 (as amended, the "LSA") representing the proceeds of the Anna Maria College Issue, Series 2017 bonds, dated as of November 30, 2017, reissued on November 8, 2018, and amended as of June 20, 2023, with a Registration Date of July 3, 2023, in the original principal amount of $24,500,000.00 (as amended, the "Bonds"), purchased by the Purchaser from the Massachusetts Development Finance Agency (the "Issuer") and loaned to the Debtor (the "Prepetition Loan").

23.     As of the Petition Date, the aggregate outstanding principal amount owed by the Debtor under the Prepetition Bond Documents was not less than $17,734,804.13 (together with any interest, fees (including, without limitation, prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Bond Documents, and further including all "Obligations" as described in the LSA, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "Prepetition Bond Obligations").

24.     The Debtor's obligations to the Prepetition Secured Creditor are secured by a first priority, senior secured lien (the "Prepetition Bond Liens") on substantially all of the Debtor's assets,[6] including but not limited to the Debtor's real property, equipment, receivables, contracts and contract rights, inventory, intellectual property rights, general intangibles, and all proceeds and products of the foregoing (collectively, the "Prepetition Collateral"), as evidenced by (i) that certain *Mortgage, Security Agreement and Fixture Filing* dated November 30, 2017, from the Debtor to the Prepetition Secured Creditor, acting for itself individually and as collateral agent for the Purchaser, recorded with the Worcester South District Registry of Deeds in Book 58113, Page

---

[6] The Prepetition Bond Liens do not extend to "Donor Restricted Funds," meaning cash existing as of the Petition Date that constitutes gifts, grants, bequests, donations or contributions designated or restricted at the time made by the donor or maker for specified purposes.

296, as amended pursuant to that certain *Amendment No. 1 to Mortgage, Security Agreement and Fixture Filing* dated as of September 30, 2024, recorded with the Worcester South District Registry of Deeds in Book 71102, Page 299 (the "Mortgage" and the property encumbered, the "Mortgaged Property"); (ii) that certain *Security Agreement (All Assets)*, dated as of November 30, 2017, by the Debtor in favor of the Disbursing Agent, for itself and as agent for the Purchaser (as amended, the "Security Agreement"); and (iii) that certain *Collateral Assignment of Permits, Licenses, Approvals and Contracts* dated November 30, 2017 by the Debtor to the Disbursing Agent, for itself and as agent for the Purchaser (the "Collateral Assignment").   Additional information regarding the nature and extent of the Prepetition Loan and Prepetition Bond Liens is set forth in the DIP Motion.[7]

25.     In addition to the Prepetition Bond Liens, the Debtor's records indicate that certain of its assets are or were subject to the following *asserted* liens and interests which are expired, unperfected or disputed as indicated:

a.  Notice of Federal Interest. On September 30, 2023, the Community Program Funding/Congressionally Directed Spending Construction awarded Grant No. 6CE1HS52504-01-03 (the "Grant") to the Debtor.  As a condition of the Grant, a Notice of Federal Interest (the "Federal Interest") was required to be recorded with respect to Miriam Hall, which is part of the Mortgaged Property ("Miriam Hall"). No such recordation occurred.

b.  Siemens Equipment Lien. Siemens Public, Inc. ("Siemens") held a lien of record on certain energy efficiency equipment pursuant to a *Master Lease and Sublease Agreement* dated as of September 1, 2010 (as supplemented by Schedule No. 1 thereto dated September 30, 2010), among Siemens (as Lessor), MDFA (as Lessee), and the Debtor (as Sublessee). Siemens' original loan amount was approximately $1,677,724, of which $855,966.44 was outstanding as of the November 30, 2017 closing. The underlying debt to Siemens has been paid in full and its financing statement has lapsed.

c.  Mechanics' Lien.  Bowdoin Construction Corp. ("Bowdoin") filed a Notice of Contract with the Worcester South Registry of Deeds on May 18, 2026 asserting a

---

[7] To the extent of any inconsistency between the foregoing and the DIP Motion, the description in the DIP Motion shall prevail.

mechanics' lien on College property known as St. Joseph's Hall located at 50 Sunset Lane, Paxton, Massachusetts; in its subsequently filed Statement of Account, Bowdoin indicated that it is owed $32,965.96 from the Debtor. The Debtor disputes the validity of any mechanics' lien asserted by Bowdoin given that the Notice of Contract is untimely, under M.G.L. c. 254, and therefore, invalid.

d. <u>Superior Court Injunction/Right of First Refusal</u>: Prior to the Petition Date, adjacent landholders, David Roy, Elaina Roy, and David Roy, Jr. (collectively, the "<u>Roys</u>"), filed a Verified Complaint with the Worcester Superior Court ("<u>State Court</u>") seeking a declaration that they hold an oral right of first refusal to purchase an approximately two acre portion of Parcel 3 referred to as "Lot 2," based on promises alleged to have been made by the College's former president and executive vice president, Case No. 2585CV00823. On July 24, 2025, the State Court issued a consensual form of temporary restraining order preventing the sale of Lot 2 desired to be acquired by the Roys (for no consideration), pending trial on the matter (the "<u>TRO</u>"). [8] The TRO was not recorded with the Worcester Registry of Deeds prior to the Petition Date, and the Debtor disputes the validity of the alleged right of first refusal asserted by the Roys; and

e. <u>First American Lease</u>. As of the time the Prepetition Loan was funded, First American Commercial Bancorp, Inc. had filed a UCC-1 financing statement asserting a protective lien in equipment leased to the Debtor pursuant to Master Lease No. 2008220. The UCC-1 has since lapsed, and the Debtor's books and records indicate that the lease has terminated, with no amount due and owing to First American Commercial Bancorp. [9]

26. As described in the DIP Motion, the Debtor is now seeking post-petition financing under a DIP Facility (as defined in the DIP Motion) from Citizens Bank, N.A. (the "<u>DIP Lender</u>") to fund ongoing expenses during the Sale process on terms negotiated with the DIP Lender.

---

[8] The TRO is stayed as to the Debtor pursuant to section 362(a) of the Bankruptcy Code. 11 U.S.C. § 362(a)(1), (2), (3). The Debtor seeks to sell the Sale Assets, free and clear of the Roys' claimed right of first refusal pursuant to section 363(f) of the Bankruptcy Code, with any such interest attaching to the proceeds of the Sale in accordance with section 363(f). The Debtor submits that one or more of the conditions of section 363(f) is satisfied with respect thereto, including that the interest is in bona fide dispute. The Roys will receive notice of this Motion, the Sale Procedures, and the Sale Hearing and will have the opportunity to be heard with respect to any objection to the Sale of the real estate.

[9] In addition, the Debtor's historic audited financial statements contain a reference to the Debtor as maker of a note payable to the Congregation of the Sisters of Saint Ann ("Congregation") with a balance as of FYE 2025 of $1,021,901 that is payable in the event that the Debtor liquidates its assets.

27.     Additional factual background information about the Debtor, including its business operations, its corporate and capital structures, its restructuring efforts and the events leading to the filing of the Chapter 11 Case, is set forth in detail in the First-Day Declaration.[10]

### THE PROPOSED SALE

#### A.     Marketing and Prepetition Sale Efforts

28.     The Debtor has entered this Chapter 11 Case for the purpose of monetizing the Sale Assets in order to realize upon what may be substantial value above the secured indebtedness owed to the Prepetition Secured Creditor. It does so as a not-for-profit entity in a highly regulated industry that has undertaken only the earliest stages of marketing towards one or more monetization events that, if it is to succeed, must move forward quickly, in order to properly wind-down College operations. This Motion is filed in an effort to clear a path towards that goal by providing ample notice to the creditors and at least equally as importantly the government regulators and agencies with jurisdiction over or a role in the sale of charitable assets owned by a not-for-profit institution of higher education to elicit prompt reaction or objection to the proposed Sale procedures so that, as the process plays out, no party in interest can proclaim surprise or prolong the process for internal approvals.

29.     Among the agencies and organizations that will receive advance notice are the following:

   a. The Charitable Assets Division of the Massachusetts Attorney General's Office ("AGO") has state law afforded jurisdiction and authority over transfer of charitable assets. Statutory, regulatory and decisional law tasks the AGO, *inter alia*, with ensuring that fair value is received, *see Massachusetts Charitable Mechanic Association v.*

---

[10] All capitalized terms not expressly defined herein shall have the same meaning as ascribed in the First-Day Declaration.

*Beede*, 320 Mass. 601 (1947), and affords it certain review and approval rights over transfers of substantially all assets by a charity.  M.G.L. c. 180, § 8A;[11]

b.  The Massachusetts Department of Higher Education has regulatory authority under the Financial Assessment and Risk Monitoring regulations ("FARM"), 610 CMR 13.00, over a broad array of institution closure issues, some of which may be implicated by asset transfers; and

c.  The United States Department of Education and the College's accreditor, NECHE, each may have an interest in being heard as to matters regarding transfers of academic assets.

30.  To date, the College's efforts toward monetizing its Assets have consisted primarily of interviewing a series of real estate brokers and engaging a highly regarded regional real estate brokerage firm to offer the Campus for sale[12] and to negotiate and execute a Memorandum of Understanding relating to the transfer of its nursing program (without any portion of the Campus) to a Massachusetts-based higher education institution for substantial cash consideration (the "MOU").

31.  Given the College's limited liquidity, its complex debt stack, the substantial regulatory overlay and, importantly, the appraisal-based view that there is substantial value to be realized for the benefit of all constituents, the College seeks this Court's authority to undertake a sale process that is both expeditious and value maximizing, with the consent of the Prepetition Secured Creditor and in compliance with the terms required of the DIP Lender described in the DIP Motion.

**B.  No Stalking Horse Bidder**

32.  As of the date of this Motion, the Debtor has not entered into an asset purchase agreement with a stalking horse bidder for the Sale Assets or any part of the Sale Assets. The Sale

---

[11] The Debtor is not currently contesting or conceding the role of the various regulators and accreditors in a sale process undertaken in accordance with section 363 of the Bankruptcy Code, and if past history is any indicator does not foresee a likelihood of having to do either, but anticipates a repeat of what in past higher education institution winddown related transactions has been an iterative and cooperative process.

[12] A separate application to retain the broker will be filed.

16

Assets are such that, although there may be a single purchaser of substantially all Sale Assets, there may also be several different purchasers for subsets of the Sale Assets. The Debtor intends to solicit bids from all interested parties for all or some of the Sale Assets through the Sale Procedures described herein and to select the party or parties submitting the highest and best bid(s) for all or some of the Sale Assets. The Debtor reserves the right, however, to designate one or more stalking horse bidders and enter into an asset purchase agreement with such party prior to the Auction, subject to Court approval. In the event the Debtor seeks to designate a stalking horse bidder for substantially all of the Sale Assets, or several stalking horse bidders for different subsets of the Sale Assets, the Debtor will file supplemental papers with the Bankruptcy Court seeking approval of any such stalking horse arrangement, including any proposed bid protections (such as a break-up fee and/or expense reimbursement), on notice to all parties in interest.

