**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

|  |  |
|---|---|
| In re: | |
| | Chapter 11 |
| THE SISTERS OF ST. ANN<br>d/b/a ANNA MARIA COLLEGE, | Case No. 26- 40758 |
| Debtor.[1] | |

**DECLARATION OF DR. SEAN J. RYAN IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

I, Sean J. Ryan, Ed.D., hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

1.      I am the President of The Sisters of St. Ann d/b/a Anna Maria College (the "Debtor" or the "College"). I was appointed to serve in this role for a three year period effective July 1, 2025. I have more than twenty-seven years of experience in higher education administration, including most recently as the Senior Vice President for Administration, Strategic Initiatives, and Trustee Affairs at Bellarmine University. Prior to that I was the Vice President for Enrollment Management and Dean of the School of Continuing and Professional Studies at Bellarmine University. I hold a doctorate in education from the University of Pennsylvania, a graduate degree from Regis College, and an undergraduate degree from St. Anselm College.

2.      In my capacity as President, I serve as the chief executive and administrative officer of the College, vested with full authority over the College's operations subject only to the approval and direction of the Board of Trustees (the "Board"). I serve *ex officio* as a member of the Board and when

---

[1] The last four digits of the Debtor's taxpayer identification number are 2060. The Debtor's address is 50 Sunset Lane, Paxton, MA 01612.

appointed, I was tasked with responsibility for providing educational leadership to staff, faculty and students; ensuring implementation of Board policies; overseeing compliance with all applicable legal and regulatory requirements; maintaining appropriate academic standards; and advancing the best interests of the College community.

3.      As duly authorized representative of the Debtor, I submit this declaration (the "Declaration") in support of the voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") filed on June 26, 2026 (the "Petition Date") commencing the above-captioned chapter 11 case (the "Chapter 11 Case"), and the relief requested in the initial set of motions the Debtor has filed concurrently herewith described herein (the "First Day Motions")

4.      Except as otherwise indicated, all facts set forth in this Declaration are based upon (i) my personal knowledge and information acquired in my capacity as President; (ii) consultation with other officers, Board members, employees, and trustees of the College or with the Debtor's advisors, including Verdolino & Lowey P.C. ("V&L"); (iii) my review of relevant documents, including the College's books and records, governance documents, and financial statements; and (iv) my professional experience, analysis and understanding of the College's operations, financial condition and the higher education industry. If called upon to testify, I could and would testify competently to the facts set forth herein.

5.      To better familiarize the Court with the Debtor, its operations, and the circumstances leading to the Chapter 11 Case, this Declaration is organized as follows: **Part I** provides general background regarding the formation of the College, its long-history as an institute of higher education, its organizational structure, and capital and debt structure; **Part II** describes the events leading to the

filing of this Case, and the Debtor's initial restructuring and sale efforts; and **Part III** sets forth the basis for the relief requested in the First Day Motions.

## PART I

## GENERAL BACKGROUND

### A.    The Debtor's History

6.    Anna Maria College is a private, Catholic, coeducational institution of higher education located on an approximately 260-acre residential campus at 50 Sunset Lane, Paxton, Massachusetts, just outside the City of Worcester, Massachusetts ("Campus"). The Campus is spread across multiple parcels, as described in greater detail below, and is zoned "GRB (General Residence District B)" under the Town of Paxton's zoning regulations.  It operates as an educational institution by special permit.

7.    The College was founded in 1946 as a college exclusively for women by the Sisters of Saint Anne of Marlborough, Massachusetts, with a charter from the Commonwealth of Massachusetts authorizing the College to grant all degrees except those in law and medicine. The College relocated to the Campus in 1951, and in 1955, was accredited by the New England Association of Schools and Colleges (now known as the New England Commission of Higher Education, or "NECHE"). The College transitioned to co-education in 1973 and opened its graduate division in 1974. Since approximately 1980, the College has operated as an independent nonprofit corporation while maintaining its Catholic mission and identity, with governance vested in the Board.

8.    Until recently, as will be discussed, the College's academic programs were organized into the following disciplines: Natural Sciences (nursing, health science, fire science, paramedic science, and emergency management); Humanities (history, English, theology, and philosophy); Art and Music; Economic and Legal Sciences (business, criminal justice, forensics, and law and society); and Social Services (social work, psychology, education, and health and human services). Broadly,

3

the College has balanced liberal arts education with career-oriented programs, educating teachers, social workers, nurses, and public safety professionals.

9.      As of fiscal year ending June 30, 2025 (the 2024-2025 academic year), total student enrollment was approximately 1,520 students. Approximately 1,529 students were enrolled for the 2025-2026 academic year before the College ceased academic operations in May, 2026.

**B.      Overview of the Debtor's Organizational Structure.**

10.      The Debtor is organized as a Massachusetts nonprofit corporation under a charter originally granted on July 14, 1887 by the Commonwealth of Massachusetts, as amended by a Certificate of Change of Purpose dated March 8, 1946. Its governance structure is set forth in the Debtor's Articles of Organization and its Bylaws (the "Bylaws"), as most recently amended on May 9, 2025; as a non-profit entity, the Debtor does not have shareholders.

11.      The Bylaws provide that, in the event of dissolution or termination of the College, all remaining net assets shall be transferred to The Community of the Sisters of Saint Anne, a Massachusetts not-for-profit corporation located at 720 Boston Post Road East, Marlborough, Massachusetts, 01752 ("Sisters Community").

12.      In the ordinary course of operating the College, the Debtor's senior leadership team included a Senior Vice President for Academic Affairs, an Executive Vice President and Chief Information Officer, a Vice President for Enrollment, a Vice President for Student Affairs, and a Vice President for Institutional Advancement, a Vice President for External Relations and COO, among other officers and managers. These individuals, however, are no longer employed by the College or will shortly term from employment by the College as of June 30, 2026.

