**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | |
|---|---|
| In re:<br><br><br>THE SISTERS OF ST. ANN<br>d/b/a ANNA MARIA COLLEGE,<br><br><br>Debtor.[1] | Chapter 11<br><br>Case No. 26-40758 |

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND
FINAL ORDERS (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION
FINANCING, (II) GRANTING CONSENSUAL PRIMING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO DIP
LENDER, (III) AUTHORIZING CONSENSUAL USE OF CASH COLLATERAL,
(IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED
CREDITOR, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING A
<u>FINAL HEARING, AND (VII) GRANTING RELATED RELIEF</u>
(REQUEST FOR EMERGENCY DETERMINATION)**

The Sisters of St. Ann d/b/a Anna Maria College, as debtor and debtor in possession in the above-captioned Chapter 11 case (the "College" or the "Debtor"), hereby moves (the "Motion") for entry of an interim order (the "Interim Order") substantially in the form attached hereto as Exhibit A, and upon conclusion of a final hearing regarding the Motion ("Final Hearing"), entry of a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"), pursuant to Sections 105, 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 4001-2 and 9013-1 of the Local Rules for the United States Bankruptcy Court for the District of Massachusetts (the "MLBR"): (a)

---

[1] The last four digits of the Debtor's taxpayer identification number are 2060. The Debtor's address is 50 Sunset Lane, Paxton, MA 01612.

authorizing the Debtor to obtain senior secured, superpriority postpetition financing (the "DIP Facility") from Citizens Bank, N.A., solely in its capacity as postpetition lender (in such capacity, the "DIP Lender"), in an aggregate principal amount of up to $3,000,000, consisting solely of new-money delayed-draw term loans, of which up to $1,000,000 shall be available on an interim basis upon entry of the Interim Order, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code and with the consent of the Prepetition Secured Creditor (defined below); (b) granting allowed superpriority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in the Chapter 11 Case and any Successor Case (each as defined herein) to all obligations owing under the Interim Order and ultimately, the Final Order (the "DIP Obligations"); (c) authorizing the Debtor to use the Prepetition Secured Creditor's "Cash Collateral," as defined in Section 363(a) of the Bankruptcy Code pursuant to the approved Budget (defined herein), and providing adequate protection to the Prepetition Secured Creditor as a condition thereof; (d) granting the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), which liens shall be subject to the priorities described in the Interim Order; (e) modifying the automatic stay to the extent necessary to implement the terms of the Interim Order; (f) scheduling the Final Hearing, and issuance of a Final Order (to be filed in proposed form subsequent to entry of the Interim Order); and (g) granting related relief.  In support of the Motion, the Debtor relies upon and incorporates by reference the *Declaration of Dr. Sean J. Ryan in Support of Chapter 11 Petition and First Day Pleadings* (the "First-Day Declaration"), filed contemporaneously herewith, and respectfully states as follows:

## BACKGROUND

1.     On the date hereof (the "Petition Date"), the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, commencing the above-captioned Chapter 11 case (the

"Chapter 11 Case"). The Debtor continues to operate its business and manage its property as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.     To date, no creditors' committee (a "Committee") has been appointed by the Office of the United States Trustee (the "U.S. Trustee") and no trustee or examiner has been appointed in the Chapter 11 Case.

## JURISDICTION AND VENUE

3.     The Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).

4.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The bases for the relief requested herein are Sections 105, 361, 362, 363, 364, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and MLBR 4001-2 and 9013-1.

## PRELIMINARY STATEMENT

6.     By this Motion, the Debtor seeks authorization to borrow up to $1,000,000 on an interim basis and up to $3,000,000 on a final basis, consisting solely of new-money delayed-draw term loans under the DIP Facility, to fund postpetition expenses in accordance with the cash-flow projections prepared by the Debtor with its financial advisors attached to the Interim Order as Exhibit A (the "Budget"), on a senior secured basis, priming the Debtor's Prepetition Secured Creditor, with consent. Separately, the Prepetition Secured Creditor has consented to the Debtor's use of Cash Collateral on the terms set forth in the Interim Order, including the Budget, in exchange for certain limited forms of adequate protection.

7.     As discussed herein, the Debtor's unrestricted cash assets were largely exhausted by the time the Debtor entered chapter 11 in maintaining its operations through the end of the 2025/2026 academic year such that without access to the DIP Facility, it would enter chapter 11

3

with minimal cash on hand. Access to the DIP Facility during the early days of this Chapter 11 Case is critical to ensure the Debtor's smooth entry into chapter 11 and the ability to satisfy ordinary course business expenses, among other costs, that accrue over the next several months while the Debtor markets its real estate portfolio for sale. The Debtor believes that the relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtor is denied access to the vital liquidity on terms that it negotiated with the DIP Lender, only after representatives of the College were unsuccessful in obtaining any additional donor-provided funding once news of the College's financial troubles became public. The Debtor contends that the terms of the DIP Facility are reasonable and the best that could be obtained under the totality of the circumstances, and will appropriately preserve value for the benefit of the entire creditor body.

## GENERAL BACKGROUND

8.      Anna Maria College is a private Catholic institution of higher education located in Paxton, Massachusetts, just outside the City of Worcester, Massachusetts. Established as a Massachusetts non-profit entity in 1946 as a college for women only, the College eventually became accredited by the New England Association of Schools and Colleges (now known as the New England Commission of Higher Education, or "NECHE") in 1955, transitioned to coeducation in 1973 and opened its graduate division in 1974.

9.      The College's campus (the "Campus") is situated at 50 Sunset Lane, Paxton, Massachusetts 01612 and consists of approximately 261.75 acres of land, including 17 buildings totaling approximately 300,622 square feet of gross building area. The Campus property is zoned GRB (General Residence District B) under the Town of Paxton's zoning regulations and operates as an educational institution by special permit. A more detailed description of the Debtor's Assets, including the individual parcels, is set forth in the First-Day Declaration, and the

4

contemporaneously filed *Motion for Entry of (I) An Order (A) Approving Sale Procedures in Connection with the Sale of Substantially All of the Debtor's Assets in One or More Transactions, (B) Scheduling an Auction and Hearing to Approve the Sale(s) and the Form and Manner of Notice Thereof, (C) Establishing Procedures Relating to the Assumption and Assignment of Executory Contracts and Unexpired Leases, (D) Authorizing De Minimis Sales of Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, and (E) Granting Related Relief; and (II) An Order (A) Approving the Sale of Substantially All of the Debtor's Assets, in One or More Transactions, Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* [Dkt. No. __] (the "Sale Motion").

10. As is described in the Sale Motion, with the College having made the difficult decision upon assessment of its liquidity and projected revenue and expenses to close the College after the Class of 2026 graduated in May, 2026 and to wind-down its non-profit entity, the Debtor filed the Chapter 11 Case to market and sell its valuable portfolio of real estate assets, with Court approval, in order to realize value for distribution to its creditor body, with the consent of the Prepetition Secured Creditor. Through the Sale Motion, the Debtor has requested Court approval of sale procedures and the timeline for marketing, diligence, and bids, and ultimately, the terms of a sale or series of sales negotiated with prospective purchasers. Through this Motion, the Debtor requests authority to obtain postpetition funding from Citizens Bank, N.A., in its capacity as DIP Lender, with the consent of the Prepetition Secured Creditor, solely in its prepetition secured creditor capacity, to the priming of the Prepetition Bond Liens and the use of Cash Collateral, so that the Debtor may sustain its remaining operations throughout the pendency of the Chapter 11 Case to preserve value, on terms set forth herein.

### A.      The Debtor's Secured Indebtedness.

11.      The Debtor obtained funding on a secured basis from Citizens Funding Corp., a New Hampshire corporation (the "Purchaser"), and Citizens Bank, N.A., a national banking association, as disbursing agent (the "Disbursing Agent" and, together with the Purchaser, the "Prepetition Secured Creditor"), pursuant to a *Loan and Security Agreement,* dated November 1, 2017, as amended by that certain First Amendment to Loan and Security Agreement dated November 8, 2018, and as further amended by that certain Second Supplemental Loan and Security Agreement dated June 20, 2023 and effective as of July 3, 2023 (the "LSA") representing the proceeds of the Anna Maria College Issue, Series 2017 bonds, dated as of November 30, 2017, reissued on November 8, 2018, and amended as of June 20, 2023, with a Registration Date of July 3, 2023, in the original principal amount of $24,500,000.00 (as amended, the "Bonds"), purchased by the Purchaser from the Massachusetts Development Finance Agency (the "Issuer") and loaned to the Debtor (the "Prepetition Loan").

