**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

|  |  |
|---|---|
| In re:<br><br><br>THE SISTERS OF ST. ANN<br>d/b/a ANNA MARIA COLLEGE,<br><br><br><br>Debtor.[1] | Chapter 11<br><br>Case No. 26-40758-EDK |

**SUPPLEMENTAL DECLARATION OF DR. SEAN J. RYAN**
**IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION**
**FINANCING, (II) GRANTING CONSENSUAL PRIMING LIENS AND PROVIDING**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO DIP LENDER,**
**(III) AUTHORIZING CONSENSUAL USE OF CASH COLLATERAL,**
**(IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED**
**CREDITOR, (V) MODIFYING THE AUTOMATIC STAY, (VI) SCHEDULING**
**A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

I, Sean J. Ryan, Ed.D., hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of

perjury that the following is true and correct to the best of my knowledge, information and belief:

1.      I am the President of The Sisters of St. Ann d/b/a Anna Maria College (the "Debtor"

or the "College"). I submit this supplemental declaration (this "Supplemental Declaration") in

support of the *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to*

*Obtain Postpetition Financing, (II) Granting Consensual Priming Liens and Providing*

*Superpriority Administrative Expense Status to DIP Lender, (III) Authorizing Consensual Use of*

*Cash Collateral, (IV) Granting Adequate Protection to Prepetition Secured Creditor, (V)*

*Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*

---

[1] The last four digits of the Debtor's taxpayer identification number are 2060. The Debtor's address is 50 Sunset Lane, Paxton, MA 01612.

[Dkt. No. 16] (the "DIP Motion"), filed contemporaneously with the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2.      The statements in this Supplemental Declaration are based upon (i) my personal knowledge and information acquired in my capacity as President of the College; (ii) my review of the Debtor's books, records, governance documents, and financial statements; (iii) communications with members of the Board of Trustees (the "Board"), remaining College personnel, and representatives of the College's development office; (iv) information provided to me by the Debtor's financial advisor, Verdolino & Lowey P.C. ("V&L"), and restructuring counsel, Holland & Knight LLP; (v) discussions and communications concerning Citizens Funding Corp. and Citizens Bank, N.A. (collectively, solely in their respective prepetition capacities, the "Prepetition Secured Creditor") and Citizens Bank, N.A., solely in its capacity as postpetition lender (in such capacity, the "DIP Lender"); (vi) information provided in connection with the engagement of the Debtor's broker, Kelleher & Sadowsky Associates; and (vii) my professional experience, analysis, and understanding of the College's operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein.

3.      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion or my *Declaration of Dr. Sean J. Ryan in Support of Chapter 11 Petition and First Day Pleadings* [Dkt. No. 9] (the "First-Day Declaration").

4.      I submit this Supplemental Declaration to provide additional factual support for the DIP Motion and, in particular, to describe (a) the Debtor's efforts to obtain postpetition financing and the reasons the Debtor was unable to obtain financing on more favorable terms, (b) the development of the Budget and the Debtor's immediate need for the DIP Facility, and (c) the basis

for my belief that the DIP Facility represents the best available financing option under the circumstances.

5.      This Supplemental Declaration provides additional factual support for the Debtor's conclusion that, after reasonable efforts and under the circumstances existing before and as of the Petition Date, the DIP Facility was the best available financing option and that the Debtor did not obtain any financing proposal on terms more favorable than, or otherwise available in lieu of, the DIP Facility.

**The Debtor's Financial Condition and Need for DIP Financing**

6.      As described more fully in the First-Day Declaration and the DIP Motion, the College has ceased academic operations and is in the process of winding down. The Debtor entered chapter 11 with less than $55,000 in unrestricted cash. The Debtor has no expectation of incoming operating funds. Under these circumstances, access to the DIP Facility and the authorized use of cash collateral are essential to maintain critical transition functions, preserve the Campus and other assets, satisfy administrative expenses, and conduct a court-supervised sale process under section 363 of the Bankruptcy Code.

