## EXHIBIT B

**(Broker Services Agreement)**



## EXCLUSIVE RIGHT TO SELL AGREEMENT

THIS AGREEMENT is made on this 4th day of June 2026 by and between Anna Maria College & the Sisters of Saint Ann (hereinafter referred to as the "Owner") and Kelleher & Sadowsky Associates, Inc., of 120 Front Street, Suite 210, Worcester, Massachusetts 01608 (hereinafter referred to as the "Broker").

PROPERTY ADDRESSES:    50 Sunset Lane, Paxton, Massachusetts (aka 10 Sunset Lane) identified by the Town of Paxton Assessor's Department as MBLU 17-22 being one parcel of land comprised of 123.08 +- acres.

Grove Street, Paxton, Massachusetts identified by the Town of Paxton Assessor's Department as MBLU 17-22-M being one parcel of land comprised of 56.49 +- acres.

Grove Street, Paxton, Massachusetts identified by the Town of Paxton Assessor's Department as MBLU 17-22-Abeing one parcel of land comprised of 72.12 +- acres.

Grove Street, Paxton, Massachusetts identified by the Town of Paxton Assessor's Department as MBLU 17-22-C being one parcel of land comprised of 10.06 +- acres.

Collectively, hereinafter referred to as the "Property", which Property is improved with sixteen (16) +- buildings, that encompass 343,749 +- square feet of living area according to the Town of Paxton Assessor's Department.

1.    Owner hereby employs Broker as its exclusive agent with the exclusive right to sell the Property for the Term of this Agreement. The Term shall commence upon the date hereof and shall continue for a period of twelve (12) months (the "Initial Term"). Thereafter, the Term shall continue automatically on a month-to-month basis until terminated in writing by either party upon thirty (30) days prior written notice to the other, expiring on the 30th day after receipt of said written notice (the "Termination Date") (collectively the "Term").

2.    The Property shall initially be offered by Broker without a formal asking price. Inquiries related to pricing guidance (from brokers, developers, and any other prospective purchasers) will be dealt with on a case by case basis, with the current appraised property value and assessed property value being the basis of the discussion. Broker shall implement a strategic marketing plan that will align with bankruptcy court directive and will follow a systematic approach and "call for offers", which selection will be subject to a counter bid period and subsequent buyer selection.

3.    Broker agrees that it will use commercially reasonable, good faith efforts to sell the Property.

4.    Broker shall develop a marketing program which shall include the following activities:

A. Administer and plan all activities related to the marketing of the Property, subject at all times to the Owner's approval.

B. Conduct a proactive system of following up on all inquiries resulting from mailings, brochures, distributed promotional literature, and telephone calls.

C. Cooperate with other licensed brokers.

D. Coordinate and assist in the preparation of descriptive promotional material.

E. Place signage on the Property to stimulate inquiries, if requested by Owner.

F. List the Property at Kelleher & Sadowsky Associates, Inc, www.kelleher-sadowsky.com; RCM, www.rcm1.com; Co-Star, www.costar.com, Crexi, www.crexi.com, and LoopNet, www.loopnet.com to gain local, regional and national marketing exposure.

5. During the Term of this Agreement, the Owner agrees to:

A. Furnish to Broker copies of all relevant information related to the Property, including income, expenses, equipment leases, site plans, surveys, property reports (appraisal, environmental, etc.), and rent roll, if any.

Broker shall not disclose or share any such information with third parties without Owner's prior written approval and any disclosure or sharing of such information shall be provided with a written statement by Broker that such information is provided without investigation, inquiry, representation or warranty as to the accuracy of such information.

B. Immediately refer to Broker all inquiries and offerings for purchase received by the Owner, regardless of the source or form of such inquiries or offerings.

C. Cooperate with Broker's efforts to show the Property to prospective purchasers.

6. In the event that:

A. during the Term, a sale of the Property, on any terms acceptable to Owner, shall be made, whether procured by the Broker, Owner, or by any other person or entity; or

B. within twelve (12) months after the Termination Date, a sale or agreement to sell the Property, on terms acceptable to Owner, shall be made to a Qualified Purchaser (as defined below), whether procured by Broker, Owner, or any other person or entity, then Owner agrees to pay Broker a sale commission equal to the following:

- In the event the property is sold for $10,000,000, *or less*, the commission payable to Broker shall be equal to five percent (5%) of the "gross" sale price, due upon Closing. In the event the "Listing Brokerage Team" of William D. Kelleher, IV and Drew Higgins are the sole Broker of record related to the transaction, the sale commission shall be reduced to four percent (4%) of the "gross" sale price, payable at Closing.

