**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>THE SISTERS OF SAINT ANN<br>d/b/a ANNA MARIA COLLEGE,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 26-40758-EDK |

**SECOND SUPPLEMENTAL MEMORANDUM IN FURTHER SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE LIMITED USE OF ITS CASH MANAGEMENT SYSTEM, (B) OPEN AND USE A NEW DEBTOR-IN-POSSESSION ACCOUNT, (C) MAINTAIN CERTAIN EXISTING BANK ACCOUNTS FOR LIMITED PURPOSES AND CLOSE CERTAIN EXISTING BANK ACCOUNTS, AND (D) CONTINUE USING CERTAIN EXISTING BUSINESS FORMS RELATING TO RESTRICTED ACCOUNTS; (II) GRANTING A LIMITED WAIVER OF SECTION 345(B) REQUIREMENTS; AND (III) GRANTING RELATED RELIEF**

The Sisters of Saint Ann d/b/a Anna Maria College, debtor and debtor in possession in the above-captioned chapter 11 case (the "College" or the "Debtor"), hereby files this *Second Supplemental Memorandum* (the "Memorandum") in further support of and to supplement the arguments made in the pending *Motion for Entry of Interim and Final Orders (i) Authorizing the Debtor to (a) Continue Limited Use of its Cash Management System, (b) Open and Use a New Debtor-in-Possession Account, (c) Maintain Certain Existing Bank Accounts for Limited Purposes and Close Certain Existing Bank Accounts, and (d) Continue Using Certain Existing Business Forms Relating to Restricted Accounts; (ii) Granting a Limited Waiver of Section 345(b) Requirements; and (iii) Granting Related Relief* [Dkt. No. 16] (the "Cash Management Motion")[2]

[1] The last four digits of the Debtor's taxpayer identification number are 2060. The Debtor's address is 50 Sunset Lane, Paxton, MA 01612.

[2] Capitalized terms not defined herein shall have the meanings ascribed in the Cash Management Motion.

filed on June 26, 2026, through which the Debtor requests a limited waiver of the requirements of section 345(b) of the Bankruptcy Code ("Section 345(b)") to the extent applicable, with regard to donor-restricted endowment funds maintained by the College ("Donor Restricted Funds") in three investment accounts in the Debtor's name held at Fidelity Investments ("Fidelity"). Specifically, as directed by the Court at the conclusion of an interim hearing regarding the Cash Management Motion and the U.S. Trustee's Objection thereto [Dkt. No. 37] ("Objection") held on August 13, 2026, the Debtor submits this Memorandum as well as the contemporaneously filed *Declaration of Keith Lowey in Further Support of Motion of the Debtor for Entry of an Order (I) Authorizing Continued Use of Existing Cash Management System, Bank Accounts, and Business Forms, and (II) Granting a Limited Waiver of the Requirements of Section 345(b) of the Bankruptcy Code* (the "Lowey Declaration"), in order to provide additional support for the relief requested through the Cash Management Order in regard to administration of Donor Restricted Funds during the pendency of this chapter 11 case. In further support, the Debtor refers to the previously filed *Memorandum in Further Support of Debtor's Motion for Entry of Interim and Final Orders (i) Authorizing the Debtor to (a) Continue Limited Use of its Cash Management System, (b) Open and Use a New Debtor-in-Possession Account, (c) Maintain Certain Existing Bank Accounts for Limited Purposes and Close Certain Existing Bank Accounts, and (d) Continue Using Certain Existing Business Forms Relating to Restricted Accounts; (ii) Granting a Limited Waiver of Section 345(b) Requirements*; *(iii) Granting Related Relief* [Dkt. No. 145] (the "First Supplemental Memorandum"), and the *Declaration of Dr. Sean J. Ryan in Support of Chapter 11 Petition and First Day Pleadings* [Dkt. No. 9] (the "First-Day Declaration"), and respectfully states as follows:

