**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re:<br><br>THE SISTERS OF SAINT ANN<br>d/b/a ANNA MARIA COLLEGE,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 26-40758-EDK |

**DECLARATION OF KEITH LOWEY IN FURTHER SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO (A) CONTINUE LIMITED USE OF ITS CASH MANAGEMENT SYSTEM, (B) OPEN AND USE A NEW DEBTOR-IN-POSSESSION ACCOUNT, (C) MAINTAIN CERTAIN EXISTING BANK ACCOUNTS FOR LIMITED PURPOSES AND CLOSE CERTAIN EXISTING BANK ACCOUNTS, AND (D) CONTINUE USING CERTAIN EXISTING BUSINESS FORMS RELATING TO RESTRICTED ACCOUNTS; (II) GRANTING A LIMITED WAIVER OF SECTION 345(B) REQUIREMENTS; AND (III) GRANTING RELATED RELIEF**

I, Keith Lowey, hereby declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

## I. QUALIFICATIONS AND BACKGROUND

1. I am a principal at Verdolino & Lowey, P.C. ("V&L"), a professional services firm specializing in financial advisory, forensic accounting, and restructuring services. V&L has been retained as the financial advisor to The Sisters of St. Ann d/b/a Anna Maria College (the "Debtor" or the "College") in the above-captioned chapter 11 case (the "Chapter 11 Case"), effective as of June 26, 2026. *See* Dkt. No. 119.

2. I have extensive experience in bankruptcy and restructuring matters, including financial analysis, cash management, and the administration of debtor estates. In my capacity as

[1] The last four digits of the Debtor's taxpayer identification number are 2060. The Debtor's address is 50 Sunset Lane, Paxton, MA 01612.

financial advisor to the Debtor, I am familiar with the Debtor's financial affairs, including its bank accounts, investment accounts, and the restricted endowment funds at issue in this Declaration.

3. I submit this Declaration at the direction of the Court in connection with the Debtor's pending *Motion of the Debtor for Entry of an Order (I) Authorizing Continued Use of Existing Cash Management System, Bank Accounts, and Business Forms, and (II) Granting a Limited Waiver of the Requirements of Section 345(b) of the Bankruptcy Code* [Dkt. No. 16] (the "Cash Management Motion")[2] which is scheduled for a further interim hearing on September 24, 2026 to determine whether the requirements of section 345(b) of the Bankruptcy Code ("Section 345(b)") apply to donor-restricted endowment funds held by the College (defined in the Cash Management Motion as "Donor Restricted Funds"), and if so, whether "cause" exists to grant the Debtor a waiver of those requirements.

4. In addition to my work in this case, I have overseen approximately 7 wind-downs of non-profit institutions of higher education, including Mount Ida College, Green Mountain College, Sterling College, Southern Vermont College, Hampshire College, Northland College and Marlboro College, among others. In the course of those engagements, I have participated in and overseen the disposition of restricted endowment funds. In connection with those efforts, I have interacted extensively with state attorneys general and other state agencies tasked with the regulation and oversight of charitable organizations and charitable assets.

5. In preparing this Declaration, I have reviewed the docket and pleadings filed in this case, including the Schedules of Assets and Liabilities that my firm helped to prepare using information maintained in the Debtor's records, as well as various other documents relating to the

[2] Capitalized terms not defined herein shall have the meanings ascribed in the Cash Management Motion.

Donor Restricted Funds and relief requested in the Cash Management Motion, as will be discussed below.

## II. THE DONOR RESTRICTED FUNDS, GENERALLY.

6. As described in the Cash Management Motion, in addition to the bank accounts used to conduct the day to day business of the College associated with, for instance, collection of tuition costs and payment of operating expenses, as of the Petition Date, the Debtor maintained three investment accounts with Fidelity Investments ("Fidelity"), a leading brokerage firm, to hold and manage Donor Restricted Funds ("Restricted Accounts"). A summary of the Restricted Accounts is as follows:

(a) Account ending in 5130, with a value of approximately $349,199 as of August 31, 2026;

(b) Account ending in 2608, with a value of approximately $452,875 as of August 31, 2026; and

(c) Account ending in 2570, with a value of approximately $90,607 as of August 31, 2026.

7. Based on information provided by the College's endowment investment advisory firm, CW Advisors, I have come to understand that the Donor Restricted Funds have been maintained at Fidelity or its predecessor in interest since as early as March 2004. My review of the records maintained by the College in its ordinary course of business indicates that, since that time, the Restricted Accounts have realized collective investment gains of no less than $1.2 million.

8. It is my understanding based on review of the College's records and information received from the College's remaining staff that the funds held in the Restricted Accounts were donated to the College with donor-imposed restrictions regarding how the donated funds can be

expended by the College, and are not available to pay the College's general financial obligations and expenses.

