UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| THE SISTERS OF SAINT ANN,<br>d/b/a ANNA MARIA COLLEGE, | ) | |
| | ) | Chapter 11 |
| Debtor | ) | Case No. 26-40758-EDK |

**ATTORNEY GENERAL'S RESPONSE TO DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (i) AUTHORIZING THE DEBTOR TO (a) CONTINUE LIMITED USE OF ITS CASH MANAGEMENT SYSTEM, (b) OPEN AND USE A NEW DEBTOR IN POSSESSION ACCOUNT, (c) MAINTAIN CERTAIN EXISTING BANK ACCOUNTS FOR LIMITED PURPOSES AND CLOSE CERTAIN EXISTING BANK ACCOUNTS; AND (d) CONTINUE USING CERTAIN EXISTING BUSINESS FORMS RELATING TO RESTRICTED ACCOUNTS; (ii) GRANTING A LIMITED WAIVER OF SECTION 345(b) REQUIREMENTS; AND (iii) GRANTING RELATED RELIEF**

Introduction

Andrea Joy Campbell, as she is the Attorney General of Massachusetts and a party of interest in this proceeding, respectfully submits this response to the Debtor's June 26, 2026 cash management motion (Docket No. 16), and the U.S. Trustee's objection to said motion (Docket No. 37), insofar as the motion asks this Court to preserve the *status quo* with respect to three Fidelity Investment accounts that hold approximately $892,681 in donor-restricted charitable endowment funds.[1] These are funds that approximately 100 donors previously gifted to the

[1] The Attorney General notes that the fiscal year 2025 audited financial statements submitted to the Attorney General by the Debtor include a note that indicates "Due to the use of cash and investments for operations, the College no longer has financial resources in amounts needed to comply with donor restrictions. The shortfall totaled ($2,363,043) as of June 30, 2025." While more information about this is needed, this statement may represent an inappropriate use of donor-restricted funds. Nevertheless, any inappropriate use of donor-restricted funds does not change the restricted nature of the funds themselves.

Debtor with specific restrictions on what the funds could be used for. *See Lowy Decl.*, ¶¶ 6, 8, 16, 25-29. The Debtor accepted the funds subject to the restrictions imposed not by the Debtor, but by the donors; the restrictions mandate that the funds be used for specific purposes including scholarships, the Debtor's library, lecture series, ethics institute activities, multicultural activities, capital improvements, the Molly Bish Center, and education programs. *Id.* at ¶¶ 8, 12, 16. Consistent with state law, the Debtor has segregated the funds from its other accounts because the restrictions on the funds do not include supporting the Debtor's general operating expenses or satisfying its financial obligations.

This response is meant to provide the Court with a guidepost on applicable federal and state law governing the disposition of the Debtor's donor-restricted charitable endowment funds, the Attorney General's oversight authority over charitable assets in the Commonwealth, including the donor-restricted funds in question, and the appropriate application of the funds for similar charitable purposes beyond the purview of the bankruptcy estate. As detailed below, state law governs the Debtor's property interests in the donor-restricted funds at issue and the disposition of the funds. The Debtor does not own these funds but holds them in trust for designated charitable purposes specified by the funds' respective donors. Accordingly, the funds are not part of the bankruptcy estate and cannot be used to pay creditors. An order permitting the Debtor to continue segregating the funds and keeping them in the Fidelity Investment Accounts is appropriate under the circumstances.

## I. The Donor-Restricted Funds Are Not Part Of The Bankruptcy Estate.

1. In a bankruptcy proceeding, the Debtor's property rights are generally determined by state law. *See Butner v. United States*, 440 U.S. 48, 55 (1924) ("[p]roperty interests are created and defined by state law"). The estate has no rights in the assets broader than the rights of