## **RELIEF REQUESTED**

33.     By this Motion, the Debtor respectfully requests entry of an order substantially in the form of the Sale Procedures Order attached as Exhibit A (a) approving the Sale Procedures in connection with the Sale of substantially all of the Sale Assets in one or more transactions, (b) scheduling the Auction and Sale Hearing to consider approval of the Sale(s) and approving the form and manner of notice thereof, (c) establishing procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale(s), (d) authorizing the Debtor to consummate De Minimis Sales of Sale Assets with a fair market value of less than $10,000 per transaction free and clear of all liens, claims, encumbrances and other interests without further order of this Court, subject to the notice and objection procedures set forth herein, and (e) granting related relief.

34.     Additionally, the Debtor seeks entry of an order substantially in the form of the Sale Order attached hereto as Exhibit B, (a) approving the Sale or Sales, if applicable, of the Sale Assets to the Successful Bidder(s) (as defined herein), free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidder(s), and (c) granting certain related relief.

35.     For the reasons set forth below, the Debtor submits that the relief requested herein is in the best interests of the Debtor, its estate, creditors, stakeholders and other parties in interest and, therefore, should be granted.

## I.      Proposed Bid and Sale Procedures

### A.      Sale Assets to be Sold

36.     The Debtor will offer for sale all, or substantially all, of the Sale Assets, expressly excluding the Excluded Assets, in one or more transactions.

37.     The effort to market and sell all or any portion of the Campus will initially be conducted by Kelleher & Sadowsky Associates, Inc. ("K&S"), a real estate brokerage firm that the Debtor engaged prepetition and for which post-petition engagement authority is being sought from this Court. Under the terms of that engagement, K&S will market the Debtor's Campus and related Sale Assets through a process designed to synchronize available funding with value maximization.

### B.      Sale Schedule

38.     The Motion and Sale Procedures propose the following schedule for the key dates and deadlines needed to establish an efficient, expedited, and open process for the solicitation, receipt, and evaluation of Bids (defined below) and the consummation of one or more Sales. These requested dates and deadlines are subject to the Bankruptcy Court's availability and approval, and

may be modified by the Debtor to the extent permitted by the Sale Procedures and Sale Procedures

Order.

| Event | Date | Deadline |
| --- | --- | --- |
| Commencement of Marketing Efforts | June 16, 2026 | The date on which a public announcement of the acquisition opportunity was announced by K&S. |
| Sale Procedures Objection Deadline | July 10, 2026 (three (3) days before Sale Procedures Hearing)[13] | Deadline by which any objections to the Sale Procedures must be filed with the Bankruptcy Court and served so as to be actually received by the Objection Notice Parties (as defined in the Sale Procedures Order). |
| Sale Procedures Hearing | July 13, 2026 | Date for the hearing to consider the approval of the Sale Procedures. |
| Sale Notice | July 17, 2026 (Within three (3) business days following entry of the Sale Procedures Order) | Date by which the Debtor will file and serve the Sale Notice (as defined below). |
| Sale Motion Objection Deadline | August 16, 2026 (thirty (30) days after filing and service of the Sale Notice) | Date by which parties in interest must file and serve objections to the Sale Motion's provisions for conveyance of assets free and clear of all Interests and that those objections must be received by the Objection Notice Parties. |
| Sale Motion Objection Reply Deadline | August 31, 2026 (fifteen (15) days after filing and service of Sale Motion Objections) | Date by which the Debtor and any other party in interest must file a reply to any Sale Motion Objections. |

---

[13] All dates are subject to adjustment based on the Court's calendar.

| Event | Date | Deadline |
|---|---|---|
| Cure Notice | September 14, 2026 (no fewer than twenty (20) business days prior to the Sale Hearing) | Date by which the Debtor will serve the Cure Notice (as defined below) upon each counterparty to an Assumed and Assigned Contract (as defined below) and file a global exhibit listing Cure Amounts (as defined below). |
| Sale Motion Hearing | September 16, 2026 | Date of a hearing to adjudicate any objections to the sale of the Sale Assets free and clear of all Interests. |
| Assumption/Cure Objection Deadline | September 28, 2026 at 4:00 p.m. (prevailing Eastern Time) | Deadline by which objections to the proposed Cure Amounts or to the proposed assumption and assignment of any Assumed and Assigned Contract, on any basis not dependent on the identity, financial wherewithal, or operational capabilities of the ultimate assignee must be filed with the Bankruptcy Court and served so as to be actually received by the Objection Notice Parties. |
| Bid Deadline | October 9, 2026 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline") | Deadline by which the Debtor must *actually receive* binding Qualified Bids from Qualified Bidders (as defined below). |
| APA Execution | October 19, 2026 (one (1) business day before the scheduled Auction) | Deadline by which all Qualified Bidders must execute an Asset Purchase Agreement in a form provided by the Debtor, or such other form as is reasonably acceptable to the Debtor, marked to show changes against the form provided by the Debtor. |

20

| Event | Date | Deadline |
|---|---|---|
| Auction (if necessary) | October 20, 2026 at _:__ _.M. (prevailing Eastern Time) | Date that an Auction for the Sale Assets will be conducted to identify the highest and best Bid for the Sale Assets or for a subset of the Sale Assets, in person, only if the Debtor receives more than one Qualified Bid relating to the Sale Assets or a subset of the Sale Assets by the Bid Deadline. |
| Deadline to File Notice of Successful Bidder(s) | The earlier of October 22, 2026 or twenty-four (24) hours after the designation of the Successful Bidder(s) (whether at the Auction or otherwise in accordance with the Sale Procedures) | Deadline by which the Debtor shall file and serve the Notice of Successful Bidder(s) identifying the Successful Bidder(s) and the Back-Up Bidder(s), if any, summarizing the material terms of the Successful Bid(s) and any Back-Up Bid(s), identifying the contracts and leases designated for assumption and assignment, and providing or making available the adequate assurance information delivered by the Successful Bidder(s) and any Back-Up Bidder(s). |
| Deadline to Object to Designation of Successful Bidder(s) | October 27, 2026 (five (5) business days after service of the Notice of Successful Bidder(s), or at the Sale Hearing, if earlier) | Deadline by which objections to the designation of any Successful Bidder and entry of a Sale Order approving a sale transaction with a Successful Bidder. |
| Adequate Assurance Objection Deadline | October 27, 2026 (five (5) business days after service of the Notice of Successful Bidder(s), or at the Sale Hearing, if earlier) | Deadline by which objections solely to any Successful Bidder's or Back-Up Bidder's ability to provide adequate assurance of future performance under section 365 of the Bankruptcy Code must be filed with the Bankruptcy Court and served so as to be actually received by the Objection Notice Parties; provided that if the Sale Hearing occurs before such deadline, the counterparty may raise such objection at the Sale Hearing. |

| Event | Date | Deadline |
|---|---|---|
| Sale Hearing | October 30, 2026 at _:__ _.m. (prevailing Eastern Time) | Date for a hearing at which the Bankruptcy Court will consider approving the Sale(s) of the Sale Assets to the Successful Bidder(s) or Back-Up Bidder(s) pursuant to the Sale Order. |

### C.     Sale Procedures

39.     The Debtor requests that the Bankruptcy Court enter the Sale Procedures Order approving the following Sale Procedures to govern the submission and evaluation of competing bids for the Sale Assets or subsets of the Sale Assets. The Sale Procedures, which are attached to the proposed Sale Procedures Order as Exhibit 1, are designed to obtain the highest or otherwise best offer for the Sale Assets, while effectuating an efficient sale of the Sale Assets and recognizing the liquidity restrictions facing the Debtor. For purposes of the Sale Procedures, "Consultation Parties" means (a) the DIP Lender and the Prepetition Secured Creditor and (b) any statutory committee appointed in this Chapter 11 Case; provided that any such party that submits a Bid to purchase the Sale Assets or submits a credit bid for any Sale Assets shall no longer be a Consultation Party so long as such Bid or credit bid remains open.

40.     The key provisions of the Sale Procedures to be employed with respect to the proposed Sale of the Sale Assets are as follows:[14]

a.     Provisions Regarding Qualification of Bidders. Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Debtor, in order to participate in the Sale and Auction process, any party interested in submitting a Bid for the Sale Assets or any subset of the Sale Assets (each, a "Potential Bidder") must deliver by the Bid Deadline the following by electronic mail to the Debtor at the following addresses: (i) Anna Maria College, Attn: Dr. Sean Ryan, President, sryan@annamaria.edu; (ii) Debtor's counsel, Holland & Knight LLP, John J. Monaghan, Lynne B. Xerras, and Kathleen St. John,

---

[14] The summary of the terms contained in this Motion is qualified in its entirety by reference to the provisions of the Sale Procedures. In the event of any inconsistencies between the provisions of the Sale Procedures and the summary set forth herein, the terms of the Sale Procedures shall govern. Capitalized terms used but not defined in this section only have the meanings ascribed to them in the Sale Procedures.

lynne.xerras@hklaw.com; and (iii) Kelleher & Sadowsky Associates, Inc., Attn: William D. Kelleher, IV and Drew Higgins, wkelleher@kelleher-sadowsky.com, higgins@kelleher-sadowsky.com:

i.      an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Debtor to a Potential Bidder) in form and substance satisfactory to the Debtor. In the event that the Potential Bidder has already entered into an acceptable confidentiality agreement with the Debtor, it must provide a statement waiving any of its rights under such confidentiality agreement that are in conflict with the Sale Procedures or that would otherwise prohibit disclosures regarding the Potential Bidder, or any Sale it may enter into;

ii.     sufficient information, as determined by the Debtor, which may include current audited financial statements and latest unaudited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Sale Assets (or any portion thereof), current audited financial statements and latest unaudited financial statements of the equity holders of the Potential Bidder who will guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement that will allow the Debtor and its advisors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the Sale; and

iii.    a statement demonstrating to the Debtor's satisfaction, a bona fide interest in purchasing the Sale Assets or a subset of the Sale Assets from the Debtor.