**C.      Debtor's Prepetition Capital and Debt Structure.**

13.      As described in the contemporaneously filed *Debtor's Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code and*

4

*Bankruptcy Rules 2002, 4001 and 9014: (I) Authorizing Debtor to Obtain Postpetition Financing, (II) Granting Consensual Priming Liens and Providing Superpriority Administrative Expense Status, (III) Authorizing Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion"),[2] the Debtor obtained funding on a secured basis from Citizens Funding Corp., a New Hampshire corporation (the "Purchaser"), and Citizens Bank, N.A., a national banking association, as disbursing agent (the "Disbursing Agent" and, together with the Purchaser, the "Prepetition Secured Creditor"), pursuant to a *Loan and Security Agreement,* dated November 1, 2017, as amended by that certain *First Amendment to Loan and Security Agreement* dated November 8, 2018, and as further amended by that certain *Second Supplemental Loan and Security Agreement* dated June 20, 2023 and effective as of July 3, 2023 (as amended, the "LSA").

14.     The LSA represents the proceeds of the Anna Maria College Issue, Series 2017 bonds, dated as of November 30, 2017, reissued on November 8, 2018, and amended as of June 20, 2023, with a registration date of July 3, 2023, in the original principal amount of $24,500,000.00 (as amended, the "Bonds"), purchased by the Purchaser from the Massachusetts Development Finance Agency (the "Issuer") and loaned to the Debtor (the "Prepetition Loan"). The proceeds of the Prepetition Loan were used to refinance then-existing bond debt and to fund certain capital expenditures of the Debtor, including (a) renovating, furnishing and equipping the College's dining hall and student union, (b) renovating College restrooms to make them ADA compliant, and (c) funding other routine deferred maintenance projects. The Bonds, and therefore the debt evidenced by the LSA, bear interest at a variable rate equal to 65% of adjusted SOFR plus 3.25%, with monthly principal and interest payments and a final maturity of November 30, 2040. The Bonds also include a

---

[2] Capitalized terms in this subsection shall have the meanings ascribed to them in the DIP Motion.

mandatory put provision requiring the Prepetition Secured Creditor to either extend the Bonds or require repayment on November 30, 2027.

15. The Debtor's obligations to the Prepetition Secured Creditor are secured by first-priority, senior secured liens (the "Prepetition Bond Liens") on substantially all of the Debtor's assets,[3] including, without limitation, the Debtor's real property, equipment, receivables, contracts and contract rights, inventory, intellectual property rights, general intangibles, and all proceeds and products of the foregoing (collectively, the "Prepetition Collateral"). The Prepetition Bond Liens are evidenced by, among other things, (i) that certain *Mortgage, Security Agreement and Fixture Filing* dated November 30, 2017, recorded with the Worcester South District Registry of Deeds in Book 58113, Page 296, as amended by that certain *Amendment No. 1 to Mortgage, Security Agreement and Fixture Filing* dated as of September 30, 2024, recorded with the Worcester South District Registry of Deeds in Book 71102, Page 299 (the "Mortgage" and the property encumbered thereby, the "Mortgaged Property"); (ii) that certain *Security Agreement (All Assets)*, dated as of November 30, 2017, by the Debtor in favor of the Disbursing Agent, for itself and as agent for the Purchaser (as amended, the "Security Agreement"); and (iii) that certain *Collateral Assignment of Permits, Licenses, Approvals and Contracts* dated November 30, 2017 by the Debtor to the Disbursing Agent, for itself and as agent for the Purchaser (the "Collateral Assignment").

16. Pursuant to that certain *Continuing Covenants Agreement* dated as of November 30, 2017, between the Debtor and the Purchaser, as amended by that certain *Amendment to Continuing Covenants Agreement and Related Documents* dated November 8, 2018, and as further amended by that certain *Second Amendment to Continuing Covenants Agreement and Related Documents* dated

---

[3] The Prepetition Bond Liens do not extend to "all gifts, grants, bequests, donations and contributions heretofore or hereafter made to Debtor, to the extent that same are designated or restricted at the time of making thereof by the donor or maker as being for certain specified purposes so that same may not be applied to any of the obligations secured by the collateral."

September 30, 2024 (the "CCA," and together with the LSA, the Security Agreement, the Collateral Assignment, the Mortgage and all other documents and agreements executed in connection with the issuance of the Bonds, the "Prepetition Bond Documents"), the Debtor is subject to financial covenants including (a) a debt service coverage ratio of not less than 1.25:1.00, tested quarterly; (b) minimum liquidity (unrestricted cash and investments) of not less than $10,000,000, tested semi-annually on June 30 and December 31; and (c) minimum freshman enrollment of 300 full-time students by September 30 each year.

17. Since the execution of the LSA and related Prepetition Bond Documents, the Debtor has obtained waivers and covenant modifications from the Prepetition Secured Creditor several times, entering into that certain *Waiver and Covenant Modification* dated as of March 17, 2023 by and between the Prepetition Secured Creditor and the Debtor; that certain *Second Waiver and Covenant Modification* dated as of December 26, 2023, as amended by *Amendment No. 1 to Second Waiver and Covenant Modification* dated September 30, 2024; and that certain *Third Waiver of Covenants* dated as of December 19, 2024. The Debtor defaulted on its obligations to the Prepetition Secured Creditor prior to the Petition Date.

18. As of the filing of this Case, I understand that the Prepetition Secured Lender has calculated that the aggregate outstanding principal amount owed by the Debtor under the Prepetition Bond Documents was not less than $17,734,804.13 (the "Prepetition Secured Debt").

19. Based on review of the College's records and Prepetition Bond Documents, I am aware of the assertion of certain other interests with respect to the Assets, as described in the DIP Motion and Sale Motion, although none appear to give rise to valid liens.

20. In addition, it is my understanding that the Debtor's unsecured liabilities total approximately $5.5 million, consisting primarily of: a) amounts potentially owed to the U.S.

Department of Education on account of overpayments received by the College in connection with G5 Awards and Title III Grants, totaling approximately $987,495.00 and $584,562.00, respectively; b) accrued and unpaid trade payables totaling approximately $3,800,000; and c) refunds due to a sub-set of former students for overpayments of tuition and other charges, totaling approximately $211,000 (inclusive of checks issued, but not cashed).