12.      The Debtor's obligations to the Prepetition Secured Creditor are secured by a first priority, senior secured lien (the "Prepetition Bond Liens") on substantially all of the Debtor's assets,[2] including but not limited to the Debtor's real property, equipment, receivables, contracts and contract rights, inventory, intellectual property rights, general intangibles, and all proceeds and products of the foregoing (collectively, the "Prepetition Collateral"), as evidenced by (i) that certain *Mortgage, Security Agreement and Fixture Filing* dated November 30, 2017 (recorded at Book 58113, Page 296, Worcester District Registry of Deeds), as amended pursuant to that certain *Amendment No. 1 to Mortgage, Security Agreement and Fixture Filing* dated as of September 30,

---

[2] The Prepetition Bond Liens and DIP Liens do not extend to "Donor Restricted Funds," meaning cash existing as of the Petition Date that constitutes gifts, grants, bequests, donations or contributions designated or restricted at the time made by the donor or maker for specified purposes.

2024, recorded with the Worcester South District Registry of Deeds in Book 71102, Page 299 (the "Mortgage" and the property encumbered, the "Mortgaged Property"); (ii) that certain *Security Agreement (All Assets)*, dated as of November 30, 2017, by the Debtor in favor of the Disbursing Agent, for itself and as agent for the Purchaser (as amended, the "Security Agreement"); and (iii) that certain *Collateral Assignment of Permits, Licenses, Approvals and Contracts* dated November 30, 2017 by the Debtor to the Disbursing Agent, for itself and as agent for the Purchaser (the "Collateral Assignment").

13.     Pursuant to that certain *Continuing Covenants Agreement* dated as of November 30, 2017, between the Debtor and the Purchaser, as amended by that certain *Amendment to Continuing Covenants Agreement and Related Documents* dated November 8, 2018, and as further amended by that certain *Second Amendment to Continuing Covenants Agreement and Related Documents* dated September 30, 2024 (the "CCA," and together with the LSA, the Security Agreement, the Collateral Assignment, the Mortgage and all other documents and agreements executed in connection with the issuance of the Bonds, the "Prepetition Bond Documents"), the Debtor is subject to financial covenants including (a) a debt service coverage ratio of not less than 1.25:1.00, tested quarterly; (b) minimum liquidity (unrestricted cash and investments) of not less than $10,000,000, tested semi-annually on June 30 and December 31; and (c) minimum freshman enrollment of 300 full-time students by September 30 each year.

14.     Since the execution of the LSA and related Prepetition Bond Documents, the Debtor has obtained waivers and covenant modifications from the Prepetition Secured Creditor several times, entering into that certain *Waiver and Covenant Modification* dated as of March 17, 2023 by and between the Prepetition Secured Creditor and the Debtor; that certain *Second Waiver and Covenant Modification* dated as of December 26, 2023, as amended by *Amendment No. 1 to*

*Second Waiver and Covenant Modification* dated September 30, 2024; and that certain *Third Waiver of Covenants* dated as of December 19, 2024.

15. As of the Petition Date, the aggregate outstanding principal amount owed by the Debtor under the Prepetition Bond Documents was not less than $17,734,804.13 (together with any interest, fees (including, without limitation, prepayment fees), costs and other charges or amounts paid, incurred or accrued prior to the Petition Date in accordance with the Prepetition Bond Documents, and further including all "Obligations" as described in the LSA, and all interest, fees, costs and other charges allowable under Section 506(b) of the Bankruptcy Code, the "Prepetition Bond Obligations").

16. In addition to the Prepetition Bond Liens, the Debtor's records indicate that certain of its assets are or were subject to the following *asserted* or historic liens and interests which are expired, unperfected or disputed, therefore not valid, enforceable liens on the Prepetition Collateral, as indicated below:

   a. Notice of Federal Interest. On September 30, 2023, the Community Program Funding/Congressionally Directed Spending Construction awarded Grant No. 6CE1HS52504-01-03 (the "Grant") to the Debtor. As a condition of the Grant, a Notice of Federal Interest (the "Federal Interest") was required to be recorded with respect to Miriam Hall, which is part of the Mortgaged Property ("Miriam Hall"). No such recordation occurred. The Prepetition Secured Creditor's mortgage on Miriam Hall was granted and recorded on November 30, 2017, before the Grant was awarded, and the Prepetition Secured Creditor takes the position that its mortgage as to the Mortgaged Property is a first-priority lien;

   b. Siemens Equipment Lien. Siemens Public, Inc. ("Siemens") held a lien of record on certain energy efficiency equipment pursuant to a *Master Lease and Sublease Agreement* dated as of September 1, 2010 (as supplemented by Schedule No. 1 thereto dated September 30, 2010), among Siemens (as Lessor), MDFA (as Lessee), and the Debtor (as Sublessee). Siemens' original loan amount was approximately $1,677,724, of which $855,966.44 was outstanding as of the November 30, 2017 closing. The underlying debt to Siemens has been paid in full and its financing statement has lapsed;

   c. Mechanics' Lien. Bowdoin Construction Corp. ("Bowdoin") filed a Notice of Contract with the Worcester South Registry of Deeds on May 18, 2026 asserting a

mechanics' lien on College property known as St. Joseph's Hall located at 50 Sunset Lane, Paxton, Massachusetts; in its subsequently filed Statement of Account, Bowdoin indicated that it is owed $32,965.96 from the Debtor. The Debtor's records reflect that Bowdoin has not been on site since September 2025. The Debtor disputes the validity of any mechanics' lien asserted by Bowdoin given that the Notice of Contract is untimely, under M.G.L. c. 254, and therefore, invalid;

d. <u>Superior Court Injunction/Right of First Refusal</u>: Prior to the Petition Date, adjacent landholders, David Roy, Elaina Roy, and David Roy, Jr. (collectively, the "<u>Roys</u>"), filed a Verified Complaint with the Worcester Superior Court ("<u>State Court</u>") seeking a declaration that they hold an oral right of first refusal to purchase an approximately two acre portion of Parcel 3 referred to as "Lot 2," based on promises alleged to have been made by the College's former president and executive vice president, Case No. 2585CV00823. On July 24, 2025, the State Court issued a consensual form of temporary restraining order preventing the sale of Lot 2 desired to be acquired by the Roys (for no consideration), pending trial on the matter (the "<u>TRO</u>"). [3] The TRO was not recorded with the Worcester Registry of Deeds prior to the Petition Date, and the Debtor disputes the validity of the alleged right of first refusal asserted by the Roys; and

e. <u>First American Lease</u>. As of the time the Prepetition Loan was funded, First American Commercial Bancorp, Inc. had filed a UCC-1 financing statement asserting a protective lien in equipment leased to the Debtor pursuant to Master Lease No. 2008220. The UCC-1 has since lapsed, and the Debtor's books and records indicate that the lease has terminated, with no amount due and owing to First American Commercial Bancorp.[4]

17. Through negotiations with representatives of the Prepetition Secured Creditor, the DIP Lender has agreed to provide postpetition financing to the Debtor under the DIP Facility so that the Debtor may continue to pay postpetition expenses during the pendency of this Chapter 11 Case while the sale process is underway, on terms negotiated with the DIP Lender.

---

[3] The TRO is stayed as to the Debtor pursuant to section 362(a) of the Bankruptcy Code. 11 U.S.C. § 362(a)(1), (2), (3). The Debtor seeks to sell the Sale Assets (as defined in the Sale Motion), free and clear of the Roys' claimed right of first refusal pursuant to section 363(f) of the Bankruptcy Code, with any such interest attaching to the proceeds of the Sale in accordance with section 363(f).

[4] In addition, the Debtor's historic audited financial statements contain a reference to the Debtor as maker of a note payable to the Congregation of the Sisters of Saint Ann ("Congregation") with a balance as of FYE 2025 of $1,021,901 that is payable in the event that the Debtor liquidates its assets.

9

**RELIEF REQUESTED**

18.     Through this Motion, the Debtor seeks authority to (a) obtain postpetition financing pursuant to the DIP Facility, and (b) use any remaining Cash Collateral subject to the Prepetition Secured Creditor's liens, in accordance with the Budget set forth on Exhibit A to the Interim Order and consensual terms of the proposed Interim Order.