7.      Substantially all of the Debtor's assets are encumbered by the Prepetition Bond Liens securing obligations under the Loan and Security Agreement in favor of the Prepetition Secured Creditor, with outstanding principal of not less than $17,734,804.13 as of the Petition Date. The Debtor holds and is tasked with administering donor-restricted funds that are not subject to the Prepetition Bond Liens and which, by their terms, may not be used for general operating or administrative purposes. The Debtor therefore has extremely limited unencumbered property available to pledge in support of new financing.

3

**Assessment of Financing Needs and Alternatives**

8.      In preparation for the chapter 11 filing, the Debtor and its advisors thoroughly reviewed and analyzed the Debtor's projected wind-down obligations and the costs necessary to administer the estate and preserve value. Those obligations and costs include, among other things: (a) sale-process costs and broker expenses; (b) Campus preservation, maintenance, and security; (c) regulatory compliance obligations, including those arising from the Massachusetts Department of Higher Education's oversight; (d) student-record transition and coordination of educational continuity pathways; (e) efforts to transfer or sell the Nursing Program; (f) administration and disposition of donor-restricted funds and religious artifacts; (g) professional fees for counsel, financial advisors, and the broker; (h) reduced transition-team payroll and benefits; (i) utilities and insurance; and (j) chapter 11 administrative costs, including United States Trustee fees. Based on that analysis, the Debtor and its advisors determined that access to the DIP Facility was necessary to fund these obligations and preserve estate value.

**The Budget**

9.      The Debtor, with the assistance of V&L, prepared a budget (the "Budget") reflecting the Debtor's projected disbursements during the initial period of the Chapter 11 Case. The Budget reflects reasonable, necessary, and foreseeable disbursements that the Debtor expects to incur in administering this case, preserving value, and pursuing the sale process. Projected disbursements include transition-team payroll, utilities, insurance, campus preservation and security, professional fees, regulatory compliance costs, sale-process expenses, student-record transition costs, and related wind-down expenses. The College has no expectation of incoming operating funds to fund these obligations. Based on my review and consultation with V&L, I believe the Budget presents a reasonable estimate of the Debtor's near-term disbursement needs.

**The Debtor's Efforts to Obtain Financing on Better Terms**

10.     In the months leading up to the Petition Date, the Debtor undertook efforts to identify and solicit alternative sources of funding to support the College's obligations and a potential restructuring. Following the April 10, 2026 Financial Assessment, Review, and Monitoring ("FARM") notice from the Massachusetts Department of Higher Education and as the College's financial difficulties became public, the College received donations of approximately $5.3 million from anonymous donors, which sustained operations through the May 2026 commencement. The College also received a separate $1.5 million restricted endowment donation designated for accrued wages, paid time off, and employee benefits.

11.     After initiating wind-down activities under regulatory oversight, the College reached out to past donors and benefactors to seek consent to alter or eliminate restrictions on existing endowment funds or to solicit additional donor funding that could provide liquidity for the Debtor's obligations to students and faculty and for restructuring activities. Those efforts to solicit additional restricted or unrestricted funds beyond the donations already received were unsuccessful. Based on my communications with the College's representatives and advisors, I understand that the College also sought additional lending from past lenders, but those efforts did not result in any financing proposal on terms more favorable than, or otherwise available in lieu of, the DIP Facility.

12.     The Board and the Debtor's professionals also evaluated whether the College could access additional debt refinancing or other capital on commercially reasonable terms from sources other than the Prepetition Secured Creditor. Given the Debtor's capital structure (including that substantially all assets are encumbered by the Prepetition Bond Liens) the Debtor's critically low liquidity, the absence of incoming operating funds, and the College's wind-down posture, the

Board and its advisors concluded that financing from a third-party lender on terms more favorable than those of the DIP Facility was not reasonably available.

13.     Based on the outreach and evaluation described above, including solicitation of past donors and benefactors, outreach to past lenders, and evaluation of refinancing or other capital alternatives, the College did not receive any proposal for financing on terms more favorable than, or otherwise available in lieu of, the DIP Facility. As a factual matter: (a) the College has ceased academic operations and has no incoming operating funds; (b) at the time of the Petition Date, the Debtor's unrestricted cash was critically low (less than $55,000); (c) substantially all of the Debtor's assets are encumbered by the Prepetition Bond Liens, leaving negligible unencumbered assets available for pledging to a new lender; and (d) given those circumstances, no lender approached or identified offered to extend credit on terms more favorable than those of the DIP Facility.