- In the event the property is sold for $10,000,000, *or more*, the commission payable to Broker shall be equal to four percent (4%) of the "gross" sale price, due upon Closing. In the event the "Listing Brokerage Team" of William D.

Docusign Envelope ID: 54C919F0-5769-8420-8395-82B1AE52735D

Kelleher, Tv and Drew Higgins are the sole Broker-of-record related to the transaction, the sale commission shall be reduced to three percent (3%) of the "gross" sale price, payable at Closing. In no event shall the commission exceed $600,000, which shall be considered the "Commission Cap".

The commission shall be earned, due and payable to Broker in full only if, as and when Owner conveys the Property and the purchase price is paid in full (the "Closing"); provided, however, that the commission shall be payable regardless of when the Closing occurs so long as (i) a contract for such transaction is executed prior to the Termination Date of this Agreement, or (ii) a contract for such transaction is executed with a Qualified Purchaser within twelve (12) months after the Termination Date of this Agreement, provided in all events that the Closing does occur.

The term "Gross Sale Price" shall mean and include: all consideration payable on account of the sale or other transfer of the Property, along with all fixtures and equipment to the extent part of the real property, including, without limitation, a purchase price, a contribution price, assumption or prepayment of debt, ground rent or other form of payment or consideration, without deduction for closing expenses, adjustments or costs of any kind.

As used herein, the term "Qualified Purchaser" shall mean a prospective purchaser already in contact with Owner or Broker who, during the Term, has expressed an interest in purchasing the Property.

The names of each such Qualified Purchaser shall be included on a list generated by Broker and delivered to Owner within fifteen (15) business days after the effective date of termination.

7. If a licensed real estate broker other than Broker is the effective procuring cause of any sale covered by this Agreement (a "Cooperating Broker"), Broker shall at Broker's sole cost and expense compensate Cooperating Broker on terms acceptable to Broker and Cooperating Broker.

8. Owner represents that Owner is not now a party to another listing agreement with another broker with respect to the sale of the Property and that Owner has the legal right to sell the Property. The information provided to the Broker by the Owner is being provided without investigation, inquiry, representation or warranty as to the accuracy of such information.

9. Owner acknowledges that Broker may represent purchasers, and Owner consents to such dual representation provided such representation is disclosed to Owner prior to submission of any Offer to Purchase.

10. Prior to arbitration or litigation, Owner and Broker agree to negotiate in good faith (including mediation, if necessary) in an effort to resolve any dispute that may arise related to this Agreement, or any transaction related to or contemplated by this Agreement.

11. All notices required or permitted to be given hereunder shall be in writing and delivered by hand, emailed or mailed, postage prepaid, by registered or certified mail, addressed to each party as shown on the first page of this Agreement, unless another address shall be designated by written notice given to the other party.

12. This Agreement may not be assigned or transferred by Broker or Owner, without the other's prior written consent. This Agreement shall be binding upon the parties hereto, their respective

successors, agents and assigns. Each party signing this Agreement represents that the person signing has the legal capacity and authority to bind the respective party to this Agreement.

13.     This Agreement is intended to be construed and interpreted as a Massachusetts contract under seal. This contract constitutes the entire agreement between the parties hereto and may not be amended or modified except in writing signed by such parties.

All fees not paid within 30 days of their due date are subject to a 1.5% monthly finance charge and Owner agrees to be responsible for legal fees and cost of recovery for any amount not paid.

By signing below, the Client and Broker acknowledge that they have read and understand the entire Agreement. This is a legally binding document. READ IT CAREFULLY.  If you do not understand the terms of this Agreement, you should consult an attorney BEFORE signing it.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement and affixed their respective seals as of the day and year first written above.

Signed by:

*Sean Ryan*

75656412D179447...

Date:  June 4, 2026

Anna Maria College
By:    Dr. Sean J. Ryan
Its:    President
("Owner")


Date:    June 4, 2026

By: William D.  Kelleher IV
Principal & Managing Partner
Kelleher & Sadowsky Associates, Inc.
("Broker")
Signed Electronically