## BACKGROUND

1. On June 26, 2026 (the "Petition Date"), the Debtor commenced this Chapter 11 Case and continues to administer its affairs as debtor and debtor in possession. As described in the

Cash Management Motion and the First Supplemental Memorandum, in the ordinary course of business, the Debtor maintained a cash management system to collect funds generated by its operations, disburse funds to satisfy financial obligations and operating expenses, and perform forecasting and reporting functions. The Debtor also maintained three investment accounts at Fidelity, established and managed through CW Advisors, LLC ("CW Advisors"), to hold Donor Restricted Funds separately from the Debtor's operating accounts. *Lowey Decl.*, ¶¶ 6-8.

2. On July 2, 2026, the Court entered an order granting the Cash Management Motion on an interim basis [Dkt. No. 48] (the "First Interim Order"), authorizing the Debtor to continue its cash management system on an interim basis and permitting it to maintain the Restricted Accounts at Fidelity pending further order. The First Interim Order also provided that no final waiver of Section 345(b) was granted at that stage.

3. On August 6, 2026, the Debtor filed the First Supplemental Memorandum, which addressed whether Section 345(b) applies to Donor Restricted Funds and, if so, whether cause exists for a limited waiver of Section 345(b)'s requirements. The First Supplemental Memorandum explained that the Restricted Accounts are subject to donor restrictions and the Uniform Prudent Management of Institutional Funds Act ("UPMIFA"), codified at M.G.L. c. 180A, § 1 *et seq.*, and requested authority to maintain the accounts pending charitable repurposing.

4. The U.S. Trustee's Objection contends that the Donor Restricted Funds at Fidelity should be liquidated and transferred to a separate debtor-in-possession account at an approved depository until the Court determines the estate's interest in the funds. *See Objection*, ¶¶ 30-35.

5. At the continued hearing on the Cash Management Motion held on August 13, 2026, the Court directed the Debtor to submit an evidentiary declaration addressing the Donor Restricted Funds, including the nature and value of the accounts, the donor restrictions and

permitted uses, the separation and administration of the funds, the protections and financial stability of the custodian, and oversight of the Massachusetts Attorney General's Office (the "AGO").

6. On August 19, 2026, the Court entered an order granting the Cash Management Motion on a further interim basis [Dkt. No. 168] (the "Second Interim Order"), permitting the Debtor, through September 24, 2026 absent further order, to maintain the Restricted Accounts at Fidelity and use related business forms on an interim basis. The Second Interim Order reserved all parties' rights regarding the section 541 characterization of the funds, required prudent management under UPMIFA, and required reporting of the Restricted Accounts in the Debtor's monthly operating reports.

7. The Lowey Declaration establishes, among other things, that the three Restricted Accounts had an aggregate value of approximately $892,681 as of August 31, 2026; that the Donor Restricted Funds derive from approximately 100 donors and are subject to specific charitable and educational restrictions; that the Restricted Accounts have been separately administered; that Fidelity is a reputable institution not likely to fail and the funds therein are adequately protected against loss in the event of institutional failure; and that the Donor Restricted Funds are subject to AGO reporting and oversight. *See Lowey Decl.* ¶¶ 6, 8, 16, 25-29.

## I. **The Donor-Restricted Accounts Do Not Hold Estate Property.**

8. The Restricted Accounts contain Donor Restricted Funds sourced from donations and endowments that the College accepted subject to donor-imposed restrictions, including scholarships, the Library, lecture series, Ethics Institute activities, multicultural activities, capital improvements, the Molly Bish Center, and education programs. *See Lowey Decl.* ¶¶ 8, 12, 16. Section 541(a) broadly defines property of the estate to include "all legal or equitable interests of

the debtor in property" as of commencement of the case. 11 U.S.C. § 541(a). But that broad language does not give the estate a greater interest than the Debtor held when the petition was filed. Where, as here, the Debtor holds only legal title to property in a fiduciary capacity, section 541(d) limits the estate accordingly.