9. For instance, review of the audited financial statements prepared most recently by Bollus Lynch LLP ("Auditor"), and filed by the College each year in accordance with regulatory mandates applicable to charitable organizations and maintained by the AGO as a public record demonstrates that: in any given fiscal year, the College solicited charitable funds, grants and donations, including through an outside professional solicitor, reported the amount received each year in contributions, gifts, grants, and identified and accounted for donor restricted funds and their use.

10. Those publicly maintained audited financial statements and federal tax filings filed with the Massachusetts Office of the Attorney General ("AGO") have consistently listed the value of donor restricted funds separate and apart from *unrestricted* assets and donations, such as the following, for fiscal year ending June 30, 2024:

| | | | | |
|---|---|---|---|---|
| Total liabilities | 25,410,446 | - | 25,410,446 | 24,106,796 |
| Net assets | | | | |
| Without donor restrictions | 11,611,172 | - | 11,611,172 | 14,947,855 |
| With donor restrictions | - | 4,395,037 | 4,395,037 | 4,445,335 |
| Total net assets | 11,611,172 | 4,395,037 | 16,006,209 | 19,393,190 |

11. The notes to the Debtor's 2024 audited financial statements, filed with the AGO, explain:

> Net assets with donor restrictions - Net assets with donor restrictions are resources that are restricted by a donor for use for a particular purpose or in a particular future period. Some donor-imposed restrictions are temporary in nature, and the restriction will expire when the resources are used in accordance with the donor's instructions or when the stipulated time has passed. Other donor-imposed restrictions are perpetual in nature; the College must continue to use the resources in accordance with the donor's instructions. The College's unspent contributions are included in this class if the donor limited their use, as are its donor restricted endowment funds.

*See,* The Sisters of Saint Ann filings with the AGO, maintained at: https://masscharities.my.site.com/FilingSearch/s/ ("Charities Website").

12. The College's audited financial statements for the fiscal year ended June 30, 2025, indicate that College's purpose-restricted net assets totaled $2,623,993, allocated among the following categories:

- Scholarships and financial aid: $428,068
- Lecture series: $135,451
- Acquisition of property and equipment: $1,150,313
- Ethics Institute activities: $50,125
- Multicultural activities: $47,189
- Library: $77,624
- Education: $2,170
- Molly Bish Center: $6,288
- Other: $726,765.

*See Audited Financial Statements* at 19 (Note 13 - Net Assets with Donor Restrictions).

13. In addition, the College's endowment funds that require Board appropriation before any expenditure may be made included the following, with original gift amounts and fair market values as of June 30, 2025:

- Student scholarships: original gifts of $881,302; value of $1,024,613
- Library support: original gifts of $56,619; value of $77,884
- Lecture series: original gifts of $110,000; value of $234,169
- Ethics Institute: original gifts of $21,113; value of $15,736.

*See Audited Financial Statements* at 19 (Note 13 - Net Assets with Donor Restrictions).

14. In spot-checking the records maintained with the AGO's Charities Website, each Form PC or summary of the Form PC that I reviewed also separately tracked the College's receipt

of Restricted Funds, and uses of the Restricted Funds, such as the following for FYE June 30, 2025:

> DURING THE FISCAL YEAR, NET ASSETS WERE RELEASED FROM DONOR RESTRICTIONS BY INCURRING EXPENSES WHICH SATISFIED THE RESTRICTED PURPOSE OR BY OCCURRENCE OF OTHER EVENTS WHICH WERE SPECIFIED BY THE DONOR.

https://masscharities.my.site.com/FilingSearch/s/detail/a0BRm00000C14kDMAR.

15. Finally, I was able to verify that the Debtor has historically accounted for its assets with donor restrictions separately from its assets without donor restrictions in its annual Form 990s filed with the Internal Revenue Service:

| | | | | | |
|---|---|---|---|---|---|
| Liabiliti | 22 | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . . . . . . . | | 22 | |
| | 23 | Secured mortgages and notes payable to unrelated third parties . . | | 23 | |
| | 24 | Unsecured notes and loans payable to unrelated third parties . . | | 24 | |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | 763,113 | 25 | 184,447 |
| | 26 | **Total liabilities.** Add lines 17 through 25 . . | 24,106,796 | 26 | 25,410,446 |
| Net Assets or Fund Balances | | **Organizations that follow FASB ASC 958, check here ☑ and complete lines 27, 28, 32, and 33.** | | | |
| | 27 | Net assets without donor restrictions . . . . . . . . . . . | 14,947,855 | 27 | 11,611,172 |
| | 28 | Net assets with donor restrictions . . . . . . . . . . . . | 4,445,335 | 28 | 4,395,037 |
| | | **Organizations that do not follow FASB ASC 958, check here ▶ ☐ and complete lines 29 through 33.** | | | |
| | 29 | Capital stock or trust principal, or current funds . . . . . | | 29 | |
| | 30 | Paid-in or capital surplus, or land, building or equipment fund . . . | | 30 | |
| | 31 | Retained earnings, endowment, accumulated income, or other funds | | 31 | |
| | 32 | Total net assets or fund balances . . . . . . . . . . . . . | 19,393,190 | 32 | 16,006,209 |
| | 33 | Total liabilities and net assets/fund balances . . . . . . . . | 43,499,986 | 33 | 41,416,655 |

Form **990** (2023)

*See,* https://apps.irs.gov/pub/epostcard/cor/042002060_202406_990_2025042323374982.pdf. (FYE June 30, 2024).