the Debtor. If state law renders a donor-imposed restriction on charitable funds legally enforceable, those restrictions carry over into bankruptcy, and the funds do not become freely available to creditors. *See id.;* 11 U.S.C. § 541(d) (restriction on the transfer of a beneficial interest of the Debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a bankruptcy case); 11 U.S.C. § 541(f) ("property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 … may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case under this title."); *see also Bd. Of Trade of City of Chicago v. Johnson*, 264 U.S. 1, 10 (1994) (where bankruptcy law deals with property rights regulated by state law, the federal bankruptcy courts will follow and analyze in the same manner as the state courts, unless an overriding federal interest required a different result); *In re Schauer*, 62 B.R. 526, 530 (Bankr. D. Minn. 1986) (bankruptcy estate succeeds only to the title and rights in property which the Debtor had before filing for bankruptcy); *In re Bishop Coll.*, 151 B.R. 394, 398 (Bankr. N. D. Texas 1993) (citing 4 *Collier on Bankruptcy* ¶ 541.01 at 541–6 ["To the extent that an interest is limited in the hands of the debtor, it is, therefore, equally limited in the hands of the estate"]); 5 *Norton Bankr. L. & Prac.* 3d § 118:2; 3A *Bankr. Service L. Ed*. § 29:667; *Restatement of the Law, Charitable Nonprofit Orgs*. § 3.05 (2021) (restrictions on use of charitable assets, often enforceable by the state attorney general, further support the charitable trust status and exclusion of the assets from the bankruptcy estate). The bankruptcy trustee thus does not have the authority to take actions with the property that the debtor did not have the right to take under state law prior to bankruptcy and § 541 does not expressly authorize the trustee to collect property contrary to restrictions imposed by state law. *In re Bishop Coll.*, 151 B.R. at 398-99.

2. Under Massachusetts law, the Debtor, a charitable corporation, holds bare legal title to donor-restricted assets, but no equitable interest. The Debtor's property rights are governed by charitable trust law principles, including the principle that a gift to a charitable organization is ordinarily construed as a gift for a charitable purpose. *In re Boston Regional Medical Center,* 410 F.3d at 111; *Wellesley College v. Attorney General*, 313 Mass. 722, 724 (1943) ("Whether the gifts [to a college] were made for some specified purpose of the college, the [college] holds the property in trust to carry out the terms and conditions under which it was given and accepted. Where no conditions were imposed by the donor, then it holds and must apply the property in carrying out the charitable object for which it was incorporated."); *see also Trustees of Andover v. Phillips Academy*, 253 Mass. 272, 272-73 (1925) ("all gifts to an institution …. are, by implication, unless express provision is made to the contrary…that the donor intended that his gift should fall under the general statutes and rules of the institution and be regulated with the rest of its property.").

3. Of particular significance to Massachusetts courts is the intent of the donor of a charitable gift. When a donor restricts a gift to a charity, the charity's use is limited to the particular purpose for which the property was given. A charity that accepts a donor-restricted gift is barred from using the gift in contravention of those restrictions. *See Animal Rescue League of Boston v. Assessors of Bourne*, 310 Mass. 330, 333-34 (1941). This principle, rooted in Massachusetts charitable trust law, provides the non-bankruptcy law foundation that § 541 of the Bankruptcy Code requires for transfer restrictions to be enforceable in a bankruptcy case. *See* 11 U.S.C. § 541.

4. The Attorney General of the Commonwealth has the power to enforce donor restrictions on charitable assets in the Commonwealth. *Secretary of Administration and Finance*

*v. Attorney General*, 367 Mass. 154, 163 (1975) (describing Attorney General's common-law duty to represent the public interest in charitable assets). In this capacity, the Attorney General is charged with overseeing all public charities in the Commonwealth, as well as the disposition of charitable assets, including donor-restricted endowment funds. *See* M.G.L. c. 12, § 8 (Attorney General shall "enforce the due application of funds given or appropriated to public charities within the commonwealth and prevent breaches of trust in the administration thereof."); *see also* *Parker v. May*, 59 Mass. 336, 337 (1850) (a suit by the Attorney General "in the name of the Commonwealth, for establishing and sustaining charitable trusts is … a suit to protect public interests"); *Jackson v. Phillips*, 96 Mass. 539, 579 (1867) (the Attorney General represents the indefinite public in a *parens patriae* role to protect property devoted to charitable uses); *Dillaway v. Burton*, 256 Mass. 568, 573 (1926) ("[I]t is the exclusive function of the Attorney General to correct abuses in the administration of a public charity by the institution of proper proceedings"); *Ames v. Attorney General*, 332 Mass. 246, 250 (1955) ("The duty of taking action to protect public charitable trusts and enforce proper application of their funds rests solely upon the Attorney General as the representative of the public interests").