Upon the Debtor's determination, in the exercise of its reasonable business judgment and in consultation with the Consultation Parties, that a Potential Bidder has satisfied the foregoing requirements, such Potential Bidder shall be deemed a "Qualified Bidder" and shall be granted access to the Debtor's due diligence materials, including any virtual data room established by the Debtor. The Debtor reserves the right to exclude any party from access to due diligence materials if such party has not satisfied the pre-qualification requirements set forth herein. In the event the Debtor determines, in consultation with the Consultation Parties, that a Potential Bidder is not a Qualified Bidder, the Debtor will notify the U.S. Trustee within twenty-four (24) hours of such determination, including the identity of the Potential Bidder and a brief description of the basis for the determination.

b.   Due Diligence. The Debtor may, in an exercise of its reasonable business judgment, and subject to competitive and other business considerations, afford each Qualified Bidder and any person seeking to become a Qualified Bidder that has executed a confidentiality agreement with the Debtor such due diligence access to materials and information relating to the Sale Assets as the Debtor deems appropriate. No due diligence for any party other than a Qualified Bidder who has submitted a Qualified Bid will continue after the Bid Deadline. The Debtor makes no representation or warranty as to the information to be provided through this due

23

diligence process or otherwise, except to the extent set forth in any purchase agreement(s) with any Successful Bidder executed and delivered by the Debtor.

c. <u>Bid Deadline.</u> Any Qualified Bidder that wishes to submit an offer, solicitation, or proposal to purchase the Sale Assets or any subset of the Sale Assets (a "<u>Bid</u>") must deliver its Bid by electronic mail to the Debtor at the following addresses: (i) Anna Maria College, Attn: Dr. Sean Ryan, President, at sryan@annamaria.edu; (ii) proposed Debtor's counsel, Holland & Knight LLP, John J. Monaghan, Lynne B. Xerras, and Kathleen St. John, c/o lynne.xerras@hklaw.com; (iii) counsel to any statutory committee appointed in this Chapter 11 Case (if one has been appointed); (iv) counsel to the DIP Lender and the Prepetition Secured Creditor, Two International Place, Boston, MA 02110, Attn: Douglas R. Gooding  and Jonathan D. Marshall, c/o dgooding@choate.com; and (v) Kelleher & Sadowsky Associates, Inc., Attn: William D. Kelleher, IV and Drew Higgins, wkelleher@kelleher-sadowsky.com (collectively, "<u>Notice Parties</u>"), so as to be actually received by the Debtor no later than the Bid Deadline (as may be extended as set forth below). As soon as practicable after receipt of a Bid, but in no event more than twenty-four (24) hours thereafter, Debtor's counsel shall provide copies of the Bid and all related documents to any statutory committee appointed in this chapter 11 case.

d. <u>Qualified Bid Requirements.</u> A Bid that is submitted in writing by a Qualified Bidder and satisfies each of the following requirements, as determined by the Debtor, in its reasonable business judgment and in consultation with its advisors and the Consultation Parties, shall constitute a "<u>Qualified Bid</u>":

   i. *Letter of Intent.* Each Bid must include a duly authorized and executed binding letter of intent subject only to execution of an asset purchase agreement ("<u>Asset Purchase Agreement</u>") in a form provided by or otherwise reasonably acceptable to the Debtor, setting forth the Sale Assets to be purchased, the purchase price for the Sale Assets to be purchased, any termination rights and any covenants, financing or other contingencies, shareholder, board of directors, or other internal approval contingencies, or closing conditions.

   ii. *Acquired Assets.* Each Bid must identify with specificity the Sale Assets or subset thereof that the applicable Bidder offers to purchase, and shall include, without limitation, terms and provisions with respect to certainty and timing of closing, including, but not limited to, identifying with specificity all conditions to closing.

   iii. *Purchase Price.* Each Bid must clearly set forth the purchase price to be paid for the Sale Assets identified in the Bid (the "<u>Purchase Price</u>"). Each Bid must indicate whether it is an all-cash offer or consists of certain non-cash components, such as a credit bid and/or the assumption of liabilities.

   iv. *Good Faith Deposit.* Each Bid that is not a credit bid must be accompanied by a good faith deposit (the "<u>Good Faith Deposit</u>") in the form of a wire transfer (to a bank account specified by the Debtor), certified check, or such other form

24

acceptable to the Debtor, payable to the order of the Debtor (or such other party as the Debtor may determine), in an amount equal to no less than 5% of the proposed Purchase Price, which the Debtor shall hold in trust and deal with as provided under "Good Faith Deposits" herein.

v. *Binding and Irrevocable.* Each Bid must include provisions stating that the Qualified Bidder's Bid is irrevocable until the Bankruptcy Court approves the selection of the Successful Bidder (as defined below) and the Back-Up Bidder (as defined below), provided that if such Qualified Bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the earlier of (i) closing of the Sale to the Successful Bidder or the Back-Up Bidder as to the Sale Assets or subset thereof that was the subject of the applicable Bid, and (ii) thirty (30) days after the Outside Closing Date (to be defined in each Asset Purchase Agreement).

vi. *Demonstrated Financial Capability.* Each Bid must include written evidence of financial capacity to consummate the Sale transaction contemplated in the Bid, which evidence may include, but is not limited to, a firm, irrevocable commitment for financing, bank or investment account statements, an audited financial statement or other evidence of ability to consummate the proposed transaction, that will allow the Debtor to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated in the Bid.

vii. *Identity*. Each Bid must fully disclose the identity of each entity that will be bidding for the Sale Assets or otherwise sponsoring or participating in connection with such Bid, and the complete terms of any such participation. Each Bid must fully disclose any relationship or connection that the Qualified Bidder submitting such Bid has with the Debtor or with any officer, director, trustee, member, or manager of the Debtor.

viii. *As-Is, Where-Is*. Each Bid must include an acknowledgement and representation that the Qualified Bidder: (a) has had an opportunity to conduct any and all required due diligence regarding the Sale Assets prior to making its offer; (b) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Sale Assets in making its bid; (c) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Sale Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Marked Agreement; and (d) is not entitled to any expense reimbursement or break-up fee in connection with its Bid.

ix. *Affirmative Statement*. Each Bid shall be accompanied by an affirmative statement that: (i) the Qualified Bidder has acted in good faith consistent with section 363(m) of the Bankruptcy Code and not in any manner prohibited by section 363(n) of the Bankruptcy Code; (ii) the Qualified Bidder has and will

25

continue to comply with the Sale Procedures; and (iii) the Qualified Bidder waives any entitlement to any break-up fee, termination fee, expense reimbursement, or similar payment or reimbursement, and waives any substantial contribution (administrative expense) claims under section 503(b) of the Bankruptcy Code related to bidding for the Sale Assets or otherwise participating in the Auction.

    x.    *Authorization*. Each Bid must include evidence, in form and substance reasonably satisfactory to the Debtor, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the transaction contemplated by the Bid and the Sale.

    xi.    *Executory Contracts*. Each Bid must identify with particularity which executory contracts or unexpired leases the Qualified Bidder wishes to assume, include an acknowledgment and representation that the Qualified Bidder will assume the Debtor's obligations under such executory contracts and unexpired leases arising from and after the closing, and identify with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing.

    xii.    *Adequate Assurance*. Each Bid must include evidence of the Qualified Bidder's ability to comply with section 365 of the Bankruptcy Code (to the extent applicable), including providing adequate assurance of such Qualified Bidder's ability to perform in the future under the contracts and leases proposed in its Bid to be assumed by the Debtor and assigned to the Qualified Bidder, in a form that will permit the immediate dissemination of such evidence to the counterparties to such contracts and leases.

    xiii.    *Consent to Jurisdiction.* Each Bid must state that the Qualified Bidder consents to the jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Sale, the Auction, or the construction and enforcement of the Bid.

    xiv.    *Bid Deadline*. Each Bid must be received by the Bid Deadline.

    e.    <u>Evaluation of Competing Bids</u>. A Qualified Bid will be valued based upon several factors including, without limitation, items such as the Sale Assets or subset of Sale Assets that the bid relates to, the Purchase Price and the net value (including assumed liabilities and other obligations to be performed or assumed by the Qualified Bidder) provided by such Bid, the counterparties to the transactions, factors affecting the speed, certainty and value of the transactions (including any approvals required to close the transactions) and the likelihood and timing of consummating such transactions, each as determined by the Debtor, in consultation with its advisors and the Notice Parties.

f.   <u>Tender of an Asset Purchase Agreement</u>. Within twenty-four hours of receipt of a Qualified Bid, the Debtor shall deliver to each Qualified Bidder a proposed form of Asset Purchase Agreement (the "<u>Form APA</u>") for use by each Qualified Bidder.  It shall be a condition to participation in the Auction and to being named as a Successful Bidder or Backup Bidder that each Qualified Bidder deliver to the Debtor no later than one (1) business day before the scheduled Auction, a fully completed and executed Asset Purchase Agreement substantially in the form of the Form APA with substantive terms that do not differ from the terms set forth in the Qualified Bid and a copy of such Asset Purchase Agreement marked to show changes to the Form APA (a "<u>Marked Agreement</u>"). Failure of a Qualified Bidder to deliver an executed Asset Purchase Agreement shall not relieve a Qualified Bidder from the obligations set forth in its binding Letter of Intent.

g.   <u>No Competing Qualified Bids</u>. If only one Qualified Bid for the Sale Assets or any subset of the Sale Assets is received by the Bid Deadline, the Debtor shall not conduct an Auction as to the uncontested Sale Assets or subset thereof, and the party that submitted such Qualified Bid shall be deemed the Successful Bidder, provided, however, that if there is only one bid received for all of the Sale Assets but Bids are received for subsets of the Sale Assets, an Auction will be held to determine whether the total of all Bids for subsets of the Sale Assets exceeds that Qualified Bidder's bid for the entirety of the Sale Assets. In the event that the Auction is unnecessary, the Debtor reserves the right to request that the Bankruptcy Court advance the date of the Sale Hearing and will provide notice of such new date to those parties in interest entitled to notice thereof. If no Qualified Bid is received by the Bid Deadline, the Debtor will not conduct an Auction and will report to the Bankruptcy Court regarding the status of the Sale process. If the Debtor seeks Bankruptcy Court approval to designate one or more stalking horse bidders prior to the Auction, the Debtor may request approval of supplemental or modified procedures as appropriate.

h.   <u>Reservation of Stalking Horse Designation Right</u>.  The Debtor reserves the right to enter into one or more Asset Purchase Agreements with a stalking horse bidder prior to the Bid Deadline (each such Asset Purchase Agreement, a "<u>Stalking Horse APA</u>").  If the Debtor enters into a Stalking Horse APA, each competing Bid on the Sale Assets (or any subset of the Sale Assets) that are the subject of such Stalking Horse APA must (i) provide a purchase price equal to the value of the consideration under the Stalking Horse APA, plus an amount that is five percent (5%) higher than the aggregate Purchase Price plus any approved bid protections (the "<u>Initial Overbid Amount</u>") and (ii) use the Stalking Horse APA as the Form APA for purposes of submitting a clean, executed Asset Purchase Agreement and a marked version showing changes. If the Debtor seeks Bankruptcy Court approval to designate one or more stalking horse bidders prior to the Auction, the Debtor may request approval of supplemental or modified procedures as appropriate.

i.   <u>Auction Procedures.</u> Any Auction shall be conducted at the United States Bankruptcy Court for the District of Massachusetts, 595 Main Street, Room 311, Worcester, Massachusetts 01608-2076, on **October 20, 2026 at __:__ _.m.**

27

**(prevailing Eastern Time)**, or on such other date and at such other time as shall be timely communicated to all entities entitled to attend the Auction. The Auction shall be conducted in accordance with the following procedures:

i.  Auction Location.  The Auction shall be a public proceeding conducted before the Bankruptcy Court. All Qualified Bidders wishing to participate in the Auction must attend in accordance with the orders of the Bankruptcy Court and must ensure that at least one individual representative with full authority to bind such Qualified Bidder attends the Auction in person.