21.     Since my appointment, I have been made aware that prior to the start of my tenure at the College, a Verified Complaint with the Worcester Superior Court ("State Court") was filed by David Roy, Elaina Roy, and David Roy, Jr. (collectively, the "Roys"), neighbors of the College alleging to hold an oral right of first refusal to purchase a small portion of Parcel Three referred to as Lot 2, based on statements allegedly made by the College's former president and executive vice president (the "Roy Litigation"). It is my further understanding that on July 24, 2025, the State Court issued a consensual form of temporary restraining order preventing the sale of Lot 2 desired to be acquired by the Roys pending trial on the matter (the "TRO") although notice of the TRO was not recorded with the Worcester Registry of Deeds prior to the Petition Date. The College intends to market the entire Campus for sale, and otherwise dispute assertions made by the Roys.

**D.     The Debtor's Assets.**

22.     Based on my review of the Debtor's historic and more recently prepared financial statements, the Debtor's assets fall roughly into the following categories:[4]

a.     Real Property. The Campus at 50 Sunset Lane, Paxton, Worcester County, Massachusetts, consisting of three parcels of land totaling approximately 261.75 acres, with 17 buildings and all improvements thereon, appraised at a total as-is market value well in excess of the Prepetition Secured Creditor's debt as of January 7, 2025. The Debtor holds fee simple title to all Campus parcels, as confirmed by Commonwealth Land Title Insurance Company Loan Policy No. 1447-1-51652-2017.81307-212819014, issued November 30, 2017. The individual Campus parcels are as follows:

---

[4] Additional detail regarding the Assets will be set forth in the Debtor's Schedules, to soon be filed.

i.  <u>Parcel One.</u> 180.28 acres of land acquired by deed dated June 29, 1951, recorded at the Worcester County Registry of Deeds in Book 3346, Page 545, and described as land situated on the westerly side of Grove Street in the Town of Paxton, Worcester County, Massachusetts, with frontage on Grove Street and Sunset Lane.

(a) The Town of Paxton Tax Assessor identifies approximately 123.08 acres of this land as the developed campus at 50 Sunset Lane (Assessor's Parcel 17-22), improved with 17 buildings containing approximately 300,622 square feet of gross building area.

(b) The Town of Paxton Tax Assessor identifies approximately 56.49 acres of this land as excess undeveloped land on Grove Street (Assessor's Parcel 17-22M).

ii.  <u>Parcel Two.</u> 10.0651 acres of land acquired by quitclaim deed dated April 3, 2002, recorded at the Worcester District Registry of Deeds in Book 26876, Page 275, and described as land situated on the westerly side of Sunset Lane with frontage on Grove Street in the Town of Paxton, Worcester County, Massachusetts (Assessor's Parcel 17-22C).

iii.  <u>Parcel Three.</u> Approximately 72.12 acres of land acquired by quitclaim deed dated April 14, 2022, recorded at the Worcester District Registry of Deeds in Book 68580, Page 352, and described as land situated off Grove Street at the intersection of Grove Street and Streeter Road in the Town of Paxton, Worcester County, Massachusetts, excepting therefrom (i) a parcel conveyed to David E. Roy and Elaina M. Roy by deed dated May 16, 1997, recorded in Book 18897, Page 58, and (ii) Parcel Two described above (Assessor's Parcel 17-22A).

b.  <u>Buildings and Improvements.</u> All buildings, structures, and improvements now located on the real property described above, consisting of 17 buildings totaling approximately 300,622 square feet of gross building area, built between 1750 and 2012, in average to average/good overall condition.

c.  <u>Personal Property.</u> All furniture, fixtures, equipment, machinery, tools, furnishings, inventory, supplies, and other tangible personal property located on or used in connection with the Campus, including, without limitation, furniture and equipment with a gross cost basis of approximately $13,049,731, motor vehicles with a gross cost basis of approximately $542,559, and library books, periodicals, and audio-visual materials with a gross cost basis of approximately $2,020,877. Perhaps most importantly, and within the Personal Property Category, are religious artifacts and artwork obtained by the College, generally from donors, over the eighty years of pursuing its educational mission.

d.  <u>Intangible Property.</u> All intellectual property, goodwill, permits, licenses, accounts receivable, contracts, leases, and all other intangible assets used in connection with the operation of the College or the Campus. The College's various specialty accredited programs fall roughly in this category, as does a claimed Employee Retention Tax

9

Credit right of approximately $2.5 million that is currently the subject of an appeal to the Independent Office of Appeals of the Internal Revenue Service.

23.     As referenced above, substantially all of the Assets, including the Campus but excluding certain personalty described above, are encumbered by the Prepetition Bond Liens.

24.     According to an appraisal prepared by BBG, Inc., dated January 7, 2025 (the "Appraisal"), which I have reviewed, the Campus has an aggregate as-is market value substantially in excess of the College's secured debt.

## PART II

### The College's Deteriorating Financial Position and Strategic Restructuring

**A.     Events Leading to the Chapter 11 Filing**

25.     The Debtor's Chapter 11 filing results from a convergence of systemic challenges in higher education and institution-specific circumstances that left the College with no viable alternative to seeking relief under the Bankruptcy Code to preserve value.

26.     As a small, private, tuition-dependent institution, the College has been particularly impacted by a steady decline in enrollment in recent years. The College's core tuition revenue declined materially in the years preceding the Petition Date, with net tuition and fee revenue falling from approximately $19.2 million in fiscal year 2021 to approximately $14.3 million in fiscal year 2025, while total student enrollment declined from 1,853 to 1,520 over the same period.

27.     This decline in net tuition revenue reflects both a reduction in gross tuition and fees, which fell from approximately $41,923,831 in fiscal year 2021 to $37,595,855 in fiscal year 2025, and a persistent tuition discount rate driven by financial aid awards that exceeded $20 million annually throughout the period. Net tuition revenue per student fell from $10,345 in fiscal year 2021 to $9,408 in fiscal year 2025, and declined further to approximately $7,823 for the nine months ended March

31, 2026, reflecting both the enrollment decline and the deepening financial aid discount necessary to attract and retain students.

28.    Enrollment declined across virtually all program categories. Total unique student enrollment fell from 1,853 in academic year 2020-2021 to 1,520 in academic year 2024-2025. Traditional undergraduate day students (UDAY) declined from 972 to 814, graduate students (GRAD) declined from 377 to 209, online undergraduate students (OLC) declined from 213 to 171, and online graduate students (OLG) declined from 253 to 188 over the same period. The only area of growth in enrollment, although not revenue as grant-funded, was the dual enrollment (DUAL) program, which increased from zero students to 115 over the period.