19.     Specifically through this Motion, the Debtor seeks entry of the Interim Order, and after a Final Hearing, a Final Order, *inter alia*:

(i)     authorizing, under Sections 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rule 4001(c), the Debtor to obtain secured, superpriority postpetition loans, advances and other financial accommodations in an aggregate principal amount of up to $3,000,000, consisting solely of new-money delayed-draw term loans, of which up to $1,000,000 shall be available upon entry of the Interim Order, pursuant to the DIP Term Sheet and on the terms and conditions summarized below (collectively, "DIP Terms");

(ii)     granting allowed superpriority administrative expense claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in the Chapter 11 Case and any Successor Case (as defined herein) to all obligations owing under the Interim Order (the "DIP Obligations"), subject to the priorities set forth herein;

(iii)     authorizing the Debtor to use "Cash Collateral," as defined in Section 363(a) of the Bankruptcy Code (the "Cash Collateral"), that the Debtor is holding or may obtain, pursuant to Bankruptcy Code Section 361 and 363 and Bankruptcy Rules 4001(b) and 6004;

(iv)     providing adequate protection to the Prepetition Secured Creditor as a condition for use of Cash Collateral;

(v)     granting to the DIP Lender automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting Cash Collateral, which liens shall be subject to the priorities set forth herein;

(vi)     waiving any applicable stay and provisions for immediate effectiveness of the Interim Order;

(vii)     vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order;

(viii)     scheduling the Final Hearing to consider the relief requested in this Motion and approving the form of notice thereof; and

(ix)     granting related relief.

20.     For the reasons set forth below, the Debtor submits that the relief requested herein is in the best interest of the Debtor, its estate, creditors, stakeholders and other parties in interest.

21.     The DIP Lender is unwilling to provide the DIP Facility absent the inclusion of these provisions. As further described in the First-Day Declaration, the DIP Facility is critical to the Debtor's continuing operations and to preserve the value of the Debtor's estate. In light of the foregoing, the Debtor submits that the significant provisions in the DIP Orders are appropriate and necessary under the facts and circumstances of this Chapter 11 Case and should be approved.

**CONCISE STATEMENT OF THE MATERIAL
TERMS OF THE PROPOSED DIP FACILITY AND INTERIM ORDER**

22.     Pursuant to and in accordance with Bankruptcy Rules 4001(b), 4001(c), 4001(d) and MLBR 4001-2, the following is a summary of the significant terms governing the DIP Facility

and the Debtor's use of Cash Collateral as requested herein.[5]

| Term | Summary | Reference In Interim Order |
|---|---|---|
| **DIP Lender**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Citizens Bank, N.A. solely in its capacity as postpetition lender (in such capacity, the "DIP Lender"). | Interim Order at ¶¶ 1, 3; DIP Term Sheet, Ex. B |
| **Identity of Each Entity with an Interest in Cash Collateral; Value of Asserted Debt and Collateral**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)(i); MLBR 4001-2(a) | Citizens Funding Corp., a New Hampshire corporation, solely in its capacity as Purchaser, and Citizens Bank, N.A., a national banking association, solely in its capacity as Disbursing Agent (collectively, solely in their respective prepetition capacities, the "Prepetition Secured Creditor"). As of the Petition Date, the Prepetition Bond Obligations totaled not less than $17,734,804.13, subject to final reconciliation and without prejudice to the rights preserved in the Interim Order. The Prepetition Bond Liens encumber substantially all assets of the Debtor, other than "Donor Restricted Funds," meaning cash existing as of the Petition Date that constitutes gifts, grants, bequests, donations or contributions designated or restricted at the time made by the donor or maker for specified purposes. The Interim Order includes Debtor's Stipulations regarding the Prepetition Bond Liens, Prepetition Bond Obligations, and Cash Collateral, subject to the Challenge Period and rights preserved in the Interim Order. All of the Debtor's cash, other than Donor Restricted Funds, constitutes Cash Collateral. | Interim Order at § E(ii)-(vi) |
| **DIP Facility Amount**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); MLBR 4001-2(a) | The DIP Facility is a senior secured, superpriority debtor-in-possession loan facility in a total aggregate principal amount not to exceed $3,000,000, consisting solely of new-money delayed-draw term loans. Up to $1,000,000 is available on an interim basis | Interim Order at ¶ 1; DIP Term Sheet, Ex. B |

---

[5] This summary is qualified in its entirety by the provisions of the proposed Interim Order. To the extent there are any conflicts between this summary and the proposed Interim Order, the terms of the proposed Interim Order shall govern. Capitalized terms used in this summary but not defined herein shall have the meanings ascribed to such terms in the proposed Interim Order.

| Term | Summary | Reference In Interim Order |
|---|---|---|
| | following entry of the Interim Order. | |
| **Use of DIP Facility Proceeds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); MLBR 4001-2(a) | The Debtor may use advances under the DIP Facility only for the purposes specifically set forth in the Interim Order and in compliance with the Budget. Funding Requests may be made no more frequently than once weekly, must be in a minimum amount of $250,000, and may not exceed $1,000,000 during the Interim Period or $3,000,000 in total. | Interim Order at ¶ 9; DIP Term Sheet, Ex. B |
| **Interest Rate**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); MLBR 4001-2(a) | DIP Loans shall bear interest at the Daily Simple SOFR Rate, as defined in the Prepetition Bond Documents, plus a DIP Margin of 7% per annum. Interest shall be paid in cash on the first day of each month. Automatically following the occurrence and during the continuance of a Termination Event, all principal, interest, and other amounts in respect of the DIP Facility shall bear interest at 5% per annum above the non-default rate, payable solely in cash. | DIP Term Sheet, Ex. B |
| **Maturity Date**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B); MLBR 4001-2(a) | The Maturity Date is the earliest to occur of: (a) October 31, 2026; (b) fourteen (14) days after an order confirming a plan of reorganization for the Debtor is entered; (c) consummation of a sale of all or substantially all of the Debtor's assets under Section 363 of the Bankruptcy Code; and (d) the Termination Notice Date. All amounts outstanding under the DIP Facility are due and payable in full on the Maturity Date. | DIP Term Sheet, Ex. B |
| **DIP Liens and Collateral**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(i); MLBR 4001-2(a) | The DIP Facility shall be secured, pursuant to Sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, by continuing valid, binding, enforceable, non-avoidable and automatically perfected senior postpetition security interests in and liens on (the "DIP Liens") substantially all presently owned and hereafter acquired assets and real and personal property of the | Interim Order at ¶¶ 5-6 |

| Term | Summary | Reference In Interim Order |
|---|---|---|
| | Debtor, excluding Donor Restricted Funds (collectively, the "DIP Collateral" and, together with the Prepetition Collateral, the "Collateral"). The DIP Collateral includes, among other things, cash, deposit accounts, proceeds of leases of real property, owned real property, proceeds of Section 549 claims, and, subject to entry of the Final Order, proceeds of other Chapter 5 and Section 724(a) claims. The DIP Liens are junior only to the DIP Carve-Out and Prepetition Permitted Priority Liens and are otherwise senior to the Prepetition Bond Liens, Adequate Protection Liens, Adequate Protection Superpriority Claims, and any other liens or claims on the DIP Collateral. | |
| **DIP Superpriority Claim** Fed. R. Bankr. P. 4001(c)(1)(B); MLBR 4001-2(a) | Upon entry of the Interim Order, the DIP Lender shall be granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") for all DIP Obligations. The DIP Superpriority Claim is subordinate only to the DIP Liens, DIP Carve-Out, and Prepetition Permitted Priority Liens, and otherwise has priority over all administrative expenses specified in the Interim Order. | Interim Order at ¶ 7 |
| **Adequate Protection** Fed. R. Bankr. P. 4001(b)(1)(B)(iv); MLBR 4001-2(a) | The Prepetition Secured Creditor is granted adequate protection for the subordination of the Prepetition Bond Liens to the DIP Liens and the DIP Carve-Out, the Debtor's use of Cash Collateral, and any other Diminution in Value, consisting of: (a) Adequate Protection Liens on the DIP Collateral solely to the extent of any actual Diminution in Value, subordinate and subject only to the Prepetition Permitted Priority Liens, the DIP Liens, and the DIP Carve-Out; (b) Adequate Protection Superpriority Claims, subject to the DIP Carve-Out and junior to the DIP Liens, DIP Superpriority Claim, Prepetition Permitted Priority Liens, and Adequate Protection Liens; (c) payment of reasonable and documented out-of-pocket costs and expenses under the | Interim Order at ¶¶ 13-16 |