14.     The Roy Litigation was an additional practical consideration in the availability of financing alternatives to the Debtor. In the action captioned *Roy v. The Sisters of St. Ann d/b/a Anna Maria College*, Worcester Superior Court, Case No. 2585CV00823 (the "Roy Litigation"), the Roys asserted an alleged oral right of first refusal with respect to an approximately two-acre portion of Parcel 3 referred to as Lot 2. I understand that, on July 24, 2025, the State Court entered an order that, among other things, purported to restrain or enjoin the College from encumbering, selling, transferring, disposing, conveying, or otherwise modifying the impacted real estate. The order's restriction on encumbering or transferring impacted real estate contributed to uncertainty regarding  the risks associated with soliciting secured funding.[2]

---

[2] As described in greater detail in the DIP Motion, several other parties aside from the Prepetition Secured Creditor and the Roys have also asserted interests with respect to the Debtor's assets. *See* DIP Motion, ¶ 16. One such interest is a mechanics' lien asserted by Bowdoin Construction Corp. ("Bowdoin") on College property known as St. Joseph's Hall located at 50 Sunset Lane, Paxton, Massachusetts. Bowdoin filed its Notice of Contract with the Worcester South

**The DIP Facility Represents the Best Available Option**

15.    In light of the foregoing, the Debtor and its advisors engaged with the Prepetition Secured Creditor and the DIP Lender regarding (a) support for a Court-supervised sale process, (b) the terms on which cash collateral would be made available to fund the case, and (c) the provision of new-money postpetition financing.

16.    The DIP Facility provides for an aggregate principal amount of up to $3,000,000 in new-money delayed-draw term loans, with up to $1,000,000 available on an interim basis. This funding, together with the authorized use of cash collateral, is sufficient to permit the Debtor to retain reduced staff and professionals, maintain essential campus operations, preserve and market assets, address regulatory and student-records obligations, and pursue a court-approved sale process.

17.    I also believe the structure of the DIP Facility is appropriately tailored to the Debtor's circumstances. The facility consists of new-money delayed-draw loans and is limited to amounts needed under the Budget.

18.    Based on the discussions I participated in and observed throughout the negotiations, I believe that the DIP Facility, including the priming liens, superpriority administrative expense status, and adequate protection provided to the Prepetition Secured Creditor: (a) is the product of arm's-length, good-faith negotiations; (b) represents the best available financing option for the Debtor under the circumstances; and (c) is on fair, reasonable, and appropriate terms given the Debtor's financial condition and the absence of viable alternatives. I understand that the DIP Lender required the protections described in the DIP Motion (including consensual priming liens and superpriority claims) as a condition to providing the DIP Facility. Based on my consultation

---

Registry of Deeds on May 18, 2026. The Debtor's records reflect that Bowdoin has not been on site since September 2025.

7

with the Debtor's advisors and in the exercise of my business judgment, I believe that agreeing to those protections was reasonable and necessary under the circumstances in order to obtain financing that would not otherwise have been available to the Debtor.

**Immediate Need for DIP Financing**

19.    Absent access to the DIP Facility and the limited cash collateral available to the Debtor, the estate would be unable to: (a) maintain essential transition functions necessary for a responsible wind-down; (b) preserve the Campus, buildings, records, and other assets pending the sale process; (c) satisfy necessary obligations arising from the wind-down, including student-record transition and regulatory compliance; (d) fund professionals necessary to administer the Chapter 11 Case and pursue value-maximizing transactions; or (e) pursue the Court-supervised sale process that the Board has determined offers the best prospect for maximizing value for creditors and protecting students, donors, and the community. Without immediate access to the relief requested in the DIP Motion, I believe the Debtor's estate and its stakeholders would suffer immediate and irreparable harm.

20.    In the exercise of my business judgment, and based on consultation with the Debtor's professionals, I believe the DIP Facility is necessary and appropriate and that the relief requested in the DIP Motion should be approved by this Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: June 30, 2026            Respectfully submitted,

_____
Sean J. Ryan, Ph.D.
President
The Sisters of St. Ann d/b/a Anna Maria College