### A. Section 541's Textual Exclusions of Trust Property from the Scope of Property of the Estate.

9. The Court of Appeals for the First Circuit's decision in *In re Boston Regional Medical Center, Inc.*, 410 F.3d 100 (1st Cir. 2005) firmly established that charitable gifts are "impressed with a kind of quasi-trust, which demands that they be applied to charitable purposes." *Id.* at 108. The Court recognized that a gift to a charitable organization is ordinarily construed as a gift for a charitable purpose, and that the charitable character of such funds does not dissipate merely because the organization enters bankruptcy. *Id.* at 108-10. As demonstrated in the Lowey Declaration and in the First Supplemental Memorandum, the Donor Restricted Funds fall squarely in the Court of Appeals "quasi trust" holding, having been accepted by the College subject to donor-imposed restrictions and held in a fiduciary capacity as a charitable organization under UPMIFA and Massachusetts law. *See Lowey Decl.* ¶¶ 8, 16-18.

10. Two related provisions of the Bankruptcy Code make clear that, as property held in trust, the investments that comprise the Donor Restricted Funds are excluded from the broad scope of property of the estate under Section 541 of the Bankruptcy Code and, therefore, cannot fall within the scope of "money of the estate" as that term is used in Section 345 of the Bankruptcy Code.

11. First, Section 541(c)(2) of the Bankruptcy Code provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title." 11 U.S.C. § 541(c)(2). The United

States Supreme Court has made clear that the statutory provision does more than restrict the uses to which trust-held property may be used, but acts as an exclusion of that property from the otherwise broad sweep of property of the estate. *Patterson v. Shumate*, 504 U.S. 753, 757 (1992) (Section 541(c)(2) provides an "exclusion of property from the debtor's bankruptcy estate.").

12. Second, Section 541(d) recognizes the distinction between legal title and equitable ownership, providing: "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d).

13. To determine the reach of Section 541's property of the estate definition, including the exclusion of trust property from that scope, the United States Supreme Court has established that applicable state law is the polestar. *Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."). Under applicable Massachusetts law, the Donor Restricted Funds constitute an express charitable trust in which the College holds legal title as trustee, but the equitable interest belongs to the charitable beneficiaries designated by the donors, not to the College itself. The maintenance and administration of those funds are governed by UPMIFA, which requires each person responsible for managing and investing an institutional fund to do so "in good faith and with the care that an ordinarily prudent person in a like position would exercise under similar circumstances." M.G.L. c. 180A, § 2(b), and that the endowment

funds "shall be donor-restricted assets until appropriated for expenditure by the institution." M.G.L. c. 180A, § 3.

14. No particular formal words such as "trust" or "trustee" are required to create a charitable trust. In *In re Parkview Hosp.*, 211 B.R. 619, 638–39 (Bankr. N.D. Ohio 1997), the court applied a totality-of-the-evidence standard, including donor records, solicitation practices, and evidence that principal was maintained inviolate, and found clear and convincing evidence of charitable trust creation. 211 B.R. at 635–37. Applying that standard here, the Lowey Declaration shows that the College received funds from approximately 100 external donors subject to specific charitable and educational restrictions, kept them in separate accounts, and accounted for them as restricted in its financial records. These are donor-restricted funds, not quasi-endowments or board-designated assets. *See also In re Roman Catholic Archbishop of Portland in Oregon*, 345 B.R. 686, 699–701 (Bankr. D. Or. 2006).

15. The First Circuit Court of Appeals has established a clear analytical framework for determining when property is excluded from the bankruptcy estate under Section 541(d). In *In re LAN Tamers, Inc.*, 329 F.3d 204 (1st Cir. 2003), the Court held that "property is excluded from an estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers." *Id.* at 207. The Court identified three principal modes of analysis: (i) the role the debtor was intended to play with respect to the property; (ii) the degree and intensity of regulatory or legal control over the property; and (iii) the extent to which recognizing a greater ownership interest in the debtor would thwart the overall purpose of the regulatory or legal scheme. *Id.* at 211-12. The court emphasized that "the estate can only succeed to the same property interest that the debtor possesses, and cannot achieve a greater interest." *Id.* at 213.