16. Here, based on my ongoing review of records prepared and maintained in the ordinary course of business of the College I have determined that the funds held in the Restricted Accounts consist of donations received from approximately 100 separate donors, each with donor-imposed restrictions on the use of the donated funds. These funds are expressly required to be used

for specific charitable and educational purposes, including but not limited to scholarships for students formerly enrolled at the College and funding of a lecture series, and based on the restrictions in place, should not be available to satisfy the College's debt.[3]

17. As a result of my experience in winding down non-profit institutions, I have come to understand that donor restrictions on endowment funds must be abided by, that prudent investment standards must continue to be adhered to and that restricted endowment funds are not redeployed absent agreement with the donor as to the repurposing of the funds or entry of a *cy pres* order by a court of competent jurisdiction.

18. Specifically, I understand under Massachusetts law that administration of endowment funds of a charitable organization requires each person responsible for managing and investing endowment funds to do so "in good faith and with the care that an ordinarily prudent person in a like position would exercise under similar circumstances."

19. As to the redeployment of restricted endowment funds upon dissolution of a non-profit entity and, for example, in the Green Mountain College wind-down, agreement with the Vermont Attorney General and entry of an order by the Vermont Probate Court were obtained before any restricted endowment funds were repurposed. In connection with the wind-down of Mount Ida College, extensive negotiations with the Massachusetts Attorney General's Office resulted in an agreement as to the successor charitable purposes to which restricted endowment funds were to be transitioned, and a consented-to cy pres petition was submitted to the Massachusetts Supreme Judicial Court. The Acting Attorney General assented to the petition, and

[3] V&L's analysis of the College's historical financial records is ongoing. V&L has not yet determined whether any restricted funds were in fact used for purposes inconsistent with donor restrictions or whether, alternatively, certain donors may have released or modified the applicable restrictions such that the expenditures in question were permissible. To the extent any restricted funds were used inconsistent with their terms, such use would not alter the restricted character of the remaining funds held in the Restricted Accounts, which continue to be subject to donor-imposed restrictions and UPMIFA.

on January 17, 2023, the Supreme Judicial Court (Cypher, J.) entered judgment approving the modification of the restricted funds under the doctrine of cy pres and equitable deviation and authorizing their transfer to the University of Massachusetts Foundation, Inc., Cape Cod Community College Educational Foundation, Inc., and the Massachusetts Funeral Directors Association, Inc., for the purpose of administering the funds to further their original charitable and educational purposes. *See Mount Ida College v. Dewar*, No. SJ-2023-0021 (Mass. Jan. 17, 2023) (Judgment and Assented-To Motion for Entry of Judgment, true and correct copies of which are attached hereto as Exhibit A). As to the requirements of prudent practice and investment, it is my belief as estate fiduciary that continued separation of the Donor Restricted Funds from estate assets that will be made available to fund the Debtor's general operating expenses is necessary in order to abide by the donor-imposed restrictions pending a determination consistent with the Debtor's statutory and regulatory requirements as to how to repurpose the Donor Restricted Funds in accordance with donor intent or further court order.

## III. <u>ONGOING INVESTMENT STRATEGY.</u>

20. As a result of my involvement with the wind-down of numerous not-for-profit higher educational institutions, I have come to understand that the duty to engage in prudent investment strategies as to restricted endowment funds can be satisfied and adhered to by engaging competent investment advisors and by maintaining the chosen investments with a financially sound investment firm. Prior to my involvement, the College had chosen CW Advisors as the investment advisor for the endowment funds and Fidelity Investments as the account holder for the endowment funds.

21. After substantial due diligence, including, but not limited to, interaction with College President Sean J. Ryan, review of the investment return history relating to the Restricted

Accounts, review of available information regarding CW Advisors as well as of public records relating to Fidelity Investments, I have concluded that it is appropriate to maintain CW Advisors as the College's investment advisor with respect to the endowment funds, retain the Restricted Accounts with Fidelity for the duration of this case, and to continue to implement the investment strategy elected by the College, as well as to assist in the accounting tasks associated with operation in chapter 11.