5. In the exercise of her enforcement authority, the Attorney General has the power to request records from a charity that may shed light on the nature and breadth of any donor-mandated restrictions on a charitable gift. Such records include the gift instrument itself, as well as other documentation that speaks to the donor's intent with respect to the nature of the gift and relevant restrictions on its use and administration. Indeed, it is a basic tenet of charitable trust law that beneficial charitable interests are inalienable, unless the gift instrument otherwise permits its immediate application. *In re Bishop Coll.*, 151 B.R. at 398–99; *St. Clair v. Trustees of Boston University*, 25 Mass. App. Ct. 662, 665 (1988). If, as is the case here, a charity

can no longer use the funds for the particular purpose for which the funds were given, state law requires a state court with equitable jurisdiction to authorize the charity to transfer the funds to another charity that will use the funds for similar purposes pursuant to equitable principles of *cy pres*. *See Rogers v. Attorney General*, 347 Mass. 126 (1964).

6. Federal courts have acknowledged these state law principles in equity: that express and implied trusts can limit the inclusion of certain charitable assets from the estate, especially where donor intent clearly manifests that principal funds are restricted to charitable uses and not available for creditors. *See In re Parkview Hosp*., 211 B.R. 619, 629-641 (Bankr. N.D. Ohio 1997) (excluding hospital's charitable development fund from bankruptcy estate, finding that notwithstanding the absence of a formal trust, the development fund was a charitable trust to which the hospital held only legal title but not an equitable interest because the fund was restricted to further osteopathic medicine); *see also In re Bishop Coll.,* 151 B.R. at 398–99, 401 (concluding that Bankruptcy Code does not expand debtor's pre-bankruptcy rights to dispose of property contrary to the restrictions on the property pre-bankruptcy); *Hobbs v. Board of Education of Northern Baptist Convention*, 253 N.W. 627 (Neb. 1934) (in determining whether a donor-created endowment held by the college for educational purposes was subject to the claims of its creditors or should be preserved for educational purposes, bankruptcy court acknowledged that "[d]onations to the endowment fund of a college, conditioned that the principal sum shall be 'invested and preserved inviolable as endowment for said college,' constitute a charitable trust."); *but see In re Winsted Mem'l Hosp.*, 249 B.R. 588, 595 (Bankr. D. Conn. 2000) (including assets within the estate for debtor to pay creditors consistent with permitted uses prior to bankruptcy, where testator's gift to hospital was for *general purposes* "to be expended both as to

income and principal" and thus within estate only subject to restriction they be applied to debts incurred for hospital's general charitable purposes).

**II. The Debtor Has Demonstrated That The Fidelity Accounts Contain Donor-Restricted Charitable Endowment Funds.**

7. In this case, the Debtor is a charitable corporation and college that operated in the Commonwealth for eighty years prior to its closure in June 2026. In any given fiscal year, the Debtor solicited charitable funds, grants and donations, and worked with a professional solicitor in carrying out its fundraising activities. The Debtor reported the amounts received each year from its fundraising endeavors and accounted for donor-restricted funds in its required annual financial reports filed with (i) the Attorney General of the Commonwealth and (ii) the Internal Revenue Service, as part of its federal tax filings. The Debtor has historically represented that it holds donor-restricted funds in these filings, which are publicly available on the Attorney General's website,[2] as well as the IRS's website through its Tax-Exempt Organization Search Tool.[3]

8. In addition, the Debtor has worked with an investment advisory firm, CW Advisors, LLC, to maintain all of its donor-restricted funds at Fidelity Investments since as early as March 2004. *Lowy Decl.,* p. 3, ¶ 7. The donor-restricted funds are kept separate from the Debtor's other general operating accounts for two reasons: (1) the donors of the funds have mandated that the funds be used for specific purposes; and (2) state law requires that these funds be invested to ensure their growth in accordance with prescribed fiduciary standards. *See* M.G.L. c. 180A.