ii.  Notice of Participation.  On the later of a Qualified Bidder's submission of the executed Asset Purchase Agreement or two days before commencement of the Auction, each such Qualified Bidder must inform the Debtor whether it intends to participate in the Auction; provided that in the event a Qualified Bidder elects not to participate in the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until (i) the Bankruptcy Court's approval of the selection of the Successful Bidder(s) and Back-Up Bidder(s) and (ii) if such Qualified Bidder is selected as a Successful Bidder or a Back-Up Bidder, the earlier of (x) closing of the Sale to a Successful Bidder or a Back-Up Bidder, and (y) thirty (30) days after the Outside Closing Date (as defined in the Asset Purchase Agreement). At least one (1) day prior to the Auction, the Debtor will provide a summary of all Qualified Bids to the Consultation Parties and all Qualified Bidders that have informed the Debtor of their intent to participate in the Auction and will state which Qualified Bid or Qualified Bids the Debtor believes, in its reasonable business judgment, is the highest or otherwise best offer as to the Sale Assets and as to each subset of the Sale Assets (each a "Starting Bid").

iii.  Procedural Amendments. The Debtor, after consultation with its advisors and the Consultation Parties, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids or a requirement that Subsequent Bids be the Qualified Bidders' final and best bids) for conducting the Auction, provided that such rules are (i) not inconsistent with these Sale Procedures, the Local Rules, the Bankruptcy Code, or any order of the Bankruptcy Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction.

iv.  Bid Increments. Bidding at the Auction will begin with the Starting Bid as to the Sale Assets and continue, in one or more rounds of bidding, so long as during each round at least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (ii) the Debtor determines, in consultation with its advisors and the Consultation Parties that such Subsequent Bid is (A) for the first round, a higher or otherwise better offer than the Starting Bid, and (B) for subsequent rounds, a higher or otherwise

28

better offer than the Leading Bid (as defined below). The Debtor shall retain the right, in consultation with its advisors and the Consultation Parties, to set the increment requirements at any time at or prior to the Auction after informing each participating Qualified Bidder. After the first round of bidding and between each subsequent round of bidding, the Debtor shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise best offer or offers (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

v.  Asset Subset Bidding. Upon the conclusion of the Bidding for the Sale Assets, bidding will be conducted sequentially as to each subset of the Sale Assets regarding which competing Qualified Bids were submitted. The bidding process will be conducted pursuant to the same terms and conditions as are set forth in section B(iv) above relating to bids relating to the Sale Assets.

vi.  Incremental Bids. Each Bid made at the Auction shall be irrevocable until the Bankruptcy Court approves the selection of the Successful Bidder(s) (as defined below) and the Back-Up Bidder(s) (as defined below), provided that if a Bid is selected as a Successful Bid or a Back-Up Bid, it shall remain irrevocable until the earlier of (i) closing of the Sale to a Successful Bidder or a Back-Up Bidder, and (ii) thirty (30) days after the Outside Closing Date (as defined in the Asset Purchase Agreement).

vii.  Reservation of Rights. Except as otherwise provided in the Asset Purchase Agreement, the Sale Procedures or the Sale Procedures Order, the Debtor, after consultation with its advisors and the Consultation Parties: (i) may determine after each round of bidding at the Auction which Qualified Bid, if any, is the highest or otherwise best offer and the value thereof; (ii) may reject, at any time, any Bid that the Debtor determines is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Sale Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtor, its estate, and stakeholders as determined by the Debtor; (iii) except as otherwise specifically set forth herein, may modify the Sale Procedures or impose, at or prior to the Auction, additional customary terms and conditions on the Sale of the Sale Assets; (iv) may extend the deadlines set forth herein; and (v) may continue or cancel the Auction or Sale Hearing in open court without further notice.

viii.  Selection of Successful Bid(s). At the conclusion of the Auction, or if no Auction is held because only one Qualified Bid was received, promptly after the Bid Deadline, the Debtor, in consultation with its advisors and the Consultation Parties, will (i) review each Qualified Bid and evaluate each Qualified Bid as set forth in the section titled "Evaluation of Competing Bids" herein, (ii) identify the highest or otherwise best offer or offers for

29

the Sale Assets or any subset thereof received at the Auction or otherwise by the Bid Deadline (one or more such Bids, collectively the "Successful Bid" and the bidder or bidder(s) making such Bids, collectively, the "Successful Bidder"), and (iii) communicate to the Qualified Bidders the identity of the Successful Bidder(s), and the Back-Up Bidder(s), if any, and the details of the Successful Bid(s) and Back-Up Bid(s), if any. The determination of the Successful Bid(s) and Back-Up Bid(s) by the Debtor, at the conclusion of the Auction or after designation of the Successful Bidder if no Auction is held, shall be final, subject to approval by the Bankruptcy Court. The Debtor's selection of and presentation to the Bankruptcy Court of the Successful Bid(s) and, if applicable, the Back-Up Bid(s), will not constitute the Debtor's acceptance of either such Bid, which acceptance will occur only upon approval of such Bid by the Bankruptcy Court at the Sale Hearing.

ix. <u>Primacy of Bids for all Sale Assets</u>: In the event that there are one or more bids for all Sale Assets and one or more bids for a subset thereof, the Successful Bid for all Sale Assets will be the Successful Bid unless the total of all bids for subsets of the Sale Assets exceeds the amount of the highest and best bid for all Sale Assets.

x. <u>Notice of Successful Bidder(s).</u> Within twenty-four (24) hours after the designation of the Successful Bidder(s), whether at the Auction or otherwise in accordance with the Sale Procedures, the Debtor shall file and serve a notice identifying the Successful Bidder(s) and any Back-Up Bidder(s), summarizing the material terms of the Successful Bid(s) and any Back-Up Bid(s), identifying the executory contracts and unexpired leases proposed to be assumed and assigned to the Successful Bidder(s) or Back-Up Bidder(s), as applicable, and providing or making available the adequate assurance information delivered by the Successful Bidder(s) and any Back-Up Bidder(s) (the "<u>Notice of Successful Bidder(s)</u>"). The Notice of Successful Bidder(s) shall be served on all counterparties to Assumed and Assigned Contracts, the Objection Notice Parties, all parties entitled to notice of the Sale Hearing, and all other parties in interest, and shall be sent to counterparties to Assumed and Assigned Contracts by overnight mail and also by email if the contract counterparty has provided an email address to the Debtor or the Debtor otherwise has actual notice of such counterparty's email address. If any Successful Bidder or Back-Up Bidder is a special purpose entity, the Notice of Successful Bidder(s) shall also identify the entity or entities that are the primary equity holders of, or otherwise control, such special purpose entity.

xi. <u>Closing with Back-Up Bidders</u>. If the Debtor receives one or more additional Qualified Bids, then, at the Sale Hearing, the Debtor will seek approval of the Successful Bid(s) and, at the Debtor's election, the next highest or otherwise best Qualified Bid(s) (each "<u>Back-Up Bid</u>" and, any such bidder, a "<u>Back-Up Bidder</u>"), as determined by the Debtor in

consultation with its advisors and the Consultation Parties. Following Bankruptcy Court approval of the Sale to a Successful Bidder, if such Successful Bidder fails to consummate the Sale for any reason, then the applicable Back-Up Bid will be deemed to be the Successful Bid and the Debtor will be authorized, but not directed, to effectuate a Sale to such Back-Up Bidder subject to the terms of the Back-Up Bid without further order of the Bankruptcy Court. A Back-Up Bid shall remain open until the earlier of (i) the thirtieth (30th) day after the Outside Closing Date (as defined in the Asset Purchase Agreement) or (ii) the consummation of the Sale to a Successful Bidder (the "Back-Up Bid Expiration Date"). Any provision in the Back-Up Bid conditioning such Bid on a closing prior to the Back-Up Bid Expiration Date shall be void. All Qualified Bids other than a Successful Bid and a Back-Up Bid shall be deemed rejected by the Debtor on and as of the date of approval of the Successful Bid and the Back-Up Bid by the Bankruptcy Court.

xii.   Failure to Close. If a Successful Bidder fails to consummate the transaction in accordance with the terms of the applicable agreement executed by a Successful Bidder by the closing date contemplated in the purchase agreement agreed to by the parties for any reason, the Debtor shall: (i) solely to the extent provided for in the applicable purchase agreement retain the Successful Bidder's Good Faith Deposit; (ii) solely to the extent provided for in the applicable purchase agreement, retain the right to pursue all available remedies, whether legal or equitable; and (iii) be free to consummate the proposed transaction with the Back-Up Bidder at the Back-Up Bid, without the need for an additional hearing or order of the Bankruptcy Court.

xiii.   Good Faith Deposits. The Good Faith Deposit of any Back-Up Bidder shall be retained by the Debtor until the Back-Up Bid Expiration Date and returned to the Back-Up Bidder within five (5) Business Days thereafter or, if the Back-Up Bid becomes the Successful Bid, shall be applied to the Purchase Price to be paid by the Back-Up Bidder in accordance with the terms of the Back-Up Bid. The Good Faith Deposits of Qualified Bidders not selected as either the Successful Bidder or Back-Up Bidder shall be returned to such bidders within five (5) Business Days of the date of the selection of a Successful Bidder and a Back-Up Bidder. The Good Faith Deposit of a Successful Bidder will be dealt with in accordance with the terms of the Successful Bid.

xiv.   Sale Hearing. The Debtor will seek entry of the Sale Order from the Bankruptcy Court at the Sale Hearing to begin on **October 30, 2026** at _____ __.m. (prevailing Eastern Time), (or at another date and time convenient to the Bankruptcy Court) to approve and authorize the sale transaction(s) to the Successful Bidder(s) on terms and conditions determined in accordance with the Sale Procedures.

31

xv.  <u>No Shop or No Solicitation</u>. The Sale Procedures Order does not limit the Debtor's ability or right to solicit higher or otherwise better bids upon entry of the Sale Procedures Order.

41.  As noted above, the Debtor has not designated any stalking horse bidder as of the date of this Motion. The Debtor reserves the right, however, to return to this Court at any time prior to the Auction to seek approval of a stalking horse arrangement with a prospective purchaser, including approval of any bid protections (such as a break-up fee and/or expense reimbursement) in favor of such stalking horse bidder. In the event the Debtor designates a stalking horse bidder, the Debtor will file supplemental papers with the Bankruptcy Court on notice to all parties in interest, setting forth the terms of the proposed stalking horse arrangement and the basis for any requested bid protections. The Debtor will also serve notice of any such designation on all parties that have expressed an interest in acquiring the Sale Assets and all other parties entitled to notice under the Sale Procedures Order.