29.    The College's non-tuition revenue sources also contracted or proved insufficient to offset the tuition shortfall. Government grants, which had provided as much as $4,416,176 in fiscal year 2024 and $3,978,886 in fiscal year 2022 (in large part attributable to COVID-19 relief funding), declined to $1,017,946 in fiscal year 2025 as federal pandemic relief programs expired. Investment return appropriated for operations similarly declined, from $1,326,286 in fiscal year 2023 to $226,089 in fiscal year 2025. While the College received elevated contributions and gifts of $1,909,258 in fiscal year 2025, this amount was insufficient to offset the erosion in tuition, grants, and investment returns.

30.    The College's operating losses accelerated in the years preceding the Petition Date. Total revenue declined from approximately $33,133,669 in fiscal year 2021 to $25,335,884 in fiscal year 2025, while total operating expenses grew from approximately $29,215,594 to $32,861,853 over the same period, resulting in consecutive losses from operations of approximately $718,881 in fiscal year 2022, $4,268,446 in fiscal year 2023, $4,631,060 in fiscal year 2024, and $7,525,969 in fiscal year 2025. For the nine months ended March 31, 2026, the College recorded total operating revenue and other support of approximately $19,954,547 against total operating expenses of approximately

$23,418,379, a loss from operating activities of approximately $3,463,832, and a total change in net assets of approximately negative $3,507,852.

31.     Salaries and wages represent the College's largest single expense category, totaling $13,459,855 in fiscal year 2025, with payroll taxes and employee benefits adding an additional $2,893,747. Other significant expense categories include professional fees ($2,796,004), depreciation and amortization ($1,919,225), food services ($1,889,968), recruiting ($1,378,649), utilities ($1,226,742), interest expense ($757,897), and travel and entertainment ($972,583). The College's expense structure reflects the fixed-cost nature of operating a campus-based institution, which cannot be readily reduced in proportion to declining enrollment and revenue.

32.     The College's cash and cash equivalents declined to $133,499 as of June 30, 2025, from $227,273 in 2024 and $981,420 in 2023, while investments declined from $8,666,820 in 2024 to $1,613,352 in 2025, with no undesignated investments remaining. The amount available for general expenditures within one year declined from $9,442,220 in 2024 to $1,597,754 in 2025, and total net assets declined from $23,482,133 as of June 30, 2021 and $16,006,209 as of June 30, 2024 to $9,171,521 as of June 30, 2025.

**B.     The Difficult Decision to Close the College**

33.     As of June 30, 2025, the College's independent auditors, Bollus Lynch, LLP, expressed substantial doubt regarding the College's ability to continue as a going concern in their report dated April 13, 2026. This qualification triggered regulatory consequences, including increased scrutiny under federal Title IV student financial aid regulations, creating uncertainty regarding continued access to federal student aid and adversely affecting enrollment and revenue projections.

12

34.     In March 2026, NECHE issued a public notation expressing concern that the College may fail to meet its Institutional Resources standard and indicated ongoing monitoring through Spring 2026.

35.     On April 10, 2026, the Massachusetts Department of Higher Education issued a Financial Assessment and Risk Monitoring ("FARM") public notification stating that it could not confirm that the College had sufficient resources to sustain operations through the current and following academic year.

36.     As these issues became public, the College received donations (including from certain anonymous donors) in the aggregate amount of $5.3 million, enabling it to sustain operations through commencement activities held in May, 2026. The College also undertook significant remedial actions, including discontinuing certain academic programs (Music, Music Education and Music Therapy), implementing cost reductions exceeding $2 million, and enhancing enrollment and fundraising efforts. These funds supported the College's ability to complete the 2025-2026 academic year, and confer degrees on graduating seniors and graduate students as an accredited institution.

37.     Around this time, the Board undertook an extensive review of the College's financial condition, considering, among other factors: (i) significant and sustained enrollment underperformance that materially reduced net tuition revenue; (ii) the depletion or projected depletion of the College's operating reserves below levels necessary to sustain continued operations; (iii) the College's inability to access additional debt refinancing or other capital on commercially reasonable terms; (iv) the failure of cost-reduction measures and other efforts to stabilize the College's financial position; and (v) determination by the College's financial advisors that no viable path to financial sustainability has been identified.

13

38.     After this evaluation, and in consultation with their advisors, on April 22, 2026, the Board adopted resolutions determining that the College faced an imminent and severe financial crisis that threatened its ability to continue as an operating institution, and that could not be resolved through the implementation of ordinary budgetary measures or short-term remediation. As a result, the Board determined that the College was in a state of "financial exigency" as that term is understood under applicable accreditation standards and academic governance principles. Accordingly, the Board determined that the most responsible course of action, in the best interests of the College's enrolled students, faculty, staff, creditors, and the public, was to implement an orderly teach-out of enrolled students, cease academic operations following the conclusion of the Spring, 2026 semester, and not accept further student enrollments.

39.     In addition, the Board authorized the engagement of Verdolino & Lowey, P.C. ("V&L") as the Debtor's financial advisor, as well as Holland & Knight LLP ("H&K") as its lead restructuring counsel, to explore strategic alternatives to maximize the Debtor's value, including a potential sale of the Campus and other assets. The Board and the College's advisors evaluated all available options, including potential mergers, acquisitions, partnerships, recapitalization of the bond debt, and potential purchasers of the Campus, ultimately concluding that a sale under section 363 of the Bankruptcy Code offered the best prospect for maximizing value for creditors and protecting the interests of students, donors, and the broader community.

40.     On April 23, 2026, the College sent WARN Act notices to its employees, the Town of Paxton, and the MassHire Department of Career Services. On May 8, 2026, the Board authorized the commencement of this Chapter 11 Case, with the College projecting that it would exhaust available cash by the end of June, 2026 without additional funding, The College ceased academic operations as of May 9, 2026, when its final graduating class received their diplomas. The Debtor terminated all but

approximately twenty-five of its employees (the remaining, the "Transition Team") effective as of June 4, 2026, with further layoffs having occurred prior to the Petition Date (the impacted Employees, the "Terminated Employees").