14

| Term | Summary | Reference In Interim Order |
|---|---|---|
| | Prepetition Bond Documents; and (d) accrual, on the first day of each calendar month, of unpaid interest and fees at the non-default rate under the Prepetition Bond Documents, paid in kind unless otherwise agreed by the Debtor and the DIP Lender. | |
| **DIP Carve-Out**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)(iii); MLBR 4001-2(a) | The "DIP Carve-Out" consists of: (i) all U.S. Trustee fees and Clerk of Court fees required under 28 U.S.C. §§ 1930(a)(6) and 156(c); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under Section 726(b) of the Bankruptcy Code; (iii) allowed fees and expenses of the Debtor's and any Committee's professionals incurred before delivery of a Carve-Out Trigger Notice, less remaining and unapplied retainers and subject to the Budget plus any Permitted Expense Variance; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000 incurred after delivery of a Carve-Out Trigger Notice. The DIP Carve-Out is senior to all liens and claims securing the Collateral, DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, Adequate Protection Superpriority Claims, and other forms of adequate protection, liens, or claims securing the DIP Obligations or Prepetition Bond Obligations solely to the extent provided in the Interim Order. | Interim Order at ¶ 32 |
| **Termination Events and Remedies**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)(iii); MLBR 4001-2(a) | Upon written notice from the DIP Lender, the occurrence and continuation of any Termination Event, unless waived by the DIP Lender, will trigger termination rights. Termination Events include, among other things: unauthorized sale, financing, priming lien, or inconsistent cash-collateral relief; filing of a plan that does not provide payment in full in cash of the DIP Obligations and Prepetition Bond Obligations; stay relief to enforce a lien on Collateral with value exceeding $50,000; suits by the Debtor against the Prepetition Secured Creditor or DIP Lender; orders avoiding payments or liens, granting | Interim Order at ¶¶ 26-27; DIP Term Sheet, Ex. B |

15

| Term | Summary | Reference In Interim Order |
|---|---|---|
| | competing superpriority claims or liens, or terminating cash collateral use; payment of prepetition claims except as authorized by first-day orders; material misrepresentations; disallowance of the Debtor's motions to employ Holland & Knight LLP as counsel or Verdolino & Lowey as financial advisor; appointment of a chapter 11 trustee or examiner with expanded powers; conversion or dismissal; failure to comply with Milestones; and failure to perform material obligations under the Interim Order or DIP Term Sheet. Upon a Termination Event, DIP Obligations become immediately due and payable, commitments terminate, and authority to use Cash Collateral ceases, subject to limited use during the Remedies Notice Period. The Remedies Notice Period is five (5) days after the Termination Notice Date, during which the Debtor, any Committee, the U.S. Trustee, or another party in interest may seek an emergency hearing to contest the Termination Event. | |
| **Modification of Automatic Stay**<br>Fed. R. Bankr. P. 4001(b)(1)(B)(iii) | The Interim Order modifies the automatic stay as necessary to effectuate all terms and provisions of the Interim Order, including to permit the Debtor to grant the DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, and Adequate Protection Superpriority Claims. Following a Termination Notice, unless the Court orders otherwise during the Remedies Notice Period, the automatic stay as to the DIP Lender and Prepetition Secured Creditor will terminate automatically at the end of the Remedies Notice Period, and those parties may exercise their rights and remedies with respect to the Debtor and the Collateral, subject to the DIP Carve-Out, the exclusion of Donor Restricted Funds, and the Interim Order. | Interim Order at ¶¶ 17, 27 |

| Term | Summary | Reference In Interim Order |
|---|---|---|
| **Waivers of Statutory Rights**<br><br>MLBR 4001-2(c)(4) | Effective upon entry of the Final Order, no amounts may be surcharged against the DIP Lender, the Prepetition Secured Creditor or the Collateral in accordance with Section 506(c), no marshaling may occur, and the equities of the case exception under Section 552(b) shall not apply to the DIP Lender or Prepetition Secured Creditor with respect to proceeds, products, offspring, or profits of any Collateral. | Interim Order at ¶¶ 37-39 |
| **Choice of Law/Jurisdiction Provision**<br><br>MLBR 4001-2(a) | The Court shall retain exclusive jurisdiction and power with respect to all matters arising from or related to the implementation or interpretation of the Interim Order. | Interim Order at ¶ 49 |

23.     In addition to the foregoing summary, and pursuant to Bankruptcy Rule 4001(c)(1)(B) and MLBR 4001-2(a)(i), the Debtor hereby discloses the following additional material provisions of the proposed Interim Order:

(a)     **Stipulations Regarding Prepetition Bond Liens and Challenge Period** (Fed. R. Bankr. P. 4001(c)(1)(B)(ii); MLBR 4001-2(a)(i)(Q)). The Interim Order contains the Debtor's Stipulations regarding, among other things, the Prepetition Bond Liens and Prepetition Bond Obligations, subject in all respects to the Challenge Period and related rights preserved in the Interim Order. Nothing in the Interim Order shall prejudice the rights of a Committee or any other party in interest granted standing by the Court to challenge the Debtor's Stipulations within seventy-five (75) calendar days following the date of entry of the Interim Order (the "Challenge Period"). Upon expiration of the Challenge Period without the filing of a Challenge, any and all Challenges and objection are deemed waived, released, barred, and all matters not subject to a Challenge, including findings, Debtor's Stipulations, waivers, releases, affirmations, and other stipulations as to the priority, extent, and validity of the Prepetition Secured Creditor's claims, liens, and interests, shall be binding as set forth in the Interim Order. *Interim Order* at ¶ 35. *This provision varies from the requirements of MLBR 4001-2(c).*

(b)     **Releases and Waivers** (Fed. R. Bankr. P. 4001(c)(1)(B)(viii)). The Interim Order includes a release by the Debtor of the DIP Lender, the Prepetition Secured Creditor, and their respective successors, assigns, affiliates, subsidiaries, parents, officers, shareholders, directors, employees, attorneys, advisors, professionals and

17

agents, past, present and future, and their respective heirs, predecessors, successors and assigns (the "Releasees") from any and all claims arising out of or relating to the DIP Facility, the Prepetition Bond Documents, the Prepetition Bond Liens and/or the transactions contemplated thereunder, including lender liability claims, equitable subordination claims, Bankruptcy Code claims and causes of action, challenges, objections, and related claims, subject to the Challenge Period and related rights preserved in the Interim Order. *Interim Order* at § E(ix), ¶ 35. *This provision varies from the requirements of MLBR 4001-2(c).*

(c)     **Indemnification** (Fed. R. Bankr. P. 4001(c)(1)(B)(ix); MLBR 4001-2(a)(i)(K)). The Interim Order provides that the Debtor shall indemnify and hold harmless the DIP Lender and its shareholders, members, directors, agents, officers, subsidiaries, affiliates, successors, assigns, attorneys, and professional advisors from and against damages, losses, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses arising out of or related to the DIP Facility, the DIP Term Sheet, the transactions contemplated thereby, the Interim Order, this Chapter 11 Case, any plan, or any action or inaction by the Debtor, provided that such indemnity shall not apply to the extent losses are determined by final, non-appealable judgment to have resulted directly from the gross negligence or willful misconduct of the indemnified party. The indemnity includes the DIP Lender's exercise of discretionary rights under the DIP Facility, DIP Term Sheet, and Interim Order and the reasonable and documented fees and expenses of counsel selected by the DIP Lender. *Interim Order* at ¶ 30.

(d)     **Automatic Perfection / Waiver of Nonbankruptcy Perfection Requirements** (Fed. R. Bankr. P. 4001(c)(1)(B)(vii)). The Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted therein, including the DIP Liens and Adequate Protection Liens without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document, or taking any other action otherwise required under non-bankruptcy law to validate or perfect such liens. *Interim Order* at ¶ 18. *This provision varies from the requirements of MLBR 4001-2(c).*

(e)     **Liens on Avoidance Action Proceeds** (MLBR 4001-2(a)(i)(D)). The DIP Liens extend to the proceeds of claims or causes of action under Section 549 of the Bankruptcy Code. Subject to entry of the Final Order, the DIP Liens also extend to the proceeds of claims or causes of action arising under Chapter 5 or Section 724(a) of the Bankruptcy Code, other than claims or causes of action arising under Section 549. *Interim Order* at ¶ 5(a)(xvi)-(xvii). *This provision varies from the requirements of MLBR 4001-2(c).*

(f)     **Fees and Expenses of DIP Lender and Prepetition Secured Creditor** (Fed. R. Bankr. P. 4001(c)(1)(B)(ix); MLBR 4001-2(a)(i)(K)). The Debtor is authorized and directed to pay all reasonable and documented out-of-pocket costs and expenses of (x) the DIP Lender in connection with the DIP Facility, including costs and expenses incurred prior to the Petition Date, and (y) the Prepetition Secured Creditor, including costs and expenses incurred prior to the Petition Date, as

18

provided in the Prepetition Bond Documents. Payment of such costs and expenses shall not be subject to allowance by the Court; provided that professionals for the DIP Lender and the Prepetition Secured Creditor shall deliver a summary of services to counsel for the Debtor, counsel for the Committee (if any), and the U.S. Trustee, and any objections raised by the Debtor, the U.S. Trustee, or the Committee (if any) within ten (10) days after receipt shall be resolved by the Court. *Interim Order* at ¶ 29. *This provision varies from the requirements of MLBR 4001-2(c).*

(g) **Budget Variance Covenants and Reporting** (Fed. R. Bankr. P. 4001(c)(1)(B); MLBR 4001-2(a)(ii) and (iii)). The Debtor's actual disbursements under Budget expense line items may not exceed 110% of the aggregate Budgeted amounts for such expense categories, tested cumulatively on a four-week rolling basis. The Debtor shall provide the DIP Lender and Prepetition Secured Creditor with reasonable access to premises, officers, employees, auditors, appraisers, financial advisors, investment bankers, books, and records, subject to applicable privilege, confidentiality, donor confidentiality, student privacy, and other legal restrictions, and shall provide monthly operating reports and other non-privileged reports and information as reasonably requested. *Interim Order* at ¶¶ 12, 22–24.