16. The First Circuit reaffirmed and extended this framework in *In re Montreal, Maine & Atlantic Railway, Ltd.*, 888 F.3d 1 (1st Cir. 2018), holding that "the principal determinant of whether the debtor has an interest in the property is the degree of control a debtor exercises over the property transferred." *Id.* at 9 (citation omitted). The Court held that where a debtor held funds subject to restrictions that prevented it from putting the funds to any use not authorized by the restricting party, the debtor was "a mere transfer station along the road to payment" and lacked a cognizable property interest. *Id.* at 10 (citation omitted). The law, the Court observed, "'does not authorize a trustee to distribute other people's property among a bankrupt's creditors.'" *Id.* (quoting *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135-36 (1962)). Applying these cases and the factors identified therein, it is clear that the College holds the Donor Restricted Funds in a fiduciary capacity subject to donor-imposed restrictions, not as an owner with unrestricted beneficial interest;

17. As indicated above, this was reinforced by the First Circuit's decision in *In re Boston Regional Medical Center*. After establishing conclusively that restricted endowment funds were the subject of a quasi-trust, the First Circuit applied these principles in the context of a liquidating Chapter 11 debtor-hospital, holding that restricted charitable funds retained their charitable character and could not simply be redirected to satisfy general creditor claims. 410 F.3d at 110. The same principles apply here with even greater force: unlike in *Boston Regional*, the College's Donor Restricted Funds are not testamentary bequests but direct donations received over many years from approximately 100 donors, each with express donor-imposed restrictions on their use.

18. It is well-settled that restricted charitable funds do not become estate property available to pay post-petition operating expenses upon a non-profit's bankruptcy filing. *See In re*

*Parkview Hosp*., 211 B.R. 619, 641 (Bankr. N.D. Ohio 1997) (holding that a debtor held only legal title to restricted funds and no equitable interest, so the funds were not property of the estate); *In re Bishop College*, 151 B.R. 394 (Bankr. N.D. Tex. 1993) (holding that a defunct college's estate had no enforceable property interest in charitable trusts established to support the college's educational mission); *Animal Rescue League of Boston v. Bourne's Assessors*, 310 Mass. 330, 334 (1941) (distinguishing property transferred absolutely to a charitable corporation, which "becomes an asset of the corporation," from property transferred in trust, which "is held by the corporation not as its own but in its capacity as a trustee and as an instrumentality of the settlor or testator in carrying out his directions").

**B. The Obligation to Prudently Manage Donor Restricted Funds is Best Accomplished by Maintaining the Existing Management in the Existing Accounts.**

19. Whatever interest the estate holds, it holds subject to donor restrictions, UPMIFA, and the AGO's oversight authority.

20. As set forth in the First Supplemental Memorandum, it is a basic tenet of Massachusetts charitable trust law that charitable trust funds are inviolable and may not be depleted for purposes other than those envisioned by the donor. *See St. Clair v. Trustees of Boston Univ.*, 25 Mass. App. Ct. 662, 665 (1988); *In re Bishop College*, 151 B.R. 394, 399 (Bankr. N.D. Tex. 1993).

21. Also as described in the First Supplemental Memorandum, the AGO has statutory authority under M.G.L. c. 12, § 8 to enforce the due application of funds given to public charities and has taken the position that donor-restricted funds are not property of the charitable organization's bankruptcy estate available to satisfy debt obligations. *See First Supplemental Memorandum*, ¶¶ 6, 13.