22. In reaching that conclusion, I have reviewed publicly available information relating to CW Advisors, concluding that CW Advisors is a well-established and reputable investment advisory firm with experience advising charitable organizations regarding investment strategies for charitable assets, including restricted endowment funds. CW Advisors is an SEC-registered investment adviser with approximately $17.5 billion in assets under management. Importantly, representatives at CW Advisors have access to the historical records regarding the Restricted Accounts and are familiar with the College's past investment strategy and selecting another investment advisor given the likely short timeline of this case would be inefficient and inappropriate.

23. In addition, my review has also led me to conclude that CW Advisors' history of engaging in active management of the endowment investment portfolio further supports the conclusion that continued entrustment of endowment investment decisions to CW Advisors is consistent with the obligation to engage in prudent investment strategies as to endowment funds. In the course of my review, I examined the Fidelity monthly statements for calendar year to date 2026. That review indicates that, under CW Advisors' stewardship, the College's endowment has been actively managed and has during that time maintained a conservative yet shifting asset allocation. While the portfolio has historically been and remains primarily invested in U.S.

Treasury Bonds, it has also included substantial holdings in corporate bonds and in blue-chip equities.

24. Based on review of publicly available documents, I have concluded that there is little to no risk of loss on account of the risk of financial failure of Fidelity. Specifically, I have reviewed the Fidelity Investments 2025 Annual Report (the "Fidelity Annual Report"), which Fidelity publishes annually and makes publicly available on its website at fidelity.com, a true and correct copy of which is attached hereto as Exhibit B. The Fidelity Annual Report indicates that Fidelity, as of year-end 2025, had $18 trillion of assets under administration, $7.1 trillion of managed assets and $657 billion of net asset flows. That Fidelity Annual Report also indicates that Fidelity had $37.7 billion of revenue during 2025 and $12.7 billion of operating income, and that during 2025, Fidelity had serviced 57 million customers. *See Fidelity Annual Report* at 1, 4.

25. I have also reviewed an institutional brochure published by Fidelity entitled "Safeguarding Your Clients' Securities" (June 2025) (the "Fidelity Brochure"), which was provided to the College through CW Advisors, a true and correct copy of which is attached hereto as Exhibit C.

26. In the Fidelity Brochure, Fidelity represents that Fidelity and its clearing, brokerage and custody services business units, are each a member of the Securities Investor Protection Corporation or "SIPC", along with the New York Stock Exchange (NYSE), the Financial Industry Regulatory Authority (FINRA), and the Municipal Securities Rulemaking Board (MSRB), requiring Fidelity to adhere to stringent regulations to safeguard its clients' assets, including to maintain a minimum amount of net capital.

27. I have reviewed the publicly available SIPC regulations. As a result of that review, I have come to understand that, as a member institution of SIPC, a nonprofit corporation created

by Congress in 1970 specifically to protect customers of member broker-dealer firms, Fidelity brokerage accounts are protected in the amount of up to $500,000 per customer, including a per account $250,000 cash sublimit. I also reviewed the information on SIPC coverage available on a website maintained by SIPC, which indicates that funds held in a money market account are protected in an amount of up to $500,000 per customer, as follows:

> Money market mutual fund shares held in a customer's account at a brokerage firm qualify as "securities" under the Securities Investor Protection Act (SIPA) and therefore are subject to the $500,000 limit of protection, not the $250,000 limit applicable to cash. It is important to remember that, although many investors treat money market funds like cash, they are securities and, as such, may lose value. In a liquidation proceeding under SIPA, subject to the limits of SIPC protection, SIPC will return money market fund shares to a customer, but will not protect the customer against any decline in the value of those shares.

https://www.sipc.org/. Based on this, therefore, I have determined that it is unlikely that Fidelity will be forced to liquidate prior to administration of the Donor Restricted Funds, and that, if it were, the Debtor would have, at minimum, the ability to recover $500,000 through SIPC.

28. In addition, my review of documents publicly available regarding Fidelity indicates that Fidelity also offers its brokerage customers additional "excess of SIPC" coverage of up to $1.9 million per customer, well in excess of the aggregate balance of the Restricted Accounts.

29. In my opinion, the documents and information that I have reviewed and referenced in this Declaration are documents that are regularly relied upon by fiduciaries of not-for-profit entities in assessing and making decisions regarding the investment and maintenance of restricted endowment funds. Based on the foregoing, and in my experience, I believe the Restricted Accounts are held by a reputable institution that is not likely to fail, and that the funds therein are adequately protected against loss in the event of institutional failure, and that liquidating the existing investments and depositing the proceeds of that liquidation in a federally insured national bank with the returns available at those institutions would be inconsistent with the obligation of prudent investment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on September 3, 2026.

Keith Lowey
Principal, CPA/CIRA
Verdolino & Lowey, P.C.