---

[2] Annual financial filings made with the Attorney General by searching on the following web page: https://mass charities.my.site.com/FilingSearch/s/.
[3] Annual filings made with the IRS may be found on the following web page: https://apps.irs.gov/app/eos/.

9. As a charitable corporation holding donor-restricted funds, the Debtor is subject to the Uniform Prudent Management of Institutional Funds Act, as codified in M.G.L. c. 180A. Under this statute, endowment funds are held exclusively for charitable purposes. These purposes may be for the institution's general charitable purposes or for more specific purposes that fall within the overall charitable purposes of the institution but are expressed by a donor in a gift instrument. Under UPMIFA, endowment funds are invested and cannot be spent by the institution all at once. Only a portion of an endowment fund may be spent throughout the year – most often, some or all of the income earned – in accordance with UPMIFA's rules on prudent expenditures and the institution's internal spending policies. M.G.L. c. 180A, § 2. Finally, the spending restrictions on endowment funds are *donor*-imposed, expressly through a gift instrument, or impliedly, in response to fundraising solicitations.[4]

10. Under UPMIFA, donor restrictions on the use of institutional funds are binding on the institution, and neither the institution nor a court may release or modify such a restriction except with donor consent, or upon demonstrating that the restriction has become unlawful, impracticable, impossible to achieve, or wasteful. *See* M.G.L. c. 180A, § 5. A release or modification shall not allow a fund to be used for a purpose other than a charitable purpose of the institution. *Id.* This statutory framework means that donor-restricted gifts are encumbered by legally enforceable restrictions under Massachusetts non-bankruptcy law — the precise condition that triggers Section 541 of the Bankruptcy Code's trust exclusion.

---

[4] UPMIFA does not apply to board-restricted funds – funds that a charity's governing board restricts and treats as endowment funds, as opposed to a donor. *See* M.G.L. c. 180A, § 3. UPMIFA provides definitions for endowments and distinguishes between donor-restricted and board-designated funds, impacting bankruptcy treatment. Based on the Debtor's audited financial statements, federal tax filings, and its fiscal year end filings with the Attorney General, the funds in the restricted accounts at Fidelity appear to be donor-restricted and therefore, governed by UPMIFA and state law.

11. In this case, putting aside for a moment the gift instruments for the funds, the Debtor has told the IRS and the Attorney General through its filings that it has held donor-restricted endowment funds for more than twenty-two years. During that time, the Debtor's restricted accounts have realized collective investment gains of no less than 1.2M. *See Lowey Aff.*, p. 3, ¶ 7. The Debtor's audited financial statements and federal tax filings detail the value of the donor-restricted funds, separate and apart from unrestricted assets, in accordance with accounting rules governing the reporting of endowment funds; that reporting separates assets into two categories: "net assets with donor restrictions" and "net assets without donor restrictions." *See Financial Accounting Standards Committee, Accounting Standards Update No. 2016-14: Not-For-Profit Entities* (Topic 958), 28 (Fin. Accounting Standards Bd., 2016) (amending Standard 958-205-45-13). The audits and tax filings, together with the Debtor's representations – that it has held donor-restricted assets for many years –warrant keeping these funds segregated from the bankruptcy estate until the Attorney General's Office has had the opportunity to review records documenting the restrictions on the funds – records that it has requested from the Debtor.