**D.  Notice Procedures.**

42.  As stated above, the Debtor requests that this Court schedule the Sale Hearing on **October 30, 2026.** The Debtor proposes that any objections to the Sale Motion's provisions for the conveyance of assets free and clear of all Interests (a "<u>Sale Objection</u>"),[15] must (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) set forth the specific basis for the Sale Objection; (d) be filed with the United States Bankruptcy Court for the District of Massachusetts, 595 Main Street, Room 311, Worcester, Massachusetts 01608-2076, together with proof of service, on or before August 16, 2026 at 4:00 p.m. (prevailing Eastern Time) (the "<u>Sale Objection Deadline</u>"); and (e) be served, so as to be actually received on or before the Sale Objection Deadline, upon the following parties (collectively, the "<u>Objection Notice Parties</u>"): (a)

---

[15] For the avoidance of doubt, Assumption/Cure Objections and Adequate Assurance Objections (each as defined below) shall be governed by the procedures set forth below.

proposed Debtor's counsel, Holland & Knight LLP, Attn: John J. Monaghan, Esq., Lynne B. Xerras, Esq., Kathleen St. John, Esq., 10 Saint James Avenue, 11th Floor, Boston, Massachusetts 02116, c/o lynne.xerras@hklaw.com; (b) Choate, Hall & Stewart LLP, Attn: Douglas R. Gooding, Esq. and Jonathan D. Marshall, Esq., Two International Place, Boston, Massachusetts 02110, c/o dgooding@choate.com, counsel to the DIP Lender and Prepetition Secured Creditor; (c) the Office of the United States Trustee for the District of Massachusetts, Attn: William K. Harrington, 5 Post Office Square, Suite 1000, Boston, Massachusetts 02116; and (d) counsel to any statutory committee appointed in this Chapter 11 Case. The Debtor and any other party in interest must file any reply to a Sale Objection by August 31, 2026, and the Court will adjudicate any Sale Objections at the Sale Motion Hearing scheduled for September 16, 2026. Objections to the designation of any Successful Bidder and entry of a Sale Order approving a sale transaction with a Successful Bidder must be filed and served by October 27, 2026 (five (5) business days after service of the Notice of Successful Bidder(s), or at the Sale Hearing, if earlier).  If a Sale Objection is not filed and served on or before the Sale Objection Deadline, the Debtor requests that the objecting party be barred from objecting to the Sale and appearing at the Sale Hearing and deemed to have consented to the Sale for all purposes, including for purposes of section 363(f) of the Bankruptcy Code, such that this Court may enter the Sale Order without further notice to any party failing to file a timely Sale Objection.

43.     The Debtor also requests that the Bankruptcy Court approve the form of the Notice of Sale Procedures, Auction Date, and Sale Hearing (the "Sale Notice"), substantially in the form of Exhibit 2 to the Sale Procedures Order. The Debtor will serve a copy of the Sale Notice on the following parties: (a) the Objection Notice Parties; (b) any parties requesting notices in this case pursuant to Bankruptcy Rule 2002; (c) the Office of the Attorney General for the Commonwealth

of Massachusetts; (d) the Massachusetts Department of Higher Education; (e) the United States Department of Education; (f) the New England Commission of Higher Education; (g) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Sale Assets, including those identified in this Motion; (h) all non-Debtor parties to any Assumed and Assigned Contracts; (i)  the Internal Revenue Service and other relevant taxing jurisdictions; (j) the Debtor's insurers; (k) all known creditors of the Debtor; (l) all parties known to have expressed an interest in acquiring the Sale Assets; (m) all environmental authorities having jurisdiction over any of the Sale Assets; and (n) all other parties entitled to notice under the Bankruptcy Rules and the Local Rules (collectively with the parties specified in this paragraph, the "Sale Notice Parties").[16]

44.     The Debtor proposes to file with the Bankruptcy Court and serve the Sale Notice within three (3) business days following entry of the Sale Procedures Order, by first-class mail, overnight courier, or email (where available) on the Sale Notice Parties.

45.     The Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale Procedures, Auction and Sale, and Sale Hearing to the Debtor's creditors and other parties in interest as well as to those who have expressed an interest or are likely to express an interest in bidding on the Sale Assets. Based on the foregoing, the Debtor respectfully requests that this Court approve these proposed procedures with respect to the Sale Notice.

**E.     Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases.**

46.     In connection with the Sale(s), the Debtor anticipates that the Successful Bidder(s) will request that certain executory contracts and unexpired leases be assumed by the Debtor and

---

[16] Copies of the Sale Procedures Order will also be made available to prospective purchasers of the Sale Assets or any subset of the Sale Assets.

assigned to a Successful Bidder pursuant to section 365 of the Bankruptcy Code (the "Assumed and Assigned Contracts"). On or before September 14, 2026 (no fewer than twenty (20) business days prior to the Sale Hearing), the Debtor shall cause notice to be provided to all counterparties to executory contracts and unexpired leases that may be Assumed and Assigned Contracts, substantially in the form of Exhibit 3 (the "Cure Notice") to the Sale Procedures Order. The Cure Notice shall provide the counterparties to the possible Assumed and Assigned Contracts notice of (a) the amount, if any, that the Debtor believes must be cured upon the assumption and assignment as required under section 365 of the Bankruptcy Code (the "Cure Amount"), (b) the procedures for objecting to the proposed Cure Amount and any non-bidder specific objection to assumption and assignment, and (c) the procedures for requesting and objecting to evidence of adequate assurance of future performance once the Successful Bidder(s) and Back-Up Bidder(s), if any, are identified.

47.    Except as may otherwise be agreed to by the parties to an Assumed and Assigned Contract (with the consent of the applicable Successful Bidder), within ten (10) days following applicable closing of the Sale with the applicable Successful Bidder, payments to cure those defaults under the Assumed and Assigned Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code will be made in accordance with the Asset Purchase Agreement executed by such Successful Bidder. Any disputed Cure Amount or payment required in connection with providing adequate assurance of future performance that may be imposed under sections 365(b) or (f) of the Bankruptcy Code shall be resolved by the Bankruptcy Court at the Sale Hearing or such later date as may be agreed to by the parties or ordered by the Bankruptcy Court and, if required, shall be paid as soon as practicable after entry of a final order determining such amount.

48.     Objections, if any, to (i) the proposed Cure Amount for an Assumed and Assigned Contract, or (ii) the proposed assumption and assignment of an Assumed and Assigned Contract on any basis not dependent on the identity, financial wherewithal, or operational capabilities of the ultimate assignee (an "Assumption/Cure Objection"), must be filed and served so as to be actually received by the Objection Notice Parties by no later than September 28, 2026 at 4:00 p.m. (prevailing Eastern Time) (the "Assumption/Cure Objection Deadline"). Any such Assumption/Cure Objection must set forth: (a) the specific basis for the objection; (b) if disputing the Cure Amount, the amount that the counterparty contends is owed, with appropriate documentation in support thereof; and (c) if objecting to the proposed assumption and assignment, the specific facts upon which the counterparty relies. Because no stalking horse bidder has been designated, the identity of the Successful Bidder(s) will not be known until after the Auction. Accordingly, any objection to the Successful Bidder's or Back-Up Bidder's ability to provide adequate assurance of future performance under section 365 of the Bankruptcy Code shall be governed by the adequate assurance procedures set forth below.

49.     To enable counterparties to begin evaluating Qualified Bidders' ability to provide adequate assurance of future performance in advance of the designation of the Successful Bidder(s), any counterparty to an Assumed and Assigned Contract who receives a Cure Notice and wishes to receive evidence of any Qualified Bidder's ability to provide adequate assurance of future performance under section 365 of the Bankruptcy Code may make such a request in writing (an "Adequate Assurance Notice Request") to counsel to the Debtor, Holland & Knight LLP, Attn: John J. Monaghan, Esq. and Lynne B. Xerras, Esq., Kathleen St. John, Esq., 10 Saint James Avenue, 11th Floor, Boston, Massachusetts 02116, c/o lynne.xerras@hklaw.com, by September 23, 2026 at 4:00 p.m. (Prevailing Eastern Time). Within twenty-four (24) hours following the

36

Debtor's determination that a Potential Bid constitutes a Qualified Bid, the Debtor shall send, by email, the evidence submitted by such Qualified Bidder in its Qualified Bid of its ability to provide adequate assurance of future performance to each counterparty that has submitted a timely Adequate Assurance Notice Request. Receipt of such evidence prior to the Auction is intended to enable counterparties to familiarize themselves with potential assignees so that they may act promptly once the Successful Bidder(s) is/are designated.

50.     Within twenty-four (24) hours after the designation of the Successful Bidder(s), whether at the Auction or otherwise in accordance with the Sale Procedures, the Debtor shall file with the Court and serve upon all counterparties to Assumed and Assigned Contracts, the Objection Notice Parties, and all other parties in interest the Notice of Successful Bidder(s) identifying the Successful Bidder(s) and the Back-Up Bidder(s), if any, the amount of each Successful Bid and each Back-Up Bid, if any, and the contracts and leases designated for assumption and assignment. The Debtor shall send the Notice of Successful Bidder(s) to all counterparties to Assumed and Assigned Contracts by overnight mail and also by email if the contract counterparty has provided an email address to the Debtor or the Debtor otherwise has actual notice of such counterparty's email address. If any Successful Bidder or Back-Up Bidder is a special purpose entity, the Notice of Successful Bidder(s) shall also identify the entity or entities that are the primary equity holders of, or otherwise control, such special purpose entity. After a Successful Bidder is designated, any counterparty to an Assumed and Assigned Contract may object to the Successful Bidder's or Back-Up Bidder's ability to provide adequate assurance of future performance by filing and serving a written objection (an "Adequate Assurance Objection") so as to be actually received by the Objection Notice Parties by October 27, 2026 (five (5) business days after service of the Notice of Successful Bidder(s), or at the Sale Hearing, if earlier) (the

"Adequate Assurance Objection Deadline"); provided that, if the Sale Hearing occurs before such deadline, the counterparty may raise such Adequate Assurance Objection at the Sale Hearing, and the Court may adjourn the hearing solely with respect to the affected contract or lease as necessary.

51.     If no Assumption/Cure Objections are timely received by the Assumption/Cure Objection Deadline, or if a counterparty otherwise fails to timely file and serve an Assumption/Cure Objection in accordance with the Sale Procedures Order, the Debtor seeks entry of an order providing that such counterparty shall be forever barred from objecting to (i) the proposed Cure Amount and (ii) the proposed assumption and assignment of the applicable Assumed and Assigned Contract to the Successful Bidder(s), and shall be deemed to have consented to the applicable Sale(s), the assumption and assignment of the applicable Assumed and Assigned Contract, and the Cure Amount set forth in the Cure Notice; provided, however, that such counterparty shall not be barred from timely raising an Adequate Assurance Objection by the Adequate Assurance Objection Deadline. Any counterparty that fails to timely file and serve an Adequate Assurance Objection shall be deemed to have consented to the Successful Bidder's or Back-Up Bidder's provision of adequate assurance of future performance.

52.     The Debtor seeks authorization and approval to assume and assign the Assumed and Assigned Contracts at Closing. Cure amounts disputed by any counterparty shall be resolved by the Bankruptcy Court at the Sale Hearing or such later date as may be agreed to by the parties or ordered by the Bankruptcy Court. Any unresolved Assumption/Cure Objection or Adequate Assurance Objection shall be resolved at the Sale Hearing or such later date as may be agreed to by the parties or ordered by the Court, and, unless the Court orders otherwise, the affected Assumed and Assigned Contract will not be assumed and assigned until after the Court has made its determination with respect to such objection. Upon payment of the Cure Amount and the entry

of an order of the Bankruptcy Court approving the assumption and assignment of an Assumed and Assigned Contract, such Assumed and Assigned Contract shall be deemed assumed and assigned, free and clear of all defaults existing as of the closing of the Sale.