41.     When news of the College's financial struggles became more public, however, an anonymous benefactor generously funded a donation to the Debtor in the amount of $1,500,000 ("Restricted Funds") available only to satisfy the Debtor's payroll related expenses, including accrued wages and paid time off, and benefits for the Debtor's employees, including the cost of employee benefit plan premiums through the end of June 2026. With the Restricted Funds, the Debtor was able to pay each Terminated Employee prior to the Petition Date, *in advance*, the amount the Debtor calculated was owing to each employee as of June 30, 2026 in accordance with the Debtor's policies and procedures including: 1) wages; 2) accrued and unused paid time off ("PTO"), net of each Employee's share of payroll taxes and required deductions, separately paid by the Debtor's payroll processing company; and 3) the cost of maintaining the Debtor's health insurance policy for all employees through the end of June 30, 2026, when the plan administered by Mass General Brigham Health Plan will be terminated. In addition, the Debtor was able to fund the cost of all accrued PTO earned by the Transition Team through June 30, 2026 with the Restricted Funds.

42.     On June 24, 2026, the Debtor also funded, with permission of the Prepetition Secured Lender, payroll for all members of the Transition Team through June 20, 2026, such that the Debtor believes that there are no obligations relating to employee expenses or benefits due and owing for the prepetition period.  At present, therefore, the Debtor believes that it has satisfied its obligations to the Terminated Employees in full, *as well as having paid all PTO that has and will accrue in favor of the Transition Team and the Terminated Employees.*

43.     I, along with several other individuals working part-time, will remain employed by the College for the duration of this Case.

44.     As is customary, the Transition Team (and the Remaining Staff thereafter) will continue to be paid on a bi-weekly basis, with the next payroll to be funded on or about July 8, 2026.

45.     The College is committed to ensuring that currently enrolled students have a clear path to degree completion. The College has entered into Pathway Agreements with Worcester State University, Regis College, Springfield College, Bay Path University, Elms College, Fitchburg State University and UMass Lowell. Under these Pathway Agreements, the partner institutions have agreed to guarantee admission to eligible Anna Maria College students seeking to continue their studies at accredited institutions offering comparable programs. The College continues to explore additional arrangements to support its students' academic continuity. Regis College has agreed to serve as the custodian of records.

46.     In addition, despite its declining resources, the College has been cooperating with the applicable regulatory agencies, including the Massachusetts Department of Higher Education ("MA DHE") and the United States Department of Education ("DOE"), in connection with the closure of the College; in my role as President, I will ensure that the College strives to comply with all applicable regulatory requirements regarding the maintenance or transfer of student records and students to colleges of their choice for the Fall semester.

47.     Once the College initiated its wind-down process with regulatory oversight following the decision to close, representatives of the College's development office and the Board of Trustees reached out to past donors and benefactors to either obtain consent to alter or delete restrictions on endowment funds, or solicit additional donor provided funding to provide liquidity to meet current obligations to students and faculty and other restructuring activities. In doing so, the College was

fortunate to receive certain anonymous donations, including a $5.3 million infusion for operating and other general expenses and the separate $1.5 million restricted endowment mentioned above. Efforts to solicit additional restricted or unrestricted funds were unsuccessful however.

### C. The Chapter 11 Case and Anticipated Sale Process.

48. Based on consideration of all relevant factors presented to it, the Board, upon consultation with the College's outside advisors, determined that the most appropriate means to wind-down its non-profit entity while maximizing the College's Asset value for the benefit of its estate and creditors is to pursue a sale of substantially all of its Campus and personal property assets through a process approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code.

49. Based on my review of the Appraisal and familiarity with the Campus, I believe that a court-approved sale process, with the ability to sell the College's Assets free and clear of liens, claims, encumbrances, and other interests, will serve to maximize value for the estate.

50. As it prepares to market the Campus, the College is separately in negotiations with a regional college regarding the potential acquisition of a limited set of assets associated with the Debtor's now-terminated nursing program ("Nursing Program") in order to expand the acquirer's existing program and integrate the College's nursing students, by consent. Negotiations with that entity and the Massachusetts Board of Registration in Nursing ("MBORN") are underway. I am hopeful that MBORN will agree to the terms for the transfer on an expedited basis to enable the College to obtain approval of the sale on an expedited basis, so that all students are able to find placement by the start of the Fall semester.

51. In addition, over the course of this proceeding, the College and its remaining staff will assess the proper manner to administer all remaining restricted endowment funds, as well as certain religious artifacts and art located at the Campus, not all of which is titled with the College.

52.     Given the Debtor's inability to raise additional funding, the Debtor and its professionals determined that given the Debtor's capital structure and rapidly declining liquidity, the only viable option to the Debtor to conduct the desired Chapter 11 sale process was with the consent of, and with additional funding provided by, the Debtor's Prepetition Secured Creditor.

53.     In furtherance of that process, I and outside advisors to the College, reached out to the Prepetition Secured Creditor to determine if it would be willing to support the College's efforts to market the Campus over the course of a chapter 11 case in order to achieve the highest consideration available, through sale of all or any portion of the Assets "free and clear" of pre-existing liens and claims pursuant to the Bankruptcy Code. Consistent with a long history of serving as key lending partner to the Debtor, the Prepetition Secured Creditor has consented to the use by the Debtor of cash on deposit subject to the Prepetition Bond Liens as well as agreed to provide up to $3 million of post-petition financing to the Debtor so that the Debtor may continue to pay post-petition expenses and costs of administration during the pendency of this Chapter 11 Case.

54.     In addition, the Debtor's professionals, V&L and H&K, each agreed to assist the College with the closure, teach-out, and bankruptcy preparation at significantly reduced fees in the weeks leading up to the Petition Date, in furtherance of the restructuring and sale efforts anticipated, providing a significant benefit to the College.

55.     In order to ensure that the Debtor is able to enter the Chapter 11 Case with the ability to maintain its operations without disruption, the Debtor has prepared motions requesting a variety of standard relief on the "first days" of this case as well as access to critical funding, described below.