(h) **Authorization to Use Cash Collateral** (Fed. R. Bankr. P. 4001(b)(1)(B); MLBR 4001-2(a)). Subject to the terms and conditions of the Interim Order and the DIP Term Sheet, and in compliance with the Budget, the Debtor is authorized to use Cash Collateral until the earliest of (x) thirty (30) days after entry of the Interim Order and (y) the Termination Notice Date. During the Remedies Notice Period, the Debtor may use Cash Collateral solely to pay expenses critical to the preservation of the Debtor and its estate as agreed by the DIP Lender and the Debtor, to fund the DIP Carve-Out in the amount of the Post-Carve-Out Trigger Notice Cap, and to fund fees payable to the U.S. Trustee and Clerk of the Court, in each case in accordance with the Budget. *Interim Order* at ¶ 10.

(i) **Conditions Precedent to Funding** (Fed. R. Bankr. P. 4001(c)(1)(B); MLBR 4001-2(a)(ii)(E)). The DIP Lender's obligation to fund DIP Loans is subject to satisfaction, or written waiver by the DIP Lender, of the conditions precedent set forth in the DIP Term Sheet, including delivery of the initial Budget or required updates, the DIP Lender's satisfaction in its sole discretion with due diligence, entry and continuing effectiveness of the Interim DIP Order for the Interim Amount and the Final DIP Order for amounts above the Interim Amount, absence of a continuing Termination Event, payment or reimbursement of required fees and expenses, and compliance with the Milestones. *DIP Term Sheet*, Ex. B.

(j) **Mandatory Prepayments and Milestones** (Fed. R. Bankr. P. 4001(c)(1)(B); MLBR 4001-2(a)). The DIP Term Sheet requires mandatory prepayments of the DIP Loans upon asset dispositions, in an amount equal to 100% of net cash proceeds of DIP Collateral received in excess of the DIP Carve-Out, and upon incurrence of indebtedness not permitted under the DIP Term Sheet, in an amount equal to 100% of such net cash proceeds. The DIP Term Sheet also includes case milestones for

19

the sale process and approval of the DIP Facility, including deadlines for the Bidding Procedures Motion, entry of the Interim DIP Order and Final DIP Order, approval of bidding procedures, sale notice, bid deadline, auction, and sale order. *DIP Term Sheet*, Ex. B.

(k) **Cross-Collateralization / Roll-Up** (MLBR 4001-2(a)(i)(E)). The DIP Facility consists solely of new-money delayed-draw term loans and does not include any cross-collateralization or roll-up of prepetition debt.

(l) **Prohibited Use of Cash Collateral and DIP Carve-Out** (MLBR 4001-2(a)(i)(L)). The Collateral, including Cash Collateral, and the DIP Carve-Out may not be used: (i) to finance actions adverse to the DIP Lender or Prepetition Secured Creditor, except, subject to the Budget, with respect to seeking and prosecuting a Termination Challenge Hearing; (ii) to make distributions under a plan without consent; (iii) to settle claims above specified thresholds without consent unless otherwise ordered by the Court; or (iv) to object to or challenge the claims, liens, or interests of the DIP Lender or Prepetition Secured Creditor; provided that the foregoing shall not encompass any investigation of the Prepetition Bond Obligations and Prepetition Bond Liens or Challenge thereto conducted by Professional Persons retained by the Committee (if any), subject to an aggregate cost cap of $10,000 unless otherwise agreed by the DIP Lender and Prepetition Secured Creditor. *Interim Order* at ¶ 33. *This provision varies from the requirements of MLBR 4001-2(c).*

(m) **Credit Bidding**. In connection with any Court-authorized sale process, and subject to the priorities and limitations set forth in the Interim Order, each of the DIP Lender and Prepetition Secured Creditor may seek to credit bid some or all of its secured claims for its collateral pursuant to Section 363(k) of the Bankruptcy Code without the need for further Court order; provided that no Credit Bid shall be permitted with respect to Donor Restricted Funds. *Interim Order* at ¶ 13(c).

(n) **Section 506(c), Section 552(b), and Marshaling Waivers** (MLBR 4001-2(a)(i)(C), (V), (W), and (X)). Subject to approval by the Court in the Final Order, no costs or expenses of administration that have been or may be incurred in this Chapter 11 Case shall be charged against the DIP Lender, the Prepetition Secured Creditor, or the Collateral pursuant to Sections 105 or 506(c) of the Bankruptcy Code or otherwise. Subject to approval by the Court in the Final Order, the DIP Lender and Prepetition Secured Creditor shall be entitled to the rights and benefits of Section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) shall not apply with respect to proceeds, products, offspring, or profits of the Collateral. Subject to approval by the Court in the Final Order, neither the DIP Lender nor the Prepetition Secured Creditor shall be subject to the equitable doctrine of marshaling or any similar doctrine with respect to the Collateral. *Interim Order* at ¶¶ 37-39. *These provisions vary from the requirements of MLBR 4001-2(c).*

## THE DEBTOR'S NEED FOR POSTPETITION
## FINANCING AND USE OF CASH COLLATERAL

24.    As stated above, the Debtor seeks authority for the limited use of Cash Collateral, as well as authority to borrow up to $1,000,000 on an interim basis and up to $3,000,000 on a final basis under the DIP Facility. The DIP Facility matures on the earliest to occur of October 31, 2026, fourteen (14) days after entry of an order confirming a plan of reorganization for the Debtor, consummation of a sale of all or substantially all of the Debtor's assets under Section 363 of the Bankruptcy Code, and the Termination Notice Date. Quite simply, without the ability to access at least some portion of the funding available through the DIP Facility on an immediate basis, the Debtor is without the ability to conduct any of the tasks typically imposed upon the closure of an institute of higher education, let alone pay key vendors and preserve the value of the Campus.

25.    Here, the Debtor is a not-for-profit entity seeking to convey substantially all of its assets, all of which constitute "charitable assets," that has for over 80 years operated in the highly regulated, multiple accreditor overseen, local economy driving higher education industry and which, like the multiple failed colleges of recent years, is the subject of such intense public interest that press outlets have reported what they purport to know starting well before the commencement of this Chapter 11 Case. Maximizing the proceeds received from the assets to be monetized here will benefit from both the involvement of the remaining employees and the professional team that the Debtor has sought to engage, particularly to navigate the statutory and regulatory overlay applicable to the Debtor. *See Massachusetts Charitable Mechanic Association v. Beede*, 320 Mass. 601 (1947); *see also* M.G.L. c. 180, § 8A.

26.    To bridge the gap between cash on deposit with the projected cost of supporting the Debtor's operations as debtor-in-possession while the sale process described in the Sale Motion plays out, with Court approval, the Debtor has negotiated the DIP Facility with the DIP Lender, to

provide the Debtor with the working capital necessary to operate during the pendency of this Chapter 11 Case and to fund a court-supervised sale or sales of assets.

27. The funds available through the DIP Facility are also projected to be sufficient to enable the Debtor to pursue sales of its assets "free and clear" of liens, claims, and encumbrances pursuant to Section 363 of the Bankruptcy Code. Maximizing the value of the Debtor's assets, including certain real property subject to (a) an unrecorded right of first refusal, (b) an unrecorded court order restricting such property's alienation, and (c) a filed Notice of Contract, depends on the Debtor's ability to sell these assets free and clear. These assets are less valuable if such a sale cannot be consummated pursuant to a value-maximizing sale process for which access to postpetition financing and Cash Collateral is necessary.

28. At least equally as importantly, however, this Chapter 11 Case will involve more than selling real estate. The Debtor anticipates seeking the Court's authority to sell its nursing program and the assets associated with that program in a transaction currently under negotiation with a regional college. That transaction will require personnel and professionals able to work through the processes required by the Massachusetts Department of Higher Education and both the general regional higher education accreditor (the New England Commission of Higher Education) and the nursing specialty accreditor (the Massachusetts Board of Registration in Nursing). While the monetization efforts are ongoing, the Debtor will also be completing the ongoing tasks of transitioning its records to a successor institution that will take on the responsibility to confirm degree issuance and provide requested transcripts, separately assisting impacted students in their transfer to new schools. The Debtor will also be undertaking to repurpose remaining restricted endowment funds, return collections entrusted to it for use to third

22

parties and either return or monetize certain religious artifacts and art as appropriate and dependent on whether those items are property of the estate or property of another held by the Debtor.