22. As set forth in the First Supplemental Memorandum, UPMIFA Section 3 requires fidelity to donor-imposed restrictions and Section 5 provides that restrictions on endowment funds may be released only with donor consent or by appropriate court order in proceedings to which the AGO is a necessary party. *See First Supplemental Memorandum*, ¶ 12. The Restricted Accounts therefore cannot be spent or diverted from their charitable purposes without the required donor or AGO involvement.

23. UPMIFA Section 4 establishes the obligation to manage restricted funds prudently. Maintaining CW Advisors as investment advisors and the accounts at Fidelity pending that process respects the restrictions and accomplishes the prudent management obligation. *See Lowey Decl.* ¶¶ 17-20. Importantly, maintaining the management of the accounts by CW Advisors and the accounts at Fidelity affords the Debtor and the estate safe harbor protection that would be lost were the endowment funds liquidated, the Debtor put to the task of self-administering the funds and the funds moved to a federally insured national bank.

24. The prudent management obligations imposed by Section 4 of UPMIFA expressly include an option to delegate management to an "agent." If an institution acts in good faith in choosing that agent, establishes scope and terms of the agency that are consistent with the institution's mission, and periodically reviews the agent's performance, "[a]n institution shall not be liable for the decisions or actions of an agent to which the function was delegated." M.G.L. c. 180A § 4(c). The bankruptcy of the College should not interfere with the discretion of the College to delegate management of the Donor Restricted Funds in the manner deemed most appropriate for no less than 22 years, and the estate should not take on the administrative claim risk attendant upon the loss of the UPMIFA safe harbor against liability for investment decisions made by an

agent, here CW Advisors, by taking on post-petition direct endowment prudent management responsibilities.

25. For the foregoing reasons, the Donor Restricted Funds are not property of the estate available for distribution to creditors and instead, must be prudently managed under well-settled Massachusetts law, rendering the Donor Restricted Funds beyond the scope of Section 345(b).

## II. IN THE ALTERNATIVE, CAUSE EXISTS FOR A LIMITED WAIVER OF SECTION 345(B)

26. Even if the Court determines that Section 345(b) applies to the Restricted Accounts, cause exists for a limited waiver under Section 345(b)'s express provision that the requirements apply "unless the court for cause orders otherwise."

27. In *In re Diocese of Buffalo, N.Y.*, 621 B.R. 91 (Bankr. W.D.N.Y. 2020), the court directly addressed the tension between Section 345(b)'s deposit requirements and a nonprofit debtor's obligations under the Prudent Management of Institutional Funds Act, the New York analogue to UPMIFA. The court held that the diocese's duty under 28 U.S.C. § 959(b) to comply with state law investment standards, including the multi-faceted investment approach mandated by the Prudent Management of Institutional Funds Act, constituted "cause" to waive Section 345(b)'s bonding requirements. *Id.* at 93. The court observed that Section 345(b)'s narrow focus on capital preservation "contrasts sharply" with the broader investment considerations required under the Prudent Management of Institutional Funds Act, and that strict compliance with Section 345(b) would force the nonprofit to override "an overall investment strategy having risk and return objectives reasonably suited to the fund and the institution." *Id.* The same analysis applies here: the College has parallel obligations under Massachusetts UPMIFA, M.G.L. c. 180A, and Section 345(b) compliance would similarly compel the Debtor to override its existing prudent investment strategy.

28. As set forth in the First Supplemental Memorandum, Section 345(b) generally requires a bond or deposit of specified government securities for estate funds that are not federally insured or backed by the full faith and credit of the United States, while Section 345(a) directs that estate money be invested to yield the maximum reasonable net return taking safety into account. *See First Supplemental Memorandum*, ¶ 17; 11 U.S.C. §§ 345(a), (b).