In addition to the statutory framework of UPMIFA, there are fundamental state law charitable trust principles that remove donor-restricted charitable endowment funds from the orbit of the Debtor's bankruptcy estate and govern the disposition of the funds. As discussed above in Part I, Debtor does not own these funds outright; instead, it holds them in trust for specified uses mandated by the respective donors of the funds. As such, courts have recognized that true endowments or assets held under express charitable trusts are excluded from the bankruptcy estate under 11 U.S.C. § 541 and applicable state law. *See, e.g., In re Boston Regional Medical Center*, 410 F.3d 100, 111 (1st Cir. 2005) (applying Massachusetts law, First Circuit addressed treatment of charitable bequests to non-profit hospital in bankruptcy,

recognizing that under Massachusetts law, a charitable organization receives and holds such funds subject to the charitable purposes for which they were given); ; *In re Forum Health*, 444 B.R. 848 (Bankr. N.D. Ohio 2011) (citing *Parkview,* court held that restricted funds held by charitable foundations could not be used to pay creditors because restricted funds are not the property of the debtor's estate); *In re Roman Catholic Archbishop of Portland in* Oregon, 345 B.R. 686 (Bankr. D. Oregon 2006) (holding that a perpetual endowment fund listed by the debtor as personal property held for another constituted a restricted charitable trust and was therefore not the property of the bankruptcy estate). ,[5]

13. In this respect, bankruptcy courts look to the nature of the restriction to determine whether it is excluded from the Debtor's estate. Unlike donor-restricted funds, assets that a *charity* has internally designated as endowment funds without donor restriction or segregated trust status can be included in the estate, much like assets gifted to the charity for its general purposes. *See, e.g., Hobbs v. Board of Education*, 253 N.W. 627, 634 (Neb. 1934) ("We think that all these cases [argued by the creditors] are distinguishable from the one under consideration by the fact that the absolute control of the corpus of the estate conveyed was transferred to the grantee, while here, the body of the gifts and contributions were distinctly stated to be for the endowment of the college, the corpus to be kept intact and inviolable…"); *In re Bishop College*, 151 B.R. at 397-98 (rejecting creditors' assertion that "the general charitable purpose of the trust has not failed, because the settlors' general intent can be met by making the trust resources available to the estate for the payment of creditors.")

14. UPMIFA itself distinguishes between donor-restricted and *board*-designated funds, impacting bankruptcy treatment. Courts consistently reject the notion that all charitable

[5] Courts consistently reject the notion that *all* charitable assets are excluded via a *constructive* trust theory, since such exclusion would impede creditor protections and financial operations of debtor charities.

assets are excluded via a constructive trust theory, since such exclusion would impede creditor protections and financial operations of debtor charities. Instead, inclusion or exclusion hinges on identifiable donor restrictions and enforceable trust terms, with restricted endowment assets protected from creditors, while unrestricted or board-designated assets typically are accessible to the estate. *See Hobbs*, 253 N.W. at 640 (rejecting idea that charity could "set aside a portion of its general assets, call it an endowment fund and thus create a charitable trust."); *But see In re Roman Catholic Archbishop of Portland in Oregon*, 345 B.R. at 706 (holding that property of debtor's bankruptcy estate includes debtor's beneficial interest in income from charitable fund, subject to whatever restrictions on use of that income are enforceable under nonbankruptcy law: "Thus, if income is distributed to debtor, subject to conditions on the use of the income in accordance with the provisions of the Declaration of Trust, and those conditions are enforceable under nonbankruptcy law, the estate takes that income subject to the conditions on use.").15.

Here, we know from the Debtor's audited financial statements and federal tax filings that the funds in the Fidelity accounts are donor – not board – restricted. It is, therefore, appropriate for this Court to order the Debtor to continue segregating the Fidelity funds from the bankruptcy estate. The Debtor states that it received the donor-restricted funds from approximately 100 donors who contributed the gifts as part of the Debtor's fundraising activities for certain specific charitable uses – i.e., scholarships, capital improvements, the ethics center, etc. To the extent that the records show that the binding restrictions on the funds resulted from particular actions taken by the charity itself in soliciting gifts, as the Bankruptcy Court explained in *In re Parkview Hospital*,

> When a non-profit organization seeks donations for a charitable purpose, an understanding can be found between the donors and the non-profit corporation that the donations are to be used for the charitable purpose. The issue is whether such an understanding manifests an intent to legally bind the non-profit

> corporation to so use the funds or was simply a hopeful desire or suggestion for the ultimate use. Were the donations simply solicited for a charitable purpose, this Court would probably conclude that the intention was precatory and not mandatory. That is, a charitable trust would not exist. However, when the fund is being held out as being "restricted," and that only the income generated from the principle could be used for this purpose, this shows that the intent was mandatory." 211 B.R. at 634.