53. Except to the extent otherwise provided in the applicable Bid of each Successful Bidder, pursuant to section 365(k) of the Bankruptcy Code, the Debtor and the Debtor's estate shall be relieved of all liability accruing or arising after the effective date of the assumption and assignment of the applicable Assumed and Assigned Contracts.

54. Pursuant to section 365(f) of the Bankruptcy Code, the Debtor seeks authorization and approval to assume and assign the Assumed and Assigned Contracts notwithstanding any provision to the contrary in the Assumed and Assigned Contracts, or in applicable non-bankruptcy law, that prohibits, restricts, or conditions the assignment.

55. Upon assumption of the Assumed and Assigned Contracts by the Debtor and assignment to the Successful Bidder(s), the Assumed and Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of the Sale Procedures Order.

F. **Sale of the Sale Assets Free and Clear**

56. At the Sale Hearing, the Debtor will seek Court approval of the Sale to the Successful Bidder(s), free and clear of all liens, claims, interests, and encumbrances pursuant to section 363 of the Bankruptcy Code (collectively, the "Interests"), with such Interests to attach to the Sale Proceeds in the same order of priority and with the same validity, force, and effect as such Interests attached to the Sale Assets prior to the Sale, subject to any claims and defenses the Debtor may possess with respect thereto, including the assumption by the Debtor and assignment to a Successful Bidder of the Assumed and Assigned Contracts pursuant to section 365 of the

39

Bankruptcy Code. The Debtor will also seek an order of the Bankruptcy Court prohibiting all persons holding such Interests, including rights or claims based on any successor or transferee liability, from asserting them against the Successful Bidder under section 363(f) of the Bankruptcy Code. The Debtor will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that a Sale is fair, reasonable, and in the best interest of the Debtor's estate and all interested parties, and satisfies the standards necessary to approve a sale of substantially all of a debtor's assets, as a reasonable exercise of the Debtor's business judgment.

### G. De Minimis Asset Sales

57. Notwithstanding any other provision of this Motion or the Sale Procedures, the Debtor further requests authority, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to sell, transfer, or otherwise dispose of any Sale Asset with a fair market value of less than $10,000 per transaction through a De Minimis Sale to a purchaser (each, a "De Minimis Asset Purchaser") without further order or approval of this Court, free and clear of all Interests pursuant to section 363(f) of the Bankruptcy Code, subject to the following conditions: (a) the Debtor shall provide no fewer than seven (7) business days' advance written notice, substantially in the form of Exhibit 4 (each, a "De Minimis Sale Notice") to the Sale Procedures Order, of any proposed De Minimis Sale to (i) the DIP Lender, (ii) the Prepetition Secured Creditor, (iii) counsel to any statutory committee appointed in this Chapter 11 Case, if any, and (iv) the U.S. Trustee (collectively, the "De Minimis Notice Parties"); (b) each De Minimis Sale Notice shall describe the asset(s) proposed to be sold, the identity of the proposed purchaser, the proposed purchase price, and such other material terms as the Debtor deems relevant; and (c) in the event that any of the De Minimis Notice Parties serves a written objection to a proposed De Minimis Sale upon the Debtor within the seven (7) business day notice period, the Debtor shall not consummate such De Minimis Sale

unless and until the Bankruptcy Court enters an order approving such sale after notice and a hearing. For the avoidance of doubt, the Debtor shall not structure or divide transactions to avoid the $10,000 threshold set forth herein, and the aggregate value of all De Minimis Sales consummated without further Court approval shall be subject to reporting in the Debtor's periodic reports filed with the Office of the United States Trustee or this Court.

## BASIS FOR RELIEF

### A.     The Sale Procedures Should Be Approved Because They are Fair and Will Maximize Value for the Benefit of the Estate and its Creditors.

58.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. To that end, courts uniformly approve sale procedures intended to enhance competitive bidding. *See, e.g., In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (noting that bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

59.     The Sale Procedures are consistent with procedures regularly approved by courts in this District for the sale of estate assets, and are designed to maximize the value received for the Sale Assets by facilitating a competitive bidding process in which all Potential Bidders are encouraged to participate and submit competing bids. The Sale Procedures are designed to implement an expedited sale process, which is essential to maximizing the value of the Debtor's estate for its creditors, in light of the Debtor's extreme financial pressures, including its wholesale reliance on post-petition financing, accelerating operational losses, and a further year-to-date loss from operating activities of approximately $3.46 million through March 31, 2026.

41

60.     The Sale Procedures will provide for an open, competitive process spearheaded by a sophisticated regional broker in which the value of the Sale Assets may be tested and maximized at an auction to ensure receipt of the greatest possible consideration for the Sale Assets for the benefit of the Debtor's creditors.

61.     The proposed Sale Procedures will promote active bidding from seriously interested parties and will dispel any doubt as to the highest or otherwise best offer reasonably available for the Sale Assets. In particular, the proposed Sale Procedures will allow the Debtor to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Sale Procedures provide the Debtor with the opportunity to consider all Qualified Bids and to select, in its reasonable business judgment, and after consultation with its advisors and the Consultation Parties, the highest or otherwise best offer(s) for the Sale Assets. The Sale Procedures also provide the Debtor with the flexibility to modify the Sale Procedures, if necessary, to maximize value for the Debtor's estate.

62.     The Sale Procedures establish a process that the Debtor believes is necessary to obtain maximum value for the Sale Assets and prevent any undue diminution of value. The sale process contemplated by this Motion and the Sale Procedures affords all interested parties sufficient notice of the Sale in accordance with Bankruptcy Rule 2002.

63.     The Debtor submits that the sale process, which starts with a broker-run market test and concludes with an auction among competing bidders, is in the best interest of the estate for the following reasons: (i) the Debtor has not entered into an asset purchase agreement with a stalking horse bidder and has not received a firm offer from any single prospective purchaser that the Debtor believes represents the highest or otherwise best value for the Sale Assets; (ii) the Campus

42

and related Sale Assets are unique, high-value properties that are likely to attract interest from a diverse range of potential acquirers, including educational institutions, real estate developers, healthcare operators, and other parties, and a competitive bidding process is the most effective means of identifying the highest and best use and eliciting the maximum purchase price from this broad universe of potential buyers; (iii) an open and transparent process provides all parties in interest, including the Debtor's secured creditor, unsecured creditors, and regulatory stakeholders, with confidence that the sale price reflects fair market value achieved through arm's-length competition; and (iv) the Sale Procedures are designed to encourage maximum participation by qualified bidders while preserving the Debtor's ability to designate a stalking horse bidder if a qualifying offer is received, thereby combining the benefits of both private negotiation and public competition. Further, the Sale Procedures Order also appropriately preserves, subject to further order of the Court and the rights of the Debtor, any statutory committee, and other parties in interest to object, the rights of any secured creditor with a valid, perfected, and enforceable lien and the right, power, and authorization to credit bid all or a portion of its secured claim under section 363(k) of the Bankruptcy Code.

64.    In sum, the Sale Procedures will encourage bidding for the Sale Assets and are consistent with the relevant standards governing auctions in bankruptcy proceedings. Accordingly, the Debtor submits that the proposed Sale Procedures are reasonable, appropriate, and within the Debtor's sound business judgment.

**B.      The Assumption and Assignment of the Assumed and Assigned Contracts and the Procedures for Assumption and Assignment Should Be Authorized**

65.      Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

66.      Upon finding that a trustee or debtor in possession has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code.

67.      The decision to assume or reject an executory contract or unexpired lease is governed by the business judgment standard. *See In re BankVest Capital Corp.*, 360 F.3d 291, 301 (1st Cir. 2004) (applying business judgment standard to debtor's decision to assume executory contract). Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. *See In re Decora Indus., Inc.*, No. 00-4459 JJF, 2002 WL 32332749, at *8 (D. Del. May 20, 2002); *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp.)*, 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

68.      Section 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor, providing:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A)      cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)      compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

44

(C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if--

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

69.    The Debtor will require that the Successful Bidder(s) demonstrate adequate assurance of future performance under the Assumed and Assigned Contracts. Adequate assurance of future performance is given a "pragmatic approach" evaluating "the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee." *In re GlycoGenesys, Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) (finding that credible financial statements and projected cash flows, as well as information regarding the experience of the assignee's principals to be sufficient evidence of adequate assurance).

70.    The Cure Notice and Assumption/Cure Objection procedures proposed herein afford counterparties to the Assumed and Assigned Contracts sufficient notice and an opportunity to be heard regarding the proposed Cure Amounts and any non-bidder-specific objections to assumption and assignment. Because no stalking horse bidder has been designated, the identity of the ultimate assignee will not be known until after the Bid Deadline and, if applicable, the Auction. Accordingly, the Sale Procedures provide counterparties with a two-track process: (a) counterparties must raise cure and non-identity-dependent objections by the Assumption/Cure Objection Deadline, and (b) counterparties may raise objections to adequate assurance of future performance – which necessarily depend on the identity, financial wherewithal, and operational capabilities of the Successful Bidder(s) – by the Adequate Assurance Objection Deadline, which

45

runs from the designation of the Successful Bidder(s). The Adequate Assurance Notice Request mechanism further enables counterparties to review the adequate assurance evidence of all Qualified Bidders as bids are received, so that counterparties may act promptly once the Successful Bidder(s) is/are identified.

71.     To the extent any defaults exist under any Assumed and Assigned Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment. If necessary, the Debtor will submit evidence prior to or at the Sale Hearing to show the financial credibility of each Successful Bidder and its willingness and ability to perform under the Assumed and Assigned Contracts proposed to be assigned to such Successful Bidder. The adequate assurance procedures set forth herein are designed to balance the Debtor's need for an efficient post-Auction closing timeline against counterparties' right to evaluate and, if necessary, challenge the ability of the Successful Bidder(s) or Back-Up Bidder(s) to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

72.     In addition, the Debtor submits that it is an exercise of its sound business judgment to assume and assign the Assumed and Assigned Contracts to the Successful Bidder(s) in connection with the consummation of the transactions contemplated in the applicable Successful Bidder's asset purchase agreement(s), and the assumption, assignment, and sale of the Assumed and Assigned Contracts to the Successful Bidder(s) are in the best interests of the Debtor, its estate, its creditors, and all parties in interest. The Assumed and Assigned Contracts being assigned to a Successful Bidder are an integral part of the Sale Assets being purchased by such Successful Bidder, and accordingly, such assumption, assignment, and sale of the Assumed and Assigned Contracts are reasonable and enhance the value of the Debtor's estate. The Bankruptcy Court

should therefore authorize the Debtor to assume and assign the Assumed and Assigned Contracts as set forth herein.