## PART III

### <u>The First Day Motions and Financing Motions – Emergency Determination</u>

56.     The Debtor is requesting Court approval of the First Day Motions and entry of the related proposed orders to facilitate a smooth transition into chapter 11, maintain the value of the Debtor's estate, protect students and other stakeholders, and preserve the Debtor's ability to complete value-maximizing sales of its assets. I have reviewed the First Day Motions and believe that the relief requested in each motion is necessary and appropriate and in the best interests of the Debtor, its estate, creditors, students, employees, regulators, and other parties in interest. To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate, and each such factual statement is incorporated herein by reference.

57.     I believe that the relief sought therein is necessary to permit an effective transition into chapter 11 and that the Debtor's estate would suffer immediate and irreparable harm absent the ability to make certain essential payments and otherwise continue its business operations as sought in the First Day Motions. As a result, emergency determination of the First Day Motions has been requested.

### A.     The DIP Motion

58.     Through the DIP Motion (defined above), the Debtor seeks authority, on an interim and final basis, to borrow pursuant a debtor-in-possession credit facility (the "<u>DIP Facility</u>") up to $3 million on a senior secured, super-priority basis from the Prepetition Secured Creditor, in its separate capacity as lender under the DIP Facility (in such capacity, the "<u>DIP Lender</u>") on terms negotiated with the DIP Lender. The Debtor and the DIP Lender have agreed that the proceeds of the DIP Facility will be available to fund the Debtor's ongoing operational costs, as well as to pay interest on the DIP Facility at a rate of SOFR plus 7% APR, fees and expenses of the Debtor's professionals and the DIP Lender's professionals, up to the amounts set forth in the cashflow projection prepared by V&L, with

variances of no greater than 10%, filed with the DIP Motion or as will be subsequently amended ("Budget"). The Debtor has agreed that all obligations to the DIP Lender will be secured by priming liens on substantially all of the Debtor's Assets, other than those liens that are expressly senior in priority to the Prepetition Bond Liens, if any (defined as "DIP Collateral").

59.     As a corollary, the Prepetition Secured Creditor has also agreed to permit the Debtor to use "cash collateral" of approximately $53,000 during the post-petition period, also in accordance with the Budget, and in exchange for the Debtor agreeing to provide certain limited "adequate protection" of its existing secured interest.

60.     As stated above, the Debtor is entering this Chapter 11 Case with less than $55,000 in unrestricted cash and no expectation of additional operating revenue sufficient to fund a sale process or the costs of administering this Chapter 11 Case. I believe that the benefits associated with the ability to access the DIP Facility and Cash Collateral far outweigh the associated costs imposed by the DIP Lender and Prepetition Secured Creditor in agreeing to support the Debtor's restructuring effort. Through the DIP Facility, the Debtor will obtain access to liquidity necessary to maintain essential transition functions, preserve the Campus and other assets, satisfy administrative expenses, while the Assets are marketed for sale.

61.     Based on the Appraisal and my discussions with the proposed real estate broker, I believe that there is benefit to incurring additional expenses so that the College may realize higher value than that likely through a more urgent liquidation sale, or when facing foreclosure by the Prepetition Secured Lender. I believe that obtaining access to the DIP Facility on the terms available is in the best interests of the College and each of its various constituents.

B.      ***Motion for Entry of (I) An Order (A) Approving Sale Procedures in Connection with the Sale of Substantially All of the Debtor's Assets in One or More Transactions, (B) Scheduling an Auction and Hearing to Approve the Sale(s) and the Form and Manner of Notice Thereof, (C) Establishing Procedures Relating to the Assumption***

20

*and Assignment of Executory Contracts and Unexpired Leases, (D) Authorizing De Minimis Sales of Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (E) Granting Related Relief; and (II) An Order (A) Approving the Sale of Substantially All of the Debtor's Assets, in One or More Transactions, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief (the "Sale Motion").*

62.     The primary exit strategy for this Chapter 11 Case involves closing a sale or sales of all or a substantial portion of the Campus by October 31, 2026, the date the DIP Facility matures. During the weeks prior to the Petition Date, I and other representatives of the College interviewed several regional and national real estate brokerage firms, ultimately retaining Kelleher & Sadowsky Associates, Inc. ("Broker"), based in Worcester, Massachusetts based on its qualifications and familiarity with the local zoning regulations and governmental agencies, pursuant to an Exclusive Right to Sell Agreement dated June 4, 2026. The Prepetition Secured Lender has indicated that it supports the selection of the Broker. The College agreed to pay the Broker a commission of 4% to the extent the Assets sell for more than $10,000,000. I understand that the Debtor must obtain authority to retain the Broker from the Court, and plan to direct outside counsel to file an appropriate application shortly after the Petition Date.

63.     The Broker has only recently initiated the marketing process pertaining to the Campus, with that process anticipated to continue over the next three months, leading to a proposed October 9, 2026 deadline for prospective purchasers to submit a formal letter of intent through the Broker, followed by a form of asset purchase agreement. The Debtor intends to consider offers to purchase the entirety of the Campus as well as certain portions of real estate, and will ultimately consider a variety of factors in determining if the highest and best offer received by the bid deadline is one bid for the Campus, or a combination of bids.  If competing bids are received for any portion of the Campus, the

Debtor intends to conduct an auction, all of which proceed in accordance with the procedures that the Court approves.

64. In furtherance of this extended marketing and sale process, the Debtor has filed the Sale Motion. Certain categories of Assets, however, are excluded from the scope of the Sale Motion, such as the Nursing Program Assets, donor-restricted endowment funds, donor-restricted purpose funds, and any litigation rights, including avoidance actions.

65. Through the Sale Motion, the Debtor first asks that the Court establish the bidding procedures and schedule that will govern the sale process so that the Debtor may more formally proceed to sell the Campus. At the conclusion of the bidding process, the Debtor also requests, through the Sale Motion, that the Court enter an order approving the terms of the highest and best bids identified by the Debtor, in consultation with the Prepetition Secured Lender, following a sale hearing to be held in October, 2026. Importantly, the Debtor intends to request that any approved sale be conducted "free and clear" of all existing liens, claims and encumbrances regarding the Campus in accordance with Section 363(f) of the Bankruptcy Code. The Prepetition Secured Lender has indicated that it consents to the proposed sale procedures described in the Sale Motion.