29. The regulatory overlay applicable to this Chapter 11 Case is significant. Unlike most chapter 11 cases where the watchful eyes of the Court and any creditors' committee are the guardrails that the Debtor's actions are guided by, here those eyes are supplemented by a series of government agencies, multiple accreditors and a vigilant press corps. Navigating this environment requires the institutional knowledge of the reduced legacy staff with the assistance of the Debtor's team of advisors to maximize value and transition students and records.

30. The self-evident resulting diminution in the Prepetition Collateral both justifies and colors the authority sought to grant the limited forms of adequate protection to the Prepetition Secured Creditor also outlined below.

31. If there is positive news, it is that the diminution of Cash Collateral will be in a fairly minor amount. There is, after all, a limited amount of Cash Collateral to diminish and no other working capital assets. The better news is that the Appraisal suggests that there is a substantial equity cushion protecting the Prepetition Secured Creditor through its real estate that is part of the Prepetition Collateral that, if monetized as appraised, would generate a substantial return to unsecured creditors.

**THE DEBTOR WAS UNABLE TO PROCURE**
**ADDITIONAL FUNDING ON AN UNSECURED BASIS**

32. As described in the First-Day Declaration, on April 10, 2026, the Massachusetts Department of Higher Education issued a Financial Assessment and Risk Monitoring ("FARM") public notification stating that it could not confirm that the College had sufficient resources to sustain operations through the current and following academic year.

33.    As these issues became public, the College received donations (including from certain anonymous donors) in the aggregate amount of $5.3 million, enabling it to sustain operations through commencement activities in May, 2026.

34.    As the College initiated the wind-down process with regulatory oversight following the decision to close, representatives of the College's development office and the Board of Trustees reached out to past donors and benefactors to either obtain consent to alter or delete restrictions on endowment funds, or solicit additional donor-provided funding to bridge the gaps in the College's liquidity to meet current obligations to students and faculty and other restructuring activities.  In doing so, the College was fortunate to receive certain anonymous donations, including a $5.3 million infusion for operating and other general expenses and a separate $1.5 million restricted endowment donation dedicated to funding accrued obligations to the College's employees for wages and accrued benefits. Efforts to solicit additional restricted or unrestricted funds were unsuccessful.

35.    It was at this point when the Debtor and its professionals determined that given the Debtor's capital structure and rapidly declining liquidity, the only viable option to the Debtor was to obtain additional funding from Citizens Bank, N.A., in its capacity as DIP Lender. Consistent with the Prepetition Secured Creditor's long history as a supportive lending partner to the Debtor, the DIP Lender has agreed to provide the DIP Facility, and the Prepetition Secured Creditor has consented to the priming of its Prepetition Bond Liens by the DIP Liens and to the Debtor's use of Cash Collateral on the terms described below.

## APPLICABLE AUTHORITY

**A.      Approval of the Terms and Structure of the Proposed DIP Facility Is Appropriate.**

36.      Through this Motion, the Debtor seeks authority pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code to access postpetition financing from the DIP Lender under the DIP Facility in the aggregate principal amount of up to $3,000,000, of which up to $1,000,000 shall be available upon entry of the Interim Order, on a senior-secured basis to fund the Debtor's post-petition expenses through the anticipated conclusion of the Sale process, in accordance with the Budget and initially, the terms of the Interim Order, and after a final hearing, the Final Order. In exchange for the commitment to fund the DIP Facility, the Debtor has agreed to provide certain protections to the DIP Lender by, *inter alia*, providing the DIP Lender with an allowed superpriority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code on account of the DIP Obligations, and granting to the DIP Lender automatically perfected security interests in and liens on substantially all of the Debtor's presently owned and after-acquired assets, other than Donor Restricted Funds, as more fully described in the Interim Order (the "DIP Collateral"), junior only to the DIP Carve-Out and the Prepetition Permitted Priority Liens, as set forth in the Interim Order.

(i).      **The Terms of the DIP Facility Comply With Sections 364(c) and 364(d)**.

37.      Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, the presiding court may authorize the debtor to obtain credit or incur debt:

(a) with priority over any and all administrative expenses, as specified in Sections 503(b) or 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the

25

estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

38.     Relatedly, Section 364(d) provides that the court may authorize the debtor to obtain credit secured by a *senior or equal lien on property of the estate that is subject to a lien* if the debtor is unable to otherwise obtain such credit and *the interests of existing lien holders are adequately protected*. 11 U.S.C. § 364(d)(1).

39.     Bankruptcy Code Section 364 was structured with an escalating series of inducements which a debtor in possession may offer to attract credit in the postpetition period. Ultimately, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including superpriority administrative expenses under 11 U.S.C. § 364(c)(1); secured liens on unencumbered property pursuant to 11 U.S.C. § 364(c)(2); junior liens on encumbered property in accordance with 11 U.S.C. § 364(c)(3), or senior or equal liens pursuant to 11 U.S.C. § 364(d).  *See In re Titan Indus., Inc.*, No. BAP MW 00-104, 2001 WL 36381910, at *2 (B.A.P. 1st Cir. June 29, 2001) (citations omitted).

40.     In approving financing under Section 364(d), courts consider whether (i) the debtor made reasonable effort, but failed, to obtain unsecured credit under Sections 364(a) and 364(b) of the Bankruptcy Code, (ii) the credit transaction benefits the debtor as necessary to preserve estate assets, and (iii) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender. *See In re Los Angeles Dodgers LLC,* 457 B.R. 308, 312–13 (Bankr. D. Del. 2011); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990). With regard to the first factor, Section 364 imposes no duty to seek credit from every possible lender; a debtor need only demonstrate "by a good faith effort that credit was not

available without" the protections afforded to potential lenders by Section 364(c). *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1088 (4th Cir. 1986).

41.     Against this statutory backdrop, approval of the DIP Facility and the related claims resulting from the DIP Obligations under Section 364(c) on the terms negotiated and pursuant to Section 364(d) on a senior secured basis is appropriate.

42.     As demonstrated above, the Debtor has been unable to obtain *unsecured* credit allowable under Section 503(b)(1) as an administrative expense, or credit having priority over administrative expenses, or credit secured solely by a lien on unencumbered property, or credit secured solely by a junior lien, on more favorable terms. Given that substantially all of the Debtor's assets are encumbered by the Prepetition Bond Liens, the Debtor and its professionals determined that it would be difficult and expensive to procure financing that would be *subordinate* in priority to that of the Prepetition Secured Creditor. The Debtor is, therefore, unable to obtain financing from sources other than the DIP Lender on terms more favorable than those provided under the DIP Facility. The Debtor also was unable to borrow funds from the DIP Lender without granting the various DIP protections described herein; the proposed superpriority claim on account of the DIP Obligations, however, is appropriate by virtue of Section 364(c)(1).

43.     Approval of the senior-secured position of the DIP Liens is also appropriate under Section 364(d). Access to the DIP Facility is necessary given the Debtor's current financial condition, limited available working capital, and no prospect of additional revenue other than through the DIP Facility. The funding available through the DIP Facility was negotiated on terms that are designed to support the College's postpetition sale and wind-down efforts with the support of its reduced staff and professional team in order to consummate a value-maximizing sale or series of sales. With limited Cash Collateral on deposit, the DIP Facility represents the sole means

available to the Debtor to meet these obligations and preserve estate value for the benefit of all impacted parties in interest.

44.     Overall, the terms and conditions of the DIP Facility are fair and reasonable, and were negotiated by well-represented, independent parties in good faith and at arm's length; the DIP Lender has offered favorable terms to provide the Debtor with critically needed liquidity to preserve the going-concern value of its assets for the benefit of all stakeholders.

45.     The DIP Carve-Out also supports approval of the DIP Facility. By preserving the ability to pay statutory fees and allowed professional fees necessary to administer the Chapter 11 Case, maintain fiduciary oversight, and prosecute the Debtor's value-maximizing sale and wind-down process, the DIP Carve-Out provides an important estate benefit notwithstanding the DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, and Adequate Protection Superpriority Claims.

46.     The structure of the DIP Facility further supports approval. The DIP Facility is limited to new-money delayed-draw term loans, does not include any roll-up or cross-collateralization of prepetition debt, and requires the Debtor to use proceeds only as permitted by the Budget and the DIP Orders. These terms preserve the Debtor's ability to administer the Chapter 11 Case and prosecute the sale process while avoiding more burdensome financing features that are often requested by postpetition lenders in similar circumstances.