29. In *In re Service Merchandise Co., Inc.*, the court held that "cause" is determined under a totality-of-the-circumstances test and identified the following ten factors for determining whether relief from Section 345(b) is appropriate:

(i) Sophistication of debtor's business;
(ii) Size of business operations;
(iii) Amount of investments;
(iv) Bank ratings and financial-institution quality;
(v) Complexity of case;
(vi) Safeguards for fund safety;
(vii) Ability to reorganize if an institution fails;
(viii) Benefit to the debtor;
(ix) Harm to the estate;
(x) Reasonableness of the request.

240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999). As set forth below, each of these factors establishes cause here.

30. *<u>Sophistication of the Debtor's business</u>*. The College is a sophisticated institutional actor: it is a charitable educational institution that maintained professional investment management through CW Advisors since approximately 2004 and engaged Verdolino & Lowey as financial advisor in this case. *See Lowey Decl.* ¶¶ 1, 7, 22-23.

31. *<u>Size of business operations</u>*. While this is not a mega-case, the College operated prepetition as an accredited institution of higher learning with multiple programs and significant

assets. Its financial affairs and the Donor Restricted Funds have been managed through institutional advisors and documented financial systems. *See Lowey Decl.* ¶¶ 1, 6-7, 9-15.

32. *Amount of investments*. The Restricted Accounts held approximately $892,681 as of August 31, 2026, which is material to the charitable purposes for which the funds were donated and warrants preservation rather than unnecessary liquidation. *See Lowey Decl.* ¶ 6.

33. *Bank ratings and financial-institution quality*. As set forth in the Lowey Declaration, Fidelity Investments has $18 trillion in assets under administration, $37.7 billion of revenue during 2025, $12.7 billion of operating income, and serviced 57 million customers; and Fidelity and its clearing, brokerage, and custody services business units are each members of SIPC, the New York Stock Exchange, FINRA, and MSRB, requiring Fidelity to adhere to stringent regulations to safeguard its clients' assets. *See Lowey Decl.* ¶¶ 24-28.

34. *Complexity of case*. This case involves charitable restricted funds subject to UPMIFA, donor restrictions from approximately 100 donors, and a potential repurposing process requiring AGO involvement. The issue is not merely where to deposit unrestricted cash; it concerns property administered for specified charitable purposes and subject to state-law fiduciary constraints. *See Lowey Decl.* ¶¶ 9-16.

35. *Safeguards for fund safety*. The Restricted Accounts are subject to multiple layers of protection, including SIPC coverage of up to $500,000 per customer, including a $250,000 cash sublimit; and excess-SIPC coverage of up to $1.9 million per customer. *See Lowey Decl.* ¶¶ 27-28. SIPC coverage is designed to address the failure of the institution holding customer assets - the same risk underlying the Section 345(b) inquiry. *See Lowey Decl.* ¶ 27. The entirety of the Restricted Accounts is adequately protected against loss in the event of institutional failure. *See Lowey Decl.* ¶ 29.

36. _Ability to reorganize if an institution fails._ A failure of Fidelity is extremely unlikely given the institution's financial strength and regulatory status. Even in that event, SIPC and excess-SIPC protections would protect the Donor Restricted Funds within the applicable limits. *See Lowey Decl.* ¶¶ 25, 27-29.

37. _Benefit to debtor_. Maintaining the accounts at Fidelity preserves the existing investment strategy, avoids unnecessary liquidation costs and potential market losses from forced selling, and maintains compliance with UPMIFA's prudent-investment requirements. *See Lowey Decl.* ¶¶ 7, 20, 24. The Restricted Accounts have generated collective investment gains of no less than $1.2 million over the period of investment, demonstrating that the current investment strategy has served the charitable purposes well.

38. _Harm to estate_. A limited waiver of Section 345(b) with respect to the Donor Restricted Funds will cause no harm to the estate. The Donor Restricted Funds are not available to satisfy creditor claims regardless of where they are held. Liquidating and moving them to an approved depository would serve no estate purpose while potentially violating the Debtor's UPMIFA obligations and disrupting the funds' charitable administration. *See Lowey Decl.* ¶¶ 17-18, 24, 29.