This is exactly what we have here. Even assuming that the Debtor failed to keep more detailed accounting records and other documents memorializing the activities of the funds, as the Debtor did in *In re Parkview Hospital,* the record before this Court thus far – plus the audited financial statements filed with the Attorney General and federal tax filings filed with the IRS – supports a finding that the funds were restricted by donors for particular charitable uses.

**III. To the Extent That The Debtor's Endowment Funds Are Restricted For Specific Charitable Purposes, State Law Governs the Disposition of the Funds.**

16. Donor-imposed restrictions can be modified or released in state court only by procedures consistent with trust or statutory law, such as under equitable principles of the *cy pres* doctrine or UPMIFA, in both cases subject to the oversight authority of the Attorney General. *See, e.g., Briggs v. Merchants National Bank of Boston*, 323 Mass. 261, 274-75 (1948) ("Equity will not permit charitable gifts to fail where a donor's restriction has become impracticable; rather, [i]t will presume that the donor would attach so much more importance to the object of the gift than to the mechanism by which he intended to accomplish it that he would prefer to alter the mechanism to the extent necessary to save the object."); *see also In re Bishop College*, 151 B.R. at 397 ("Ameritrust recognizes that this Court is not the appropriate forum to reform the trusts pursuant to the *cy pres* doctrine. In the event the Court determines that the Trusts are not the property of the estate, Ameritrust intends to petition the [state probate court] to reform the Trusts to establish a minority student scholarship fund at Midwestern State University…").

Indeed, the Attorney General regularly takes action in state court to see that the charitable intent of donors is protected, including by participating as a necessary party to requests for *cy pres* modification and transfers of restricted assets to other appropriate charitable recipients.

Where, as here, the closure of the college has rendered it impossible to carry out the precise terms of the donor-restricted funds, modification and transfer of the funds under the *cy pres* doctrine is appropriate. For past college closures in Massachusetts, the Attorney General's Office has provided guidance and oversight as to how such donor-restricted funds may be transferred or modified to appropriate recipients under Massachusetts charities law and participates in a petition to the Supreme Judicial Court to authorizes the transfer and modification of the donor-restricted charitable funds. *See, e.g., Becker College v. Andrea Joy Campbell, as she is the Attorney General of the Commonwealth of Massachusetts*, SJ-2025-0001; *Mount Ida College v. Elizabeth N. Dewar, as she is the Acting Attorney General of the Commonwealth of Massachusetts, University Of Massachusetts Foundation, Inc., Cape Cod Community College Educational Foundation, Inc., And Massachusetts Funeral Directors Association, Inc.,* SJ-2023-0021.

**Conclusion**

For all of the foregoing reasons, the law supports donor-restricted charitable funds being shielded from inclusion in bankruptcy estates to preserve their dedicated public benefit mission. *See Restatement of the Law, Charitable Nonprofit Orgs.*, § 4.03 (2021). Accordingly, this Court should issue an order directing the Debtor to continue segregating all of its donor-restricted assets from the bankruptcy estate until such time as the Attorney General's Office is able to determine what the nature of the restrictions are under state law.

Respectfully Submitted,

ANDREA JOY CAMPBELL
Attorney General, Massachusetts

By her Attorneys:

*/s/ Argie Kosmetatos Shapiro*
Argie Kosmetatos Shapiro
Jonathan C. Green
Assistant Attorneys General
Non-Profit Organizations/Public Charities Division
One Ashburton Place
Boston, MA 02108
argie.kosmetatos@mass.gov
jonathan.green@mass.gov

Dated: September 17, 2026