73. The Debtor submits that the cure and adequate assurance procedures set forth herein are appropriate, reasonably calculated to provide notice to any affected party, afford each affected party the opportunity to exercise any rights affected by the Motion, and are consistent with section 365 of the Bankruptcy Code. To the extent that any defaults exist under any Assumed and Assigned Contracts, any such defaults will be cured pursuant to the applicable Successful Bidder's asset purchase agreement. Accordingly, the Debtor submits that the procedures for effectuating the assumption and assignment of the Assumed and Assigned Contracts as set forth herein are appropriate and should be approved.

**C. Sale of the Sale Assets Is a Product of the Debtor's Reasonable Business Judgment and Appropriate under Bankruptcy Code Section 363(b).**

74. The Debtor seeks to have the Sale approved at the Sale Hearing pursuant to section 363 of the Bankruptcy Code, which provides: "the Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, the Sale should be approved pursuant to this Court's broad equitable authority under the Bankruptcy Code, which provides in relevant part: "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

75. In accordance with Bankruptcy Rule 6004, sales of property outside the ordinary course of business may be by private sale or public auction. Fed. R. Bankr. P. 6004(f)(1). The Debtor has determined that a hybrid approach, starting with a broker led solicitation and ending with an auction, whether in a single transaction or multiple transactions, and, if applicable, a post-petition overbid solicitation process for any stalking horse bid will enable it to obtain the highest

47

or otherwise best offer(s) for the Sale Assets (thereby maximizing the value of the estate) and is in the best interests of the Debtor's creditors. In particular, the Sale(s) will be the result of comprehensive arm's-length negotiations, subject to higher or otherwise better offers, and will provide a greater recovery for the Debtor's creditors than would be provided by any other existing alternative.

76.     Courts in this Circuit apply the business judgment standard to a debtor's proposed use, sale, or lease of estate property outside the ordinary course under section 363(b). *See In re BankVest Capital Corp.*, 360 F.3d at 301; *Milk Indus. Regulatory Office of P.R. v. Rosa Dairy Farm, Inc. (In re Rosa Dairy Farm, Inc*.), 622 B.R. 806 (B.A.P. 1st Cir. 2020). Courts have consistently held that this is a "very deferential standard" that gives due regard to the debtor's exercise of business discretion. *See In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has ample discretion to administer the estate, including authority to conduct public or private sales of estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's business judgment is subject to great judicial deference."); *In re Trans World Airlines*, No. 01-0056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale."). Accordingly, courts will generally approve pre-confirmation sales under section 363(b) where the debtor demonstrates a sound business justification, adequate notice, fair value, and good faith. *See, e.g., In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015); *In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014).

48

77. The primary aim of any sale of estate property under section 363 of the Bankruptcy Code is to obtain the maximum return possible for the benefit of the estate and its creditors. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." (quoting *In re Atlanta Packaging Prods.*, Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988))). As long as the sale appears to enhance a debtor's estate, court approval of a decision to sell should only be withheld if the judgment is clearly erroneous, too speculative, or contrary to the provisions of the Bankruptcy Code. *GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289 (B.A.P. 9th Cir. 2005).

78. Here, compelling business justification exists for the proposed Sale. The College has already ceased academic operations and is generating no revenue. Meanwhile, the estate continues to incur substantial carrying costs, including insurance, utilities, security, and maintenance on 17 buildings totaling over 300,000 square feet across 261 acres. The College's recent financial performance underscores the urgency of a prompt sale: for the nine months ended March 31, 2026, the College incurred a loss from operating activities of approximately $3,463,832, or approximately $385,000 per month on average. As of June 30, 2025, the College held only $133,499 in cash and cash equivalents and had only $1,597,754 available for general expenditures within one year.

79. The College depleted its investment portfolio to fund operations, with investments declining from $8,666,820 to $1,613,352 in a single fiscal year, and no undesignated investments

49

remaining. Total net assets decreased from $23,482,133 as of June 30, 2021 and $16,006,209 as of June 30, 2024, to $9,171,521 as of June 30, 2025, and the College recorded a further total reduction in net assets of approximately $3,507,852 through March 31, 2026.

80.    The Debtor, in the exercise of its sound business judgment, has determined that the Sale(s) represent the best available path to maximize value for the benefit of the Debtor's estate and all stakeholders because: (1) the Sale(s), involving a broker led process, a call for offers and an auction, will enable the Debtor to obtain the highest and best offer(s) for the Sale Assets, whether through a single transaction for all Sale Assets or through multiple transactions for subsets of the Sale Assets; (2) the Sale Procedures provide for adequate and reasonable notice; (3) the Sale(s) will provide a greater recovery for the Debtor's creditors than would be provided by any other alternative; and (4) the Sale(s) will be the result of comprehensive good-faith arm's length negotiations, subject to higher or otherwise better offers.

81.    Accordingly, based on the foregoing and the strong presumption that in making this business decision, the Debtor has "acted on an informed basis, in good faith and in the honest belief that the action was in the best interest of the company," *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986), the Debtor submits that the proposed Sale should be approved under section 363(b).

**D.    Sale of the Sale Assets Should Be Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to Bankruptcy Code Section 363(f)**

82.    Pursuant to section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell and transfer the Debtor's right, interest, and title in the Sale Assets to the Successful Bidder(s), in one or more transactions, free and clear of all liens, claims, encumbrances, and interests, with

50

such liens, claims, encumbrances, and interests, to attach to the proceeds of the Sale(s), subject to any rights and defenses of the Debtor and other parties in interest with respect thereto.

83.   Section 363(f) of the Bankruptcy Code provides, in pertinent part:

The trustee may sell property under subsection (b) or (c) of this Section free and clear of any interest in such property of an entity other than the estate, only if –

(1)   applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)   such entity consents;

(3)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)   such interest is in bona fide dispute; or

(5)   such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because section 363(f) is written in the disjunctive, satisfaction of any one of the five requirements will suffice to justify the sale of the Sale Assets "free and clear" of liens, claims, encumbrances, and other interests. *See, e.g., BAC Home Loans Servicing LP v. Grassi*, No. 08-21085-JBH, 2011 WL 6096509, at *5 (B.A.P. 1st Cir. Nov. 21, 2011) ("Because the language of § 363(f) is in the disjunctive, courts can approve a sale if any one of the five conditions is satisfied.").

84.   The Debtor requests that the Bankruptcy Court authorize the Sale(s) of the Sale Assets to the Successful Bidder(s) free and clear of all liens, claims, encumbrances, and other interests (collectively, "Interests"), with such Interests attaching to the proceeds of the Sale(s) in the same order of priority and with the same validity, force, and effect as such Interests had against the Sale Assets, pursuant to section 363(f) of the Bankruptcy Code. No creditor will be prejudiced by the Sale(s) because all Interests will attach to the Sale proceeds with the same priority, validity, and effect that such Interests had against the Sale Assets prior to the Sale(s). The Debtor submits

that the Sale(s) may be approved free and clear of all Interests because, with respect to each Interest

holder, one or more of the conditions of section 363(f) is satisfied.

85.    With respect to any creditor asserting an Interest, one or more of the standards set

forth in Bankruptcy Code §§ 363(f)(1)-(5) has been satisfied.

86.    Neither the State Court Injunction nor the Federal Interest were recorded with the

Worcester County Registry of Deeds prepetition rendering them subject to avoidance under the

strong arm powers of section 544(a)(3) and, therefore subject to a bona fide dispute and subject to

the free and clear provisions of section 363(f)(4).  The Massachusetts Supreme Judicial Court has

broadly defined claims "affecting title to real property" that must be recorded to include any claim

asserting "some interest in the real estate . . . including a lien or encumbrance." *Wolfe v. Gormally*,

440 Mass. 699, 706 (2004).

87.    A "bona fide dispute" exists when "there is an objective basis for either a factual or

legal dispute" as to the validity of an interest in property. *See In re Genesys Rsch. Inst., Inc.*, No.

15–12794–JNF, 2016 WL 3583229, at *20 (Bankr. D. Mass. June 24, 2016); *In re Robotic Vision

Sys., Inc.*, 322 B.R. 502,505 (Bankr. D.N.H. 2005). Section 544(a)(3) grants a trustee or debtor in

possession the power to avoid a transfer by the debtor to the same extent a bona fide purchaser

could avoid the transfer. 11 U.S.C. § 544(a)(3). Those avoidance provisions are equally as

applicable to both the Roys' asserted Interest[17] and the Federal Interest, despite the Debtor's

knowledge of both. *In re Webber Lumber & Supply Co., Inc.*, 134 B.R. 76, 79 (Bankr. D. Mass.

1991) (under section 544, the Debtor "exercises the rights of a trustee without regard to any

knowledge of the trustee or of any creditor.").

---

[17] Under Massachusetts law, "[a] judgment or decree, at law or in equity . . . affecting the title to real property, shall
not have any effect except against the parties thereto, their heirs and devisees and persons having actual notice thereof,
unless a certified copy of the record thereof has been recorded in the registry of deeds for the county or district where
the land lies." Mass. Gen. Laws, ch. 184 § 17.

88.     Because the State Court Injunction and the Federal Interest were not recorded, under Massachusetts law they would not be effective against a bona fide purchaser, and the Debtor has the authority to avoid that interest under its strong arm powers. Accordingly, the Debtor submits that the asserted Interests are subject to a bona fide dispute within the meaning of section 363(f)(4), and the Sale Assets may be sold free and clear of such Interests, with such Interests, if any, attaching to the proceeds of the Sale.[18]

89.     Although a Notice of Contract has been recorded by Bowdoin Construction, the proposed sale may also be free and clear of the resulting Mechanics' Lien pursuant to section 363(f)(5).  *See, e.g., In re Urban Commons 2 West LLC*, 668 B.R. 42 (Bankr. S.D.N.Y. 2025) (section 363(f)(5) enables free and clear sale of a recorded mechanics' lien because the property would be sold free and clear of such mechanics' lien in a foreclosure); *see also In re Boston Generating, LLC*, 440 B.R. 302 (Bankr. S.D.N.Y. 2010).

90.     Other potential holders of Interests who do not object or who withdraw their objections to the Sale or the Motion are deemed to have consented to the Motion and Sale pursuant to Bankruptcy Code section 363(f)(2).