66. Based on my communication with the Broker, I believe that proposed timeline will provide sufficient opportunity for third-party purchasers and property developers to conduct necessary pre-bid diligence and prepare a compliant bid for consideration by the Debtor.

67. More broadly, with academic operations having ceased, I believe that a court-approved sale process, including the ability to sell the Sale Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, in combination with the benefits of the DIP Facility, represents the most appropriate manner for the College to generate sufficient funding to conduct an orderly wind-down that enables it to retain key staff to assist

with communication with applicable regulatory agencies, student and record transition, proper disposition of historical artifacts and restricted funds, and establishment of a source of cash proceeds from which the Debtor's secured and unsecured creditors can be paid.

### C.     Operational Motions.

i.     *Debtor's Motion for Entry of Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing or Discontinuing Services, (B) Determining Adequate Assurance of Payment for Future Utility Services and (C) Establishing Procedures for Determining Requests for Additional Adequate Assurance of Payment* (the "Utilities Motion").

68.     In the ordinary course of maintaining the Campus and operating the College, the Debtor incurred and incurs utility expenses for water, electricity, gas, telephone service, internet service, waste management service and other services (collectively, the "Utility Services") from approximately ten utility providers ("Providers"). On average the Debtor spends approximately $16,130 each month for third-party Utility Services, over a 12 month period.

69.     The Debtor is obligated to the Providers for Utility Services provided prior to the Petition Date in the amount of approximately $126,000.00.

70.     It is my understanding that a Provider may refuse to continue providing services to the Debtor unless it receives adequate assurance of payment within 20 days from the Petition Date, such as a cash deposit. Uninterrupted utility service is necessary to preserve the value, safety, and condition of the Debtor's Campus facilities, administrative offices, equipment, records, security systems, and other assets pending sale or other disposition of assets.

71.      As a result, the Debtor has agreed to fund a cash deposit of $44,107.00 ("Deposit") in the Debtor's operating account at Citizens Bank, N.A. or such other account as is approved by the Court to be held exclusively for and allocated among the Utility Providers.

72.     The Debtor has filed the Utilities Motion to request entry of an order determining that the Deposit is adequate for purposes of Section 366 so as to prevent termination of Utility Services,

23

and also, to establish a reasonable procedure for the Utility Providers to request a higher Deposit amount, if deemed necessary based on past service, while continuing to provide critical Utility Services for the benefit of the estate.

73.    It is my understanding that the proposed protocol is appropriate for purposes of Section 366, in that it appropriately balances the Utility Providers' risk of non-payment against the Debtor's ongoing need for uninterrupted services to preserve value.

ii.    *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Maintain Its Cash Management System and Certain Existing Bank Accounts, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Certain Existing Business Forms, (II) Granting A Limited Waiver of Section 345(b) Requirements, and (III) Granting Related Relief* (the "Cash Management Motion").

74.    As part of its cash management system, the Debtor currently maintains four accounts with Citizens Bank, N.A. ("Citizens Bank") to manage the Debtor's financial operations (the "Citizens Accounts"). The main operating account (ending 989-3) (the "Operating Account") currently serves as the central hub for the Debtor's unrestricted funds from which direct ACH payments to vendors are also processed. Funds are transferred from the Operating Account to a dedicated payroll account (ending 277-5) (the "Payroll Account") on a bi-weekly basis. Similarly, a separate accounts payable account (ending 276-7) (the "AP Account") is funded through daily transfers from the Operating Account to cover checks as they clear.

75.    In addition, the Debtor maintains an account at Citizens Bank that was formerly utilized exclusively to receive Federal grant and loan payments ("Citizens Grant Account") as they were disbursed to the Debtor, which funds were then transferred to the Operating Account. The Citizens Grant Account is no longer in use.

76.    The Debtor separately has an account at Country Bank (ending 7724) (the "Gift Account") that was utilized prior to the Petition Date to receive student cash deposits and to fund the Debtor's petty cash and meal expenses for athletic groups during winter and spring breaks. More

24

recently, the Debtor was required to receive, hold and distribute the proceeds of an anonymous, restricted donation funded with the sole purpose of ensuring that the Debtor had funds on deposit to satisfy accrued wage, paid time off, and benefit obligations that accrued through the June 3, 2026 layoff of the majority of the Debtor's staff. All funds in the Gift Account have been, or will imminently be, utilized.

77.     The Debtor also maintains investment accounts with CW Advisors, LLC through Fidelity ("Fidelity," and together with Citizens Bank and Country Bank, the "Banks") (accounts ending 5130, 2608, and 2570) (the "Investment Accounts," and together with the Grant Account, the "Restricted Accounts," and with the Citizens Accounts, the "Bank Accounts") to hold restricted funds previously donated to the College. The Investment Accounts are managed separately from the Debtor's other Bank Accounts to ensure that restricted funds are used in accordance with their designated purposes.

78.     It is my understanding that as debtor-in-possession, the College is subject to the requirements imposed by the Operating Guidelines and Reporting Requirements for Chapter 11 Cases (the "Guidelines") adopted by the Office of the U.S. Trustee. In compliance with the Guidelines, the Debtor and its advisors are presently working with Citizens to open a new "debtor in possession" account(s), to be utilized during the pendency of the Chapter 11 Case for the receipt of funds, and distribution of payments, in compliance with the Budget and any order relating to the DIP Motion.

79.     The Debtor is also attempting to determine if it should close all other active Citizens Accounts, particularly those that are no longer in use, with consent of Citizens Bank.

80.      Through the Cash Management Motion, the Debtor requests authority to maintain those of the Citizens Accounts, in addition to the DIP Account, that the Debtor and Citizens determine

25

must be maintained in order to collect or track amounts due to the Debtor, and to close the other Citizens Accounts.

81.     The Debtor requests that it be permitted to maintain all Restricted Accounts throughout the post-petition period until the funds on deposit are properly administered. The funds held in the Restricted Accounts are not subject to use by the Debtor to fund the expenses of the Chapter 11 Case, and given the closure of the College, will likely need to be repurposed in accordance with donor instructions, the subject of a *cy pres* action or administered by the Attorney General's Office for the Commonwealth of Massachusetts. I believe that if the Debtor is required to close the Restricted Accounts in order to comply with the UST Guidelines, there is substantial risk that the Debtor will be in violation of its agreement with the third-party donors or applicable regulations.