47.     For the foregoing reasons, the Debtor further submits that the DIP Lender is entitled to the protections provided by Section 364(e) of the Bankruptcy Code, which protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. 11 U.S.C. § 364(e). *See In re Foreside Mgmt. Co., LLC,* 402 B.R. 446, 451

(B.A.P. 1st Cir. 2009) ("The purpose of [Section 364(e)] is to encourage lenders to extend credit to debtors in bankruptcy by eliminating the risk that any lien securing the loan will be modified on appeal") (citations omitted).

### (ii)     Valid Prepetition Liens Are Adequately Protected.

48.     The Debtor recognizes that it may only obtain postpetition credit secured by a senior or equal lien on property of the estate that is subject to a lien only if the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B).  Section 361 of the Bankruptcy Code sets forth non-exclusive forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. *See In re Ledgemere Land Corp.*, 116 B.R. 338, 342–43 (Bankr. D. Mass. 1990) (adequate protection is a flexible, fact-specific concept evaluated in light of the circumstances of the particular case); *In re Aegean Fare, Inc.*, 34 B.R. 965, 968 (Bankr. D. Mass. 1983); *In re Park W. Hotel Corp.*, 64 B.R. 1013, 1018 (Bankr. D. Mass. 1986); *In re O'Connor,* 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin,* 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. *See In re Park W. Hotel Corp.*, 64 B.R. at 1017–18; *In re Swedeland Dev. Group, Inc.,* 16 F.3d 552, 564 (3d Cir. 1994).

49.     As additional adequate protection on account of the DIP Facility and the use of Cash Collateral, the Debtor seeks authority to grant the Prepetition Secured Creditor, solely to the extent of any actual diminution in value of the Prepetition Secured Creditor's interests in the Prepetition Collateral resulting from the grant of the DIP Liens, the subordination of the Prepetition Bond Liens, the use of Cash Collateral, and the imposition of the automatic stay, (a) replacement

liens (the "Adequate Protection Liens") on the DIP Collateral, subordinate and subject only to the Prepetition Permitted Priority Liens, the DIP Liens and the DIP Carve-Out, (b) an allowed superpriority administrative expense claim (the "Adequate Protection Superpriority Claims"), to the extent the Adequate Protection Liens and other adequate protection do not adequately protect against actual Diminution in Value, junior to the DIP Liens, DIP Superpriority Claim, DIP Carve-Out, Prepetition Permitted Priority Liens, and Adequate Protection Liens, and (c) additional adequate protection in the form of payment of reasonable and documented out-of-pocket costs and expenses and accrual of unpaid interest and fees at the non-default rate as provided in the Prepetition Bond Documents, with such interest paid in kind unless otherwise agreed by the Debtor and the DIP Lender. In assessing the risk of that adequate protection package, it is worth noting that, as of the Petition Date, there is limited Cash Collateral to diminish, and based upon the Appraisal, the Prepetition Secured Creditor enjoys a substantial equity cushion.

50.     In this instance, the holder of the only known *valid and enforceable* lien encumbering the Debtor's real estate – the Prepetition Secured Creditor - has consented to the priming of the Prepetition Bond Liens and the form of adequate protection offered so that the Debtor may access the DIP Facility on the terms negotiated. As a result, the DIP Facility will permit the Debtor to avoid potential costly and protracted litigation with respect to adequate protection of an existing lender's interests and the use of Cash Collateral.

51.     Although other liens and interests were granted (Federal Interest), awarded (Superior Court Injunction) or asserted (Mechanics' Lien), all are either unperfected and, therefore, avoidable (Federal Interest and Superior Court Injunction), or invalid (Mechanics' Lien), and therefore do not stand in the way of the requested grant of a priming lien to the DIP Lender. The same can be said about any previously asserted liens on the Debtor's personalty. The two liens of

record (Siemens and First American) secure claims that have been paid in full and whatever liens were once held were perfected by filed financing statements that have lapsed.

52.     With respect to the Mechanics' Lien in particular, Bowdoin's asserted lien is void as a matter of Massachusetts law and therefore is not an interest cognizable under Section 364(d). Under M.G.L. c. 254, § 2, a contractor must file its notice of contract no later than 90 days after last furnishing labor or materials.  Bowdoin filed its Notice of Contract with the Worcester South Registry of Deeds on May 18, 2026  - well more than 90 days after the last date on which Bowdoin furnished labor or materials at the Campus. The consequence of this noncompliance is unambiguous: the lien is "dissolved" – i.e., extinguished by operation of law.  M.G.L. c. 254, §§ 2, 5, 8.  A mechanics' lien under Massachusetts law is "purely a creation of statute," and courts have "consistently required exact compliance with the statute in order to create, perfect, and enforce such a lien."  *In re Globe Holdings, Inc.*, 366 B.R. 186, 193 (Bankr. N.D. Ala. 2007) (applying Massachusetts law) (quoting *Ng Bros. Constr. v. Cranney*, 436 Mass. 638, 642 (2002)); *see also Mullen Lumber Co. v. Lore*, 404 Mass. 750, 752–53 (1989) (failure to comply with the statute's mandatory requirements "normally results in dissolution of the lien . . . or in failure of the lien to attach"); *Golden v. General Builders Supply LLC*, 441 Mass. 652, 654 (2004) ("The [mechanic's lien] statute is strictly construed against the party claiming the lien."). The Bankruptcy Court for the District of Massachusetts has consistently applied this principle.  In *In re Brown*, the court held that untimely extension notices rendered a mechanics' lien invalid and that the debtor's property was free of the lien as a matter of law. 160 B.R. 401, 403-04 (Bankr. D. Mass. 1993). Similarly, in *In re Simon*, the court found a contractor's mechanics' lien invalid for failure to comply with M.G.L. c. 254, §§ 5 and 8, and treated it as having no priority without requiring a separate avoidance proceeding. 161 B.R. 329, 332-33. (Bankr. D. Mass. 1993).

31

53.     Since the Bowdoin lien is invalid under state law, it is not a lien on "property of the estate that is subject to a lien" within the meaning of Section 364(d), and the Debtor owes no adequate protection to the holder of a nullity. The First Circuit has squarely held that a Massachusetts mechanics' lien that was facially invalid as of a bankruptcy filing is not cognizable in bankruptcy and requires no formal avoidance action. *N.W. Day Supply Co. v. Valenti*, 343 F.2d 756, 756-57 (1st Cir. 1965); *Accord In re AFGO Dev. Co., Inc.*, 625 B.R. 324, 341 (Bankr. S.D. Tex. 2020) (where a purported lien is facially invalid under state law, "there is no lien for the Trustee to avoid" and the trustee need not invoke avoidance powers).  Accordingly, the Court can and should make a threshold determination of invalidity at this hearing and approve the DIP Facility without treating the Bowdoin lien as an impediment to the requested priming relief.

54.     In any event, even if properly filed, the Mechanics' Lien would be appropriately primed by the DIP Lender given the adequate protection available for its interest, which secures a claim of $32,965.96.

55.     "Although not specifically mentioned in [Section] 361, the classic protection for a secured debt justifying continuation of the stay is the existence of an 'equity cushion.'" *In re Jug End in the Berkshires, Inc.,* 46 B.R. 892, 899 (Bankr. D. Mass. 1985). The Appraisal indicates that the Debtor's real property, comprising roughly 261.75 acres, was worth approximately $42.17 million, suggesting that the Prepetition Secured Creditor as well as the holder of other valid liens would be adequately protected by a significant equity cushion even after adding the approximately $3 million envisioned under the DIP Facility to the debt stack both as to any diminution in collateral value arising from granting of the priming lien contemplated by the DIP Facility.  S*ee id*.; *see also In re Gen. Growth Props., Inc.,* 412 B.R. 122, 124 (Bankr. S.D.N.Y. 2009).  While there may be room for disagreement as to the conclusions in the Appraisal, even assuming a

significant discount to the appraised value (indeed, even a $10 million miss) leaves a substantial equity cushion above the aggregate claims of the DIP Lender and the Prepetition Secured Creditor to support the $32,965.96 claim of the Mechanics' Lien holder.

56. Further, the ability of the Debtor to sell its remaining assets "free and clear" of existing liens, claims and encumbrances that is enabled by the DIP Facility also serves to enhance the value realizable from the Debtor's assets. As set forth in the First-Day Declaration, some or all of a parcel of the Debtor's real estate that is subject to the Prepetition Bond Liens is also subject to an unrecorded order of the Worcester Superior Court (Docket No. 2585CV00823), entered on July 24, 2025, restraining and enjoining the College from encumbering, selling, transferring, disposing, conveying, or otherwise modifying or altering the impacted real estate. An alleged unrecorded right of first refusal in that lot is referenced in that litigation. The free and clear authority afforded to the Debtor under Section 363 will serve to enhance the value received through sale of the Debtor's assets by enabling a sale free and clear of the interests asserted and the injunction issued in that litigation, further adequately protecting the interests of all actual and potential secured claimants. *See In re Ralar Distribs., Inc.*, 166 B.R. 3, 6 (Bankr. D. Mass. 1994). Accordingly, under the facts and circumstances of the Chapter 11 Case, the adequate protection available to any other valid lienholders would be both appropriate and sufficient for purposes of Section 364(d).