39. _Reasonableness of request_. The request is narrowly tailored: it seeks only to maintain the existing Restricted Accounts pending charitable repurposing with AGO involvement, and the Debtor will report all Restricted Account activity in its Monthly Operating Reports. The Second Interim Order already requires such reporting. *See Lowey Decl.* ¶¶ 20, 24; *Second Interim Order* [Dkt. No. 168].

40. The totality of these circumstances demonstrates cause for a limited waiver of Section 345(b) for the Restricted Accounts. The Restricted Accounts are subject to unusually

strong legal and practical safeguards, and the requested relief preserves restricted charitable assets without impairing the protection of estate funds. *See Lowey Decl.* ¶¶ 24, 29.

41. The court in *In re King Mountain Tobacco Company, Inc.*, 623 B.R. 323, 331-32 (Bankr. E.D. Wash. 2020), further elaborated on this framework, emphasizing that the "cause" inquiry is "a fact- and context-specific assessment of the appropriate result under the totality of the circumstances presented." *Id.* at 332. Notably, the *King Mountain* court observed that the protections of Section 345(b) "have the most utility in a liquidating case where assets are reduced to money which accumulates over extended period of time to fund eventual creditor distributions," while "[t]he utility of the provision diminishes" where the funds serve ongoing purposes. *Id.* at 333-34. Here, the Donor Restricted Funds are not general estate assets awaiting distribution to creditors; they are restricted charitable funds that must be administered in accordance with donor restrictions and UPMIFA regardless of the bankruptcy proceeding.

42. The legislative history of Section 345(b) reinforces this point. *Service Merchandise* quoted Congress' explanation that "[w]hile this requirement is wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors." *In re Service Merchandise Co., Inc.*, 240 B.R. at 896 (quoting H.R. Rep. No. 103-834, at 224 (1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)). As the *King Mountain* court recognized, these concerns are amplified where, as here, the funds at issue are not general estate cash but restricted charitable assets subject to independent fiduciary and regulatory obligations that Section 345(b) was never designed to override.

43. Here, forced liquidation of the Restricted Accounts would serve no protective purpose. It would not create funds available to creditors, but could impose liquidation costs, expose the portfolio to market losses, undermine the College's UPMIFA obligations, and potentially

expose the College and its fiduciaries to liability for breach of fiduciary duty. The requested limited waiver therefore advances, rather than frustrates, the safety and orderly-administration objectives of Section 345. *See Lowey Decl.* ¶¶ 24, 29.

44. The Debtor's requested relief is limited to maintaining the existing Restricted Accounts and related business forms pending an appropriate charitable repurposing process. The Debtor will continue to manage the funds prudently, refrain from withdrawals or transfers except as permitted by applicable law or further order, and report all activity in its Monthly Operating Reports. See Second Interim Order [Dkt. No. 168]; *Lowey Decl.* ¶¶ 20, 24.

45. For these reasons, the Debtor submits that grounds exist to overrule the Objection, and for entry of a final order granting the Cash Management Motion, expressly carving the Restricted Accounts from the Section 345(b) requirements.

WHEREFORE, the Debtor respectfully requests that this Court: (a) enter a Final Order granting the Cash Management Motion on the terms described herein and overruling the Objection; and (b) grant such other relief as the Court may deem just and proper.

Dated: September 3, 2026

Respectfully submitted,

/s/ *Kathleen M. St. John*___________________

John J. Monaghan (MA Bar #546454)
Lynne B. Xerras (MA Bar #632441)
Kathleen St. John (MA Bar #681565)
**HOLLAND & KNIGHT LLP**
10 St. James Avenue
Boston, MA 02116
Telephone: (617) 523-2700
Facsimile: (617) 523-6850
E-mail: john.monaghan@hklaw.com
lynne.xerras@hklaw.com
kathleen.stjohn@hklaw.com

*Counsel to the Debtor/Debtor in Possession*