91.     A sale free and clear of liens, claims, encumbrances, or interests is necessary to maximize the value of the Sale Assets. A sale of the Sale Assets other than one free and clear of

---

[18] The Debtor does not seek, by this Motion, a final determination of the validity, priority, extent, enforceability, or avoidability of the State Court Injunction. Litigation or final adjudication of the extent to which the asserted Interests may be avoided under section 544(a)(3) is not required for there to be a "bona fide dispute" for purpose of section 363(f)(4). *In re Genesys Rsch. Inst., Inc.*, No. 15–12794–JNF, 2016 WL 3583229, at *20 (Bankr. D. Mass. June 24, 2016) ("Section 363(f)(4) does not contemplate or require that the court resolve or determine any dispute about ownership before a sale hearing, but rather requires only an examination of whether there is an objective basis for either a factual or legal dispute . . . ."); *In re Genesys Rsch. Inst., Inc.,* No. 15–12794–JNF, 2016 WL 3583229, at *19 (Bankr. D. Mass. June 24, 2016) ("Nothing in section 363 requires a trustee to commence an adversary prior to sale, where there is an established bona fide dispute, and no such requirement can be found in Bankruptcy Rule 6004 that governs sales."); *In re Gaylord Grain L.L.C.*, 306 B.R. 624, 628 (B.A.P. 8th Cir. 2004) (holding that even where "the trustee did not file an adversary proceeding to avoid the liens in question, he may nevertheless sell free and clear of the bank's liens if he can show, pursuant to 11 U.S.C. § 544, an objective basis for avoiding the liens, and thus establish a bona fide dispute for purposes of 11 U.S.C. § 363(f)(4).").

all Interests would yield substantially less value for the Debtor's estate, with less certainty than the transactions contemplated by the Sale Procedures. Therefore, the transactions contemplated herein are in the best interests of the Debtor, its estate and creditors, and all other parties in interest. A sale free and clear of all Interests is particularly appropriate under the circumstances because any Interest in, to or against the Debtor's right, interest and title in the Sale Assets that exists immediately prior to the closing of any Sale will attach to the Sale proceeds allocated to the Debtor with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtor or any party in interest. The Debtor submits that holders of Interests, if any, will be adequately protected by the availability of the proceeds of the Sale(s) to satisfy their Interests.

92.     The legal basis for the sale of property free and clear of liens, claims, encumbrances, and other interests set forth above applies with equal force to De Minimis Sales. In addition, the Debtor submits that authorizing De Minimis Sales without further court order is a sound exercise of the Debtor's business judgment and is appropriate under the circumstances. Courts routinely approve de minimis sale authority in chapter 11 cases to permit the efficient disposition of low-value assets without the expense and delay of filing a separate motion and obtaining a separate order for each such sale. *See, e.g.*, *In re Oscient Pharmaceuticals Corp.*, No. 09-16575 (HJB), 2011 WL 8317810, at *2 (Bankr. D. Mass. Dec. 20, 2011); *In re: Source Home Ent., LLC,* No. 14-11553-KG, 2014 WL 4655746, at *1 (Bankr. D. Del. July 18, 2014).

93.     Here, the College's estate includes substantial quantities of tangible personal property, including furniture, equipment, motor vehicles, supplies, and other items, much of which has a low individual fair market value. Requiring the Debtor to incur the administrative expense of filing a separate motion and obtaining a separate court order for each sale of a low-value Sale

54

Asset would impose costs disproportionate to the value of the Sale Assets sold and would impede the efficient administration of the estate to the detriment of creditors. The notice and objection procedures set forth above adequately protect the interests of the Prepetition Secured Creditor, the DIP Lender, any statutory committee formed in this Chapter 11 Case, and the U.S. Trustee by affording each an opportunity to review and, if appropriate, object to any proposed De Minimis Sale before consummation. As set forth above, the Interests of any party asserting an interest in the Sale Asset subject to the applicable De Minimis Sale shall have such Interest attach to the proceeds of the applicable De Minimis Sale with the same validity, extent, and priority as it had in the applicable Sale Asset. Accordingly, the Debtor submits that the requested authority to conduct De Minimis Sales without further order of this Court, subject to the notice and objection procedures set forth herein, should be granted.

        E.       **The Successful Bidder(s) and De Minimis Asset Purchaser(s) Should Be Granted the Protection of Bankruptcy Code Section 363(m).**

94.     The Debtor also maintains that the Successful Bidder(s) and De Minimis Asset Purchaser(s) will be entitled to the protections afforded by Bankruptcy Code section 363(m).

95.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property acquired from the estate, notwithstanding that the sale is later reversed or modified on appeal. 11 U.S.C. § 363(m).

96.     While the Bankruptcy Code does not define "good faith," courts assessing good faith under section 363(m) focus on the integrity of the purchaser's conduct in the sale process. The First Circuit has recognized that a purchaser's good faith is an ultimate factual determination. *Greylock Glen Corp. v. Community Savings Bank*, 656 F.2d 1, 3 (1st Cir. 1981). Consistent with that approach, courts generally hold that misconduct sufficient to defeat good-faith purchaser status involves fraud, collusion between the purchaser and other bidders or

the trustee, or an attempt to take grossly unfair advantage of other bidders. *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). Courts also examine whether the purchaser bought for value, and a properly conducted auction may be sufficient evidence of value absent collusive or value-depressing conduct. *Id.* at 149.

97.     The Debtor submits that the Sale Procedures are designed to ensure that any transaction consummated pursuant thereto will be the product of arm's-length, good faith negotiations, free of any collusion among the parties thereto. Given the open, transparent, and competitive nature of the Sale Procedures, and that each De Minimis Sale will be an arms-length transaction subject to the notice and objection procedures set forth herein, the Debtor submits that each Successful Bidder and De Minimis Asset Purchaser will be a good faith purchaser. Accordingly, the Debtor requests that (i) the Sale Procedures Order include a finding that each De Minimis Asset Purchaser is a good faith purchaser entitled to the protections of section 363(m), and (ii) the Sale Order include a corresponding finding that each Successful Bidder is a good faith purchaser entitled to the protections of section 363(m).

98.     In addition, section 363(n) of the Bankruptcy Code permits a debtor to avoid a sale and recover damages where the sale price was controlled by an agreement among potential bidders at such sale. 11 U.S.C. § 363(n). The Debtor does not believe that any Sale pursuant to the Sale Procedures will be the result of collusion or other bad faith between bidders or that the purchase price will be controlled by an agreement between potential or actual bidders. As noted above, each Qualified Bidder is required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale. The Debtor requests that (i) the Sale Procedures Order include a finding that each De Minimis Sale is not subject to avoidance under section 363(n), and (ii) the Sale Order

include a corresponding finding that the applicable Sale is not subject to avoidance under section 363(n).

**F.     Notice of the Proposed Sale is Reasonable and Appropriate under the Circumstances**

99.    The Debtor submits that the Sale Notice is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Sale Procedures, the Auction (if necessary), the Sale Objection Deadline, the Sale Hearing and the Sale. Under Bankruptcy Rules 2002(a) and (c), the Debtor is required to notify creditors of the proposed sale of the Sale Assets, including a disclosure of the time and place of an auction, the terms and conditions of a sale, and the deadline for filing any objections.

100.    The Debtor submits that the Notice Procedures herein comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the sale by auction to the Debtor's creditors and other interested parties. The proposed time frame between the filing of this Motion, the commencement of the bidding process and the Auction will provide interested purchasers sufficient time to participate in the Auction.

**G.     Disposition of Sale Proceeds**

101.    At the closing of each Sale, the Debtor requests authority to disburse the net proceeds of such Sale as follows: first, to satisfy any and all DIP Obligations (as defined in the DIP Motion) and Prepetition Bond Obligations against the Sale Assets sold in such Sale, to the extent of the allowed amount of such secured claims and the value of such secured creditors' interest in the Sale Assets sold; and second, to retain any remaining proceeds to be used to fund this Chapter 11 Case's administration or distributed in accordance with any plan of reorganization or subsequent order of this Court.

**H.      Waiver of the Fourteen-Day Stay under Bankruptcy Rules 6004(h) and 6006(d) is Warranted.**

102.      Pursuant to Bankruptcy Rule 6004(h), unless the Bankruptcy Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Similarly, under Bankruptcy Rule 6006(d), unless the Bankruptcy Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days after entry of the order. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

103.      Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally Collier on Bankruptcy* ¶ 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Furthermore, if an objection is filed and overruled, and the objecting party informs the Bankruptcy Court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

104.      In light of the Debtor's financial constraints – including its reliance on post-petition financing, accelerating operating losses exceeding $7.4 million in fiscal year 2025, continued operating losses of approximately $3.46 million through March 31, 2026, recent historical operating losses averaging approximately $385,000 per month during that period, and a going concern opinion from its independent auditors – the potentially diminishing value of the Sale

Assets, and the continuing expense to the estate, the Debtor must close the Sale(s) promptly. It has arranged for funding of a process that balances value maximization with financial resource availability, and any delay in consummating the Sale(s) beyond the contemplated timeline will further erode the estate's already critically depleted resources to the detriment of creditors. Thus, waiver of any applicable stays is appropriate in this circumstance.

## RESERVATION OF RIGHTS

105. The Debtor reserves the right to modify the terms of the Sale Procedures and/or to withdraw the Motion at any time prior to entry of the Sale Order.

## NOTICE

106. Notice of the Motion will be provided by email, facsimile, or overnight courier to: (a) the Office of the United States Trustee; (b) all known creditors of the Debtor; (c) Douglas Gooding, Esq. and Jonathan D. Marshall, Esq., Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, c/o dgooding@choate.com, as counsel to the DIP Lender and the Prepetition Secured Creditor; (d) all known secured creditors of the Debtor; (e) all counterparties to the Assumed and Assigned Contracts; (f) all parties known to the Debtor to have expressed an interest in acquiring the Sale Assets; (g) all entities asserting liens, claims, interests, or encumbrances on the Sale Assets; (h) the Massachusetts Department of Higher Education; (i) NECHE; (j) the United States Department of Education; (k) any parties requesting notices in this case pursuant to Bankruptcy Rule 2002; (l) the Office of the Attorney General for the Commonwealth of Massachusetts; (m) all relevant taxing jurisdictions; (n) the Debtor's insurers; (o) all environmental authorities having jurisdiction over any of the Sale Assets; and (p) all other

59

parties entitled to notice under the Bankruptcy Rules and the Local Rules. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need to be given.

## NO PRIOR REQUEST

107. No previous request for the relief sought herein has been made to the Bankruptcy Court or any other court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that this Court: (I) enter the Sale Procedures Order, substantially in the form attached hereto as Exhibit A, (a) approving Sale Procedures in connection with the proposed Sale(s) of the Sale Assets, in one or more transactions, (b) scheduling the Auction and Sale Hearing and approving the Sale Notice, (c) establishing procedures relating to the assumption and assignment of executory contracts and unexpired leases in connection with the Sale(s) including approval of the Cure Notice, (d) authorizing the Debtor to consummate De Minimis Sales of Sale Assets with a fair market value of less than $10,000 per transaction free and clear of all liens, claims, encumbrances and other interests pursuant to section 363(f) of the Bankruptcy Code, without further order of this Court, subject to the notice and objection procedures set forth herein, and (e) granting related relief; and (II) upon the Sale Hearing, enter the Sale Order, substantially in the form attached hereto as Exhibit B, (a) approving the Sale(s) of the Sale Assets to the Successful Bidder(s), free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases to the Successful Bidder(s), and (c) granting such other and further relief as this Court deems just and proper.

Dated: June 26, 2026

Respectfully submitted,

/s/ *John J. Monaghan*
John J. Monaghan (MA Bar #546454)
Lynne B. Xerras (MA Bar #632441)
Kathleen St. John (MA Bar #681565)
**HOLLAND & KNIGHT LLP**
10 St. James Avenue
Boston, MA  02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850
E-mail: john.monaghan@hklaw.com
       lynne.xerras@hklaw.com
       kathleen.stjohn@hklaw.com

*Proposed Counsel to the Debtor*