82.     Accordingly, since the relief requested in the Cash Management Motion is limited in scope, designed to comply with the Guidelines in all salient respects, and is in the best interests of the Debtor, its estate and its creditors, I believe that approval of the Cash Management Motion is appropriate.

iii.     *Debtor's Motion For Entry of Interim and Final Orders (I) Authorizing The Debtor To (A) Continue Its Insurance Program, and (B) Renew, Supplement, Or Enter Into New Insurance Coverage In The Ordinary Course Of Business; and (II) Granting Related Relief* (the "Insurance Program Motion")

83.     In connection with the operation of the College and preservation of the Campus, the Debtor maintains various insurance policies providing coverage pertaining to, among other things, commercial property, general liability, umbrella liability, commercial automobile liability, directors' and officers' ("D&O") liability, employment practices liability ("EPL"), crime, cyber liability and workers' compensation (collectively, the "Insurance Policies," and together with all premiums and other obligations related thereto, including any broker or advisor fees, taxes, surcharges, other fees and deductibles, collectively, the "Insurance Obligations").

26

84.     The Debtor maintains its Insurance Policies through several different third-party insurance carriers (collectively, the "Insurance Carriers"), as described in more detail below. The Insurance Policies and all related obligations are collectively referred to as the "Insurance Program."

85.     The Insurance Policies are currently procured through the Debtor's insurance broker, Brown & Brown, based in Boston, Massachusetts ("Insurance Broker"), receiving compensation via commissions assessed from the Insurance Carriers.

86.     Specifically, the Debtor maintains a Commercial Property Package ("CPP") policy, a commercial automobile liability policy and an umbrella liability policy through The Hanover Insurance Group. The CPP policy provides coverage for the Debtor's Campus with a total insured property value of approximately $107,721,685. Citizens Bank, N.A. is listed as mortgagee and lender loss payee under the CPP policy. The commercial automobile liability policy provides damage and liability coverage for vehicles used in the Debtor's operations. The umbrella liability policy provides excess liability coverage of $10 million for claims in excess of underlying policy coverage. These policies were originally bound effective July 1, 2025 through July 1, 2026. The total premium paid for the CPP policies was approximately $225,555.00.

87.     The Debtor maintains a Non-Profit Organization Management Liability Policy providing Directors and Officers Liability Insurance, Employment Practices Liability Insurance (including Third Party Liability Coverage) ("D&O/EPL Policy"), through Landmark American Insurance Company, originally for the period July 1, 2025 through July 1, 2026. The D&O/EPL Policy provides an aggregate limit of liability for all coverage sections of $3,000,000, with a Directors and Officers Limit of Liability of $3,000,000, and an Employment Practices Limit of Liability of $3,000,000. The annual premium for the D&O/EPL Policy with applicable taxes and fees was $63,520.12.

88.     The Debtor maintains a Crime Insurance policy through the Hanover Insurance Company, for the policy period July 1, 2025 to July 1, 2026, expiring effective July 1, 2026. The Crime Insurance policy provides coverage for dishonest acts by employees, third-party frauds, and various forms of theft and forgery. The annual premium paid for the Crime Insurance policy was $2,783.00.

89.     The Debtor maintains a Cyber Liability policy through Endurance American Specialty Insurance Company, for the policy period July 1, 2025 to July 1, 2026, expiring effective July 1, 2026. The annual premium paid for the Cyber Liability policy with applicable taxes and fees was $5,205.20.

90.     Other than with regard to the D&O Policy, each of the Insurance Policies is set to expire effective July 1, 2026, shortly after the Petition Date. The Debtor has previously secured a two-year Management Liability Run-Off endorsement extending the claims period with regard to the D&O/EPL Policy through July 1, 2028, at a total cost of $78,881.92, paid prior to the Petition Date; a portion of this premium charge was funded by the individual members of the Board. In addition, the Debtor has extended its Cyber Policy through July 1, 2027, with the premium having previously been funded with the Broker.

91.     In preparation for filing of the Chapter 11 Case, the Debtor requested that its Broker secure endorsements to each other Insurance Policy to ensure that the Debtor is properly insured as the Chapter 11 Case proceeds. As part of this process, the Debtor has procured, through the Broker, renewals or extensions of the coverage period for the Insurance Policies as follows ("Renewals"):

(a)     endorsements extending coverage through October 1, 2026 for the Commercial Package Policy for a total cost of $56,840.00;

(b)     endorsements extending coverage through October 1, 2026 for the Commercial Umbrella Policy for a total cost of $14,317.00;

(c)     endorsements extending coverage through October 1, 2026 for the Commercial Auto Policy, with the removal of coverage for three vehicles no longer in use by the College's staff, for a total cost of $6,972.00; and

28

(d)    a renewal of the Fiduciary/Nonprofit Entity Policy through July 1, 2027 for a total premium of $2,316.00.

92.    The total cost associated with the Renewals is $83,259.00 ("Renewal Premiums")

93.    Based on the limited operations on the Campus, the Debtor has determined it is not necessary to renew the Crime Policy.

94.    It is my understanding that the Debtor is required to maintain its Insurance Program pursuant to the Prepetition Bond Documents as well as, on a go-forward basis, the Guidelines, such that the relief requested in the Insurance Motion is both necessary and appropriate, and therefore, the underlying decision to maintain the Insurance Program is a sound exercise of the Debtor's business judgment.

**Request for Emergency Relief**

95.    The Debtor seeks emergency consideration of the First Day Motions because the requested relief is necessary to avoid immediate and irreparable harm to the Debtor's estate, for the reasons described herein and in the First Day Motions.

**CONCLUSION**

96.    As set forth above, I am familiar with the content and substance of the above identified First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information, and belief, and I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to maximize the value of its estate.

97.    Accordingly, for the reasons set forth herein and in each of the respective First Day Motions, the relief requested in each of the First Day Motions is necessary and appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 26, 2026

Respectfully submitted,

Sean J. Ryan, Ed.D.
President
The Sisters of St. Ann d/b/a Anna Maria College