57. For the foregoing reasons, the requirements of Section 364(d) are satisfied, warranting approval of this Motion.

**B. Entering Into The DIP Facility Is A Sound Exercise of the Debtor's Business Judgment.**

58. In approving terms of debtor-in-possession financing pursuant to Section 364, generally, bankruptcy courts grant a debtor considerable deference when acting in accordance with

33

its business judgment. *See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest").

59.     As previously described, approval of the DIP Facility will provide the Debtor with immediate and ongoing access to borrowing availability to pay its operating expenses, including postpetition wages and benefits, utilities, and other expenses incurred in the ordinary course, as well as to satisfy the costs of administration of this Chapter 11 Case as the Debtor proceeds to consummate a value-maximizing sale of its assets with Court approval – and consent of the Prepetition Secured Creditor.

60.     The ability of the Debtor to fund the administration of this Chapter 11 Case, to preserve and maintain the value of its assets, satisfy wind-down and regulatory obligations, and to maximize a return for all creditors requires the availability of working capital from the DIP Facility. The absence of such liquidity would immediately and irreparably harm the Debtor, its estate, creditors, and the possibility of a successful sale of the Debtor's assets.

61.     The DIP Facility is designed to provide the Debtor with sufficient liquidity to administer the Chapter 11 Case, maintain the remaining operations and assets necessary to support a Court-approved sale process, and avoid a forced liquidation that would impair value to the detriment of all stakeholders. Accordingly, obtaining funding through the DIP Facility is in the best interests of the Debtor's creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtor's sound and reasonable business judgment.

62.     Accordingly, the Debtor submits that the Court should enter the Interim Order, and after the Final Hearing, enter the Final Order.

**C.     The Debtor's Request to Use Cash Collateral on a Consensual Basis Is Appropriate.**

63.     As a corollary, the Debtor also requires authority to use Cash Collateral under Section 363 of the Bankruptcy Code.

64.     Section 363(c)(2) of the Bankruptcy Code sets forth the requirements for a debtor's proposed use of cash collateral. Specifically, Section 363(c)(2) of the Bankruptcy Code provides, in pertinent part:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless -- (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

65.     As an initial matter, the Prepetition Secured Creditor is the only claimant with a perfected interest in Cash Collateral, and it has consented to the relief requested herein, pursuant to the terms of the Interim Order, including the Budget.  In exchange for offering its consent, the Debtor has agreed to provide the Prepetition Secured Creditor a reasonable package of adequate protection for the Prepetition Secured Creditor's interest in the Collateral, including Cash Collateral, as detailed above and in the Interim Order.

66.     The requirements of Section 363(c)(2), therefore, are satisfied, permitting the use of Cash Collateral on the terms of the Interim Order.

**D.     The Debtor's Immediate Use of Cash Collateral and Access to the DIP Facility Should be Approved**

67.     Bankruptcy Rule 4001(b)(2) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after service of such motion, but that a

35

preliminary hearing may be commenced prior to the expiration of such 14-day period, at which the Court may authorize the use of "only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2). Bankruptcy Rule 4001(c)(2) similarly permits interim postpetition financing relief before a final hearing to the extent necessary to avoid immediate and irreparable harm pending the final hearing. Local Bankruptcy Rule 4001-2(b) further provides that interim relief is available to the extent necessary to avoid immediate and irreparable harm pending a final hearing.

68.     The Debtor has an immediate and critical need for access to Cash Collateral and the DIP Facility. Without such access, the Debtor will be unable to meet its postpetition obligations, maintain essential operations, preserve records and assets, satisfy necessary wind-down obligations, or pursue the sale process that is the Debtor's principal means of generating value for creditors. Accordingly, interim relief is necessary to avoid immediate and irreparable harm to the Debtor's estate.

### E.     The Automatic Stay Should be Modified on a Limited Basis

69.     The relief requested herein contemplates a modification of the automatic stay to permit the Debtor to grant the DIP Liens. Specifically, the DIP Facility contemplates modifying the automatic stay so as to (i) permit the creation and perfection of the DIP Liens, and (ii) provide for the automatic termination of such stay to permit the DIP Lender and Prepetition Secured Creditor to enforce their respective rights with respect to the Debtor and the Collateral following the Termination Notice Date, subject to the five (5) day Remedies Notice Period and the right of the Debtor, any Committee, the U.S. Trustee, or any other party in interest to seek an emergency hearing during such period.

70. Stay modifications of this kind are ordinary and standard features for DIP financing, and in the Debtor's business judgment, are reasonable and fair under the present circumstances. *See, e.g.*, *In re Water's Edge Limited Partnership,* No. 24-12445 (Bankr. D. Mass. Feb. 25, 2025); *In re Vantage Travel Service, Inc.,* Case No. 23-11060 (Bankr. D. Mass. Sept. 19, 2023); *In re Community Eco Power, LLC,* No. 21-30234 (Bankr. D. Mass., Sept. 26, 2021); *In re Reed and Barton Corp.*, No. 15-10534 (Bankr. D. Mass. Feb. 19, 2015); *In re Paper Source, Inc.*, No. 21-30660-KLP (Bankr. E.D. Va. Mar. 3, 2021); *In re The NORDAM Group, Inc.*, Case No. 18-11699 (MFW) (Bankr. D. Del. July 25, 2018); *In re Claire's Stores, Inc.*, Case No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018).

### WAIVER OF BANKRUPTCY RULE 6003, 6004(A) AND 6004(H)

71. Because this Motion is being filed within the first 21 days of the Chapter 11 Case, the Debtor must demonstrate that the relief requested is necessary to avoid immediate and irreparable harm. Without immediate access to Cash Collateral and the DIP Facility, the Debtor will be unable to meet payroll for its remaining employees, maintain essential operations, preserve records and assets, satisfy necessary wind-down obligations, or pursue the sale process that is the Debtor's principal means of generating value for creditors. The Debtor therefore submits that the requirements of Bankruptcy Rule 6003 are satisfied. The Debtor also requests waiver of any notice requirement under Bankruptcy Rule 6004(a) and waiver of the 14-day stay under Bankruptcy Rule 6004(h), to the extent applicable, so that the Debtor may immediately implement the relief granted by the Interim Order.

### NOTICE

72. Notice of the Motion will be provided by electronic mail, the Court's ECF system, regular mail, postage prepaid, or overnight delivery to: (a) the Office of the U.S. Trustee; (b) the holders of the 20 largest unsecured claims against the Debtor; (c) counsel to the DIP Lender and

37

the Prepetition Secured Creditor, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: Douglas R. Gooding and Jonathan D. Marshall, c/o dgooding@choate.com; (d) the Internal Revenue Service; (e) the U.S. Department of Education; (f) the Attorney General for the Commonwealth of Massachusetts; (g) the New England Commission of Higher Education; (h) the Massachusetts Department of Higher Education; (i) all holders of record of liens on or interests asserted in the Debtor's assets; (j) those persons who have formally appeared in the Chapter 11 Case and requested service pursuant to Bankruptcy Rule 2002; and (k) any other party entitled to notice pursuant to MLBR 9013-3(a) (the "Notice Parties"), all as identified on the Service List filed with the Certificate of Service.  The Debtor submits that, in light of the nature of the relief requested, no other or further notices need to be given.

## NO PRIOR REQUEST

73.     No previous request for the relief sought herein has been made to the Court or any other court.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the form annexed hereto, (a) authorizing the Debtor to obtain postpetition financing under the DIP Facility, (b) granting the DIP Lender the DIP Liens and the DIP Superpriority Claim, (c) authorizing the Debtor to use Cash Collateral, (d) granting adequate protection to the Prepetition Secured Creditor, (e) modifying the automatic stay, (f) scheduling a final hearing, and (g) granting such other and further relief as may be just and proper.

Dated: June 26, 2026

Respectfully submitted,

/s/ *John J. Monaghan*
John J. Monaghan (MA Bar #546454)
Lynne B. Xerras (MA Bar #632441)
Kathleen St. John (MA Bar #681565)
**HOLLAND & KNIGHT LLP**
10 St. James Avenue
Boston, MA  02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850
E-mail: john.monaghan@hklaw.com
        lynne.xerras@hklaw.com
        kathleen.stjohn@hklaw.com

*Proposed Counsel